```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     United States of America,

 4                          Plaintiff,

 5     -v-                                    Case No. 22-20519

 6     Cortez Blake, D1,
       Karamoh Turner, D2,
 7     Semaj Ayers, D3,
       Maijah Greene, D4,
 8     Shatonnia Kimbrough, D5,
       Armond Williams, D6,
 9     Nasir Lewis, D7,

10                          Defendants.
       _____/
11
                            MOTION HEARING
12                         August 25, 2023

13          BEFORE THE HONORABLE LAURIE J. MICHELSON
                  United States District Judge
14
            Theodore Levin United States District Courthouse
15                  231 West Lafayette Boulevard
                        Detroit, Michigan
16
       APPEARANCES:
17
       FOR THE GOVERNMENT:    JEANINE BRUNSON
18                            DAVID PATRICK COWEN
                              United States Attorney's Office
19                            211 West Fort Street, Suite 2001
                              Detroit, Michigan  48226
20

21     FOR THE DEFENDANT      DAVID I. LEE
       CORTEZ BLAKE, D1:      615 Griswold, Suite 722
22                            Detroit, Michigan  48226

23     APPEARANCES CONTINUED TO FOLLOWING PAGE

24          To Obtain a Certified Transcript Contact:
             Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                   www.transcriptorders.com
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE DEFENDANT      JAMES W. AMBERG
      K. TURNER, D2:         Amberg and Amberg
 3                           32121 Woodward Avenue, Suite 305
                             Royal Oak, Michigan  48073
 4

 5    FOR THE DEFENDANT      SAMUEL J. CHURIKIAN
      SEMAJ AYERS, D3:       500 Griswold Street, Suite 2340
 6                           Detroit, Michigan  48226

 7

 8    FOR THE DEFENDANT      RANDALL C. ROBERTS
      MAIJAH GREENE, D4:     120 North Fourth Avenue
 9                           Ann Arbor, Michigan  48104

10

11    FOR THE DEFENDANT      JUDITH S. GRACEY
      S. KIMBROUGH, D5:      The Gracey Law Firm
12                           2200 Beechmont Street
                             Keego Harbor, Michigan  48320
13

14    FOR THE DEFENDANT      BEN M. GONEK
      A. WILLIAMS, D6:       Gonek & Belcher Law, P.C.
15                           14290 Northline Road
                             Southgate, Michigan  48195
16

17    FOR THE DEFENDANT      GERALD J. GLEESON, II
      NASIR LEWIS, D7:       Miller Canfield Paddock & Stone, PLC
18                           840 W. Long Lake Road, Suite 200
                             Troy, Michigan  48098
19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2       **MATTER**                                                      **PAGE**

3       STATUS CONFERENCE AND MOTION HEARING

4         Summary by the Court...................................     5

5       STATUS UPDATES
          For the Government by  Mr. Cowen......................     8
6         For the Government by  Ms. Brunson....................    16
          For Defendant Turner, D2, by  Mr. Amberg..............    17
7         For Defendant Blake, D1, by  Mr. Lee..................    21
          For Defendant Ayers, D3, by  Mr. Churikian............    22
8         For Defendant Greene, D4, by  Mr. Roberts.............    22
          For Defendant Kimbrough, D5, by  Ms. Gracey...........    24
9         For Defendant Williams, D6, by  Mr. Gonek.............    27
          For Defendant Lewis, D7, by Mr. Gleeson...............    27
10        Review by the Court...................................    30
          Discussion Re: Severance..............................    33
11        Discussion Re: Speedy Trial...........................    38
          Discussion Re: Setting Trial and Other Dates..........    39
12        Findings by the Court as to Speedy Trial..............    40

13      MOTION TO WITHDRAW
          Argument by  Mr. Lee .................................    43
14        Argument by Defendant Blake...........................    45
          Ruling by the Court...................................    50

15

16      CERTIFICATE OF COURT REPORTER.........................    54

17

18

19

20

21

22

23

24

25

1  Detroit, Michigan

2  August 25, 2023

3  10:10 a.m.

4                          *      *      *

5          THE CLERK:  The United States District Court for

6  the Eastern District of Michigan is now in session, the

7  Honorable Laurie J. Michelson presiding.

8          You may be seated.

9          The Court calls Case Number 22-20519, the

10  United States of America versus Cortez Blake, Karamoh Turner,

11  Semaj Ayers, Maijah Greene, Shatonnia Kimbrough, Armond

12  Williams, and Nasir Lewis.

13          Counsel, please state your appearances for the record.

14          MR. COWEN:  Good morning, your Honor.  David Cowen

15  and Jeanine Brunson on behalf of the United States.

16          THE COURT:  Good morning.

17          MR. LEE:  Good morning, your Honor.  David Lee,

18  appearing on behalf of Cortez Blake, who, for the record,

19  is present and sitting behind me here at counsel table.

20          THE COURT:  All right.  Thank you.  Good morning.

21          MR. AMBERG:  Good morning, your Honor.  Good to see

22  you.  Jim Amberg on behalf of Mr. Turner, D-2, and he is also

23  sitting as well.

24          THE COURT:  All right.  Good morning.

25          MR. CHURIKIAN:  Good morning, your Honor.  Samuel

 1    Churikian, appearing on behalf of Mr. Semaj Ayers, who is
 2    before the Court.
 3              THE COURT:  Yes.  Good morning.
 4              MR. GONEK:  Good morning, your Honor.  Ben Gonek,
 5    appearing on behalf of Armond Williams.
 6              THE COURT:  Thank you, Mr. Gonek.
 7              And Mr. Roberts?
 8              MR. ROBERTS:  Good morning, your Honor.  My name is
 9    Randall Roberts, for the record.  I represent Maijah Greene
10    who has joined us in the courtroom behind me.
11              THE COURT:  Okay.  Thank you.
12              Ms. Gracey?
13              MS. GRACEY:  Good morning.  For the record, Judith
14    Gracey on behalf of Ms. Kimbrough, who is sitting to my left.
15              THE COURT:  All right.
16              And Mr. Gleeson?
17              MR. GLEESON:  Good morning, your Honor.  Gerald
18    Gleeson on behalf Mr. Nasir Louis, who is behind me in the
19    orange.  Thank you.
20              THE COURT:  Okay.  Thank you.  Good morning, counsel.
21    Good morning to all of the defendants.
22              I want to first thank the marshals for allowing all
23    of us to meet together.  We met previously at the end of June
24    and we had to meet separately.
25              We have seven defendants who are charged in a

1    kidnapping conspiracy.  One of the defendants was only

2    recently added in a superseding indictment in April.

3          While the underlying allegations here involve conduct

4    that took place over, really, several hours, maybe up to a

5    day, it also appears to involve extensive discovery; a lot of

6    phones and the like have been evaluated and those materials

7    produced to the defendants.

8          At the last conference we focused on the status of

9    the discovery production, the time needed by the defense

10   counsel and the defendants to review the extensive discovery,

11   and preliminary discussions about a realistic trial date.  I

12   set this follow-up conference to get a progress report on the

13   status of the discovery and to set a realistic trial date.

14         I entered an order on the parties' stipulation to

15   adjourn the trial and made the -- I made a number of findings,

16   including, as I mentioned, we had one defendant added late

17   in the case who wasn't arraigned until June.  We had one

18   defendant who requested and was granted a new lawyer.

19         And we had the situation where the United States

20   has produced three rounds of discovery.  They said the

21   parties need additional time to further produce and review

22   discovery, review the relevant facts, renew any mitigating

23   facts, effectively engage in plea negotiations, and determine

24   whether a negotiated resolution is possible.

25         And I recognize here that I may have to balance some

1    potentially competing Sixth Amendment rights.  The defendants

2    have a right to a speedy trial.  They also have a right to the

3    effective assistance of counsel.  And right now, that appears

4    to be creating some tension amongst some of the defendants,

5    some defendants who are insisting on their speedy trial rights

6    and have expressed an intention to not extend the dates, and

7    their lawyers who have expressed that they are not prepared

8    to try the case.

9          And I don't know if anybody is thinking through the

10   possible outcome of that tension is what we're starting to

11   see, which is requests for new counsel.  And if defendants are

12   going to get new counsel, and that new counsel has to start

13   over and review the discovery from scratch, that's obviously

14   going to have an impact on the trial date.

15         But I'm going to address those things later, because

16   I think what's creating the conflict is the lack of a realistic

17   trial date.  And we're going to set a realistic trial date

18   today, and then I will address with some of the defendants and

19   their counsel whether that can resolve some of the issues that

20   they are having.

21         I'll also advise the defendants that in this district

22   we don't have what is called hybrid representation, meaning if

23   you're represented by counsel, you can't represent yourself.

24   And so you shouldn't be submitting to me legal documents or

25   docketing legal documents.  Those should come from your counsel

```
 1    if you're represented by counsel, and right now all of you are
 2    represented by counsel.
 3            So with that, let me start with the government.  And
 4    if you could please give me a status report as to where you
 5    are with the production of the discovery.  And then I do want
 6    to have a discussion about why there is so much discovery here
 7    or how much of the discovery that's been produced -- I may
 8    have raised this before -- is actually relevant in light of
 9    my understanding of the underlying allegations here.
10            MR. COWEN:  Thank you, your Honor.
11            So first of all, since our last hearing what we did
12    is we did a side-by-side comparison, because this was brought
13    up about how much of the carjacking case discovery has been
14    handed over to the defendants in this case, because as this
15    Court knows, the separate carjacking case was basically a
16    predicate mode that the government alleges for the lead-up to
17    this kidnapping.
18            And so, by and large, the defendants in this case
19    have all the discovery that the defendants in the carjacking
20    have.  So there's obviously some discovery, Jencks, things
21    like that, that have not been handed out, but we have done
22    that comparison.  And so the carjacking discovery is
23    essentially being -- has been produced to the defendants
24    in this case as well as part of previous productions.
25            In addition, after the last hearing what the
```

1    government has done and is still doing is going back and

2    basically creating an entire list of what has not gone out

3    and flagging those items that could -- starting soon could

4    immediately go out for Production Number 4; almost, for lack

5    of a better term, a clean-up production of things that either

6    were not handed out or should now be handed out.

7          And then as part of that fourth round of production

8    the government is recognizing what's going on in this case,

9    kind of the number of defendants.  We are doing a hard look

10   at discovery that would be more traditionally categorized as

11   Jencks and we're starting to -- we intend to include that

12   in this forthcoming fourth production to help facilitate

13   evaluation of where the case stands as far as facilitating

14   whether this case has an opportunity to be resolved or just

15   help gear up for trial.

16         We still intend to hold back on some traditional

17   Jencks, but we hope releasing some of those witness statements

18   and reports will just help delay [sic] any eventual trial

19   leading up to it and things of that nature.  But as far as --

20         THE COURT:  And how many witness statements and

21   reports are we talking about?

22         MR. COWEN:  Not a substantial amount.  Like, in

23   particular, focusing on the victim, who at this point it's

24   no surprise who she is, and so I think her statements in

25   particular are relevant to start handing out.

Motion Hearing - August 25, 2023                              10

 1              There are some additional potential witnesses whose

 2     identity is not known, who we're a little bit more cautious

 3     about until we have that firm trial setting to evaluate, in

 4     particular, the risk that these witnesses could have and just

 5     the offer of proof that they might have.

 6              THE COURT:  And how many -- when you say potential

 7     witnesses, about how many are we talking about?

 8              MR. COWEN:  Well, when we -- when Ms. Brunson and

 9     I yesterday were talking about a potential trial, we --

10     our initial estimate was a total number of witnesses in the

11     10 to 15 range, including lay witnesses, law enforcement, and

12     a possible minimal number of experts, subject to any trial

13     stipulations or motions in limine that the Court rules on.

14              THE COURT:  Okay.  But certainly not anything overly

15     time consuming for the defendants to review witness statements?

16              MR. COWEN:  No.  No.  So with those statements there

17     could be recordings of the statement as well.  So there might

18     be a written report and then an audio recording.  You know,

19     a two-page report might carry a 45-minute recording or

20     something of that nature.

21              But I don't -- I wouldn't certainly say this is a new

22     wave of discovery.  I still maintain our position from last

23     time that through the first three productions, that's the

24     substantial bulk of discovery in this case.

25              THE COURT:  And remind me, that is primarily the

1    contents of the defendants' cellphones and other people's

2    cellphones?

3         MR. COWEN:  Correct.  Some of that will be subject to

4    the Court's protective order because they involve juveniles or

5    uncharged individuals who it's impossible to redact the social

6    media on it, so we'd just as soon to hand it over subject to

7    the protective orders that defense counsel can have a complete

8    review of it, but that's the large -- whether in terms of,

9    like, gigabyte or page number, that's the size component

10   versus, as I said, a number of pages, a report, summarizing

11   an interview.

12        THE COURT:  Right.  Because it's the entirety of the

13   phone?

14        MR. COWEN:  There's phones and then social media

15   accounts.  And so sometimes the phone contains the social

16   media as well, but yes.

17        THE COURT:  Okay.  Phones and social media accounts.

18        And fair that the focus here is the day of the

19   incident and then probably some period of time before the

20   incident and some period of time after the incident?

21        MR. COWEN:  Correct.  Even for the search warrants

22   that allowed us to get the access to this material, the range

23   is only leading up to the carjacking, the few days before and

24   then a few days after.  So we're talking about a time frame of

25   November 12 through maybe, like, the 17th.  I forget the exact

 1     range in most of these search warrants, but that would be the

 2     material that was permitted to be searched and disclosed.

 3             THE COURT:  Say that again.  So when you make your

 4     production to the defendants, is it focused and limited to

 5     that time frame or are they getting the entirety of each

 6     other's cellphones and social media accounts?

 7             MR. COWEN:  So social media, I believe, is more

 8     restrictive; like, if you ask for a date range, they can give

 9     you that date range.  But if you execute a search warrant on

10     the phone dump and get the entire Cellebrite, the warrant

11     allows you to review the timeline authorized by the Court, but

12     you don't just extract that minimum.

13             So if you dump a phone and have a Cellebrite, you

14     have the entire device, typically.  But the warrant would

15     allow you to look within the parameters.  So as it relates

16     to phones, they are going to be getting a larger amount of

17     material, but with the designated focus of the events leading

18     up to and immediately after the kidnapping.

19             THE COURT:  Does it get produced that way to them or

20     do they just get the full dump of the cellphone?

21             MR. COWEN:  You would get the whole cellphone dump,

22     the Cellebrite copy of the phone.

23             THE COURT:  Okay.  They get all of that.  And then

24     does the government have -- I don't -- a separate discovery

25     set that is focused on this November 12 to 17 time frame?

1   MR. COWEN:  I'm not sure I understand the separate --

2   the question.

3   THE COURT:  Well, basically, can a production be made

4   that focuses on the November 12 to 17 time frame so that the

5   defendants don't need to take all of this time?  You know, so

6   that Mr. Ayers, for example, doesn't have to go through the

7   entirety of Mr. Turner's cellphone that might have a million

8   pages of irrelevant material and 15 pages of relevant material.

9   MR. COWEN:  So what the government can do, and what

10  defense can also do, is within the Cellebrite program that you

11  pull up on your computer you can run reports.  So you can say,

12  give me every text message conversation from November 12

13  through November 17.  And you can say, give me every photo

14  from November 12 through November 17.

15  So you can create these individualized reports,

16  certainly, within that time frame, but we're not in the

17  position to sanitize, you know, in-house, certainly, and just

18  say here's your -- here's your relevant phone data from this

19  period, because defense counsel might also want to review some

20  of those dates outside the scope of our focus.

21  THE COURT:  Oh, sure.  Sure, sure.  And they have

22  that.  They have that and they can do that.  I just wondered

23  if there is a separate, broken down -- not that they would

24  only get that broken down, because I understand.  That is the

25  dilemma, now, that we deal with in all of these big cases.

1        You get the phones, you get the computer, and then

2    the defendants get a terabyte of discovery of which the vast

3    majority is not relevant.  And this case is a good example.

4        I mean, this case involves a few hours of activity,

5    and so I'm just trying to see how we can make this more

6    efficient.  But maybe this Cellebrite is what the defendants

7    are already doing.

8        All right.  Keep going, Mr. Cowen.  I didn't mean to

9    cut you off there.  I mean, I did, but I'll let you go on.

10        MR. COWEN:  No, Judge, I think along with any

11    additional follow-up questions, that's kind of the status.

12    We hope to accomplish, as this fourth production, the cleaning

13    up of any material that was previously intentionally withheld

14    or overlooked, and then taking a fine look at some of the

15    witness statements, Jencks, to turn over.

16        And then I suppose there would be that final, more

17    traditional discovery leading up to the trial of remaining

18    Jencks for witnesses that we're confident are actually going

19    to testify.

20        And then we're still investigating, obviously, so

21    if something pops up we're mindful of our ongoing discovery

22    duties.  But I think that's -- after this fourth global

23    production, I realize Mr. Gleeson kind of got one all at once

24    because he got on with Mr. Lewis, but for the majority of the

25    defendants, this fourth production, all defendants, as we call

1    it, we hope to inclusively be in a very good spot.

2          In a short period of time Ms. Brunson and I are

3    starting a trial on September 18, so we certainly want to have

4    that material reviewed and sent out before that trial date,

5    because then we're going to be tied up for the rest of

6    September.

7          THE COURT:  Okay.  And just for the defendants for

8    whom this is new, when you're talking about Jencks, Mr. Cowen

9    is talking about witness statements that you all would have a

10   chance to review.

11         So before I hear from the defendants, what's the

12   government's sense of a realistic trial date here?

13         MR. COWEN:  Judge, when -- in speaking with counsel

14   and even some of the defense counsel as well, I'll let them

15   speak for themselves, my gut instinct told me a realistic

16   trial date would be in the February, early March setting,

17   depending on the Court's calendar.

18         I know that's not ideal, but we're approaching

19   the one-year mark in November in this case for the first

20   six defendants.  Ms. Brunson and I, as I said, have a trial

21   starting in front of Judge Drain on September 18.

22         I also have a trial starting with Judge Berg on

23   November 30th.  And then approaching the holidays and other

24   people's trial schedules, I think realistically if we set a

25   motion deadline early in the first of the year followed by

1    some pretrial conferences with a firm trial setting.

2         As far as the length of the trial, Judge, I would ask,

3    does this Court do full days, Monday through Friday, half days?

4         THE COURT:  I typically do half days, 8:30 to 1:30.

5         MR. COWEN:  So our initial estimate, Ms. Brunson and

6    I, in speaking yesterday, would be to reserve a two-week block

7    for trial.  It could -- the half days are hard to predict

8    sometimes, especially with, for instance, the victim in this

9    case being cross examined seven times.  That in and of itself

10   would take a lot of half days, and so I think our two-week

11   estimate was probably more based on full-length days or at

12   least some full-length days.  And so that --

13        THE COURT:  Yeah.  And we could do some full-length

14   days.

15        MR. COWEN:  So some of those witnesses, it might

16   just make more sense, if it pleases the Court, to knock out

17   longer days, and even if it required a break on a Friday

18   or something.  But that two- to three-week trial window, I

19   think, is realistic given our estimate right now of 10 to

20   15 potential witnesses.

21        THE COURT:  Okay.  All right.  Thank you, Mr. Cowen.

22        MS. BRUNSON:  Your Honor, before you move on to

23   defense counsel, just so that you're familiar with our trial

24   schedule, yes, Mr. Cowen and I do a number of cases together.

25   The trial that he is speaking of that he has in November is

1    something separate and apart from a trial that I have that

2    begins on November 28 before Judge Murphy, and that's a double

3    carjacking that will probably last two and a half weeks.

4              THE COURT:  Okay.  Thank you.

5              MS. BRUNSON:  Thank you.

6              THE COURT:  All right.  So let me hear from the

7    defendants.  And why don't we start with the status of the

8    discovery, if there are any issues that any of the defense

9    counsel want to raise with respect to that issue before we

10   move to the trial date.

11             So anything about the discovery that anybody wants

12   to talk about?

13             No?  Okay.

14             All right.  Then how about with respect to the issue

15   of a realistic trial date?

16             And understanding that we're going to have a lot of

17   people to accommodate here, the government has suggested

18   February/March time frame.  And maybe one way I can try to

19   make this easier is we could start this on March 5 as a

20   potential.

21             I see --

22             MR. AMBERG:  Sorry, your Honor.

23             THE COURT:  What is the issue with March?

24             MR. AMBERG:  Your Honor, Jim Amberg on behalf of

25   Mr. Turner, Defendant 2.

```
 1              I was recently appointed on the case, just about
 2    six or seven weeks ago.  I have had a chance to go through a
 3    lot of the discovery, talk to my client a number of times.
 4    We're getting geared up for this case for trial.
 5              I have other trials that are set that are, in my
 6    opinion, set in stone.  I have a trial on January 16 with
 7    Judge Leitman in a multi-defendant fraud and tax fraud case
 8    that's been set for quite a while.
 9              But the big question is going to be, we have been
10    basically granted a severance motion between these counts, so
11    that trial may not take as long.  I don't know -- Judge
12    Leitman just tried another version of that trial.
13              THE COURT:  Yes, I'm very familiar.
14              MR. AMBERG:  So I'm sure you probably saw --
15              THE COURT:  There were also a lot of adjournments.
16              But okay.  The earliest I was going to give you is to
17    put you on a trailing docket for January 10, because I have
18    another criminal case that is -- they say they are going to
19    go, but in case it didn't, that -- but that's not going to
20    work if you have got January 16.
21              MR. AMBERG:  And the second thing --
22              THE COURT:  Yeah.  Because that doesn't impact March.
23              MR. AMBERG:  So March 4 is when I start -- I'm in
24    Group 2 of the Vice Lords, and we are scheduled to start
25    on March 4, and I anticipate that trial will probably take
```

1    six weeks.  So I'm thinking, could I -- would it even be

2    possible to squeeze this thing in between whatever happens

3    with the Triad Angelo case.  I don't know if that would even

4    be possible.  I wouldn't want to be in a position and I'm

5    calling the Court up at the last second going, "Hey, Judge,

6    I'm across the hall, we're still in trial."  So I don't know,

7    if possible --

8              THE COURT:  So what were you expecting for a trial

9    date here?

10             MR. AMBERG:  Like I said, I'm -- I'm just in the

11   case, so I was thinking after the Vice Lords was over in

12   April.

13             THE COURT:  So when you agreed to take this case,

14   did you notify them of your trial schedule?

15             MR. AMBERG:  Yeah.  I mean, look, Judge, I could

16   do -- I could do that if we did it maybe, like, the first

17   week of February.

18             I would like to know from Judge Leitman, though,

19   because I don't know -- you know, the thing is, the difference

20   between this case and that case is, you know, the dates have

21   sort of been moved around in that case and we do have this --

22   like, we just had a status conference where the timing of --

23   you know, now instead of one trial we have a tax trial and

24   then a fraud trial; right?

25             So what Judge Leitman does with that, I'm not sure.

1    I do know that Judge Leitman's other trial was much shorter

2    than what it was portrayed to be, and I anticipate the fraud

3    portion of that case is going to be very short as well,

4    because it's much smaller than the tax portion of it.

5            So for me, if the Court gave me like a week or two to

6    determine what's going to happen with Judge Leitman, because

7    we have already sent around a stip order to sever, I would

8    have a much better idea.  Two weeks --

9            THE COURT:  I don't know.  I think he is out of the

10   country, so I'm not sure if you're going to have that answer.

11           Let me hear from the other defendants, then we will

12   circle back here.

13           MR. AMBERG:  Yes, your Honor.

14           THE COURT:  And maybe I should just tell you, I came

15   in here thinking, at least, I would tell you I could put you

16   on a trailing docket for January 10, but that would only be if

17   the other case doesn't go.

18           After that, we could really try it any time in March

19   or April.  And my preference would have been to start -- we

20   can't -- we don't pick juries on Friday or Monday, which is

21   why these are Tuesdays, so we would start March 5 or we

22   would start April 2.

23           Mr. Amberg, who has got the Vice Lords trial?

24           MR. AMBERG:  Judge Grey, your Honor.  And that --

25   I'm curious to see whenever -- when Judge Leitman gets back

1    in town, I'm curious to see what they would do about that,

2    because, I mean, the January date, if my other trial goes,

3    then it's perfect.  But I have to see what the Court wants

4    to do there.

5            Here's the problem, your Honor, is these dates, they

6    come up and then all of a sudden something happens and then

7    they push a trial date to a different time and it's -- you

8    know, it's a -- I just feel like I'm a flight controller

9    sometimes, putting this all together to do them.

10           But I have talked to my client about that.  He

11   understands that I'm newer to the case.  We are in preparation

12   for trial mode here.  These -- this does take some time.

13   There's a lot of discovery in this case.

14           And so Mr. Turner doesn't have any problem with this

15   trial going on a little bit later.  I can't speak for anybody

16   else in the case.  I can only speak for him and I, but --

17           THE COURT:  Right.  Well, that's the issue.  We have

18   got six other defendants I need to hear from.

19           MR. AMBERG:  I understand.

20           THE COURT:  So all right.  Let's go in order.

21           Mr. Lee?

22           MR. LEE:  Yes, your Honor.  Good morning.

23           I would be fine, if I'm going to be in the case, and

24   I guess we will talk about that later, but I would be fine

25   right now with March or April.

1          I start a very large narcotics case in front of Judge

2     Edmunds at the beginning of January, and unlike Mr. Amberg, I

3     don't know if I can do all that as quickly.  I mean, I would

4     need a little while to decompress and then get ready for this

5     one.  And the trial in front of Judge Edmunds could go a month

6     or two.

7          Thank you, Judge.

8          THE COURT:  Mr. Churikian?

9          MR. CHURIKIAN:  Yes, Judge.  Let me note that I have

10    got a state practice as well and I have got a homicide trial

11    and assault with intent to murder trial between now and the

12    middle of March.  So I'm going to ask the Court to consider

13    that April 2 trial date and make it firm.  That would be fine.

14    But that would work for me, Judge.

15         THE COURT:  Okay.  Mr. Roberts?

16         MR. ROBERTS:  Your Honor, may I ask a question?

17         THE COURT:  Yes.

18         MR. ROBERTS:  Is it the Court's intention to try all

19    seven of these defendants together?

20         THE COURT:  Yes.

21         MR. ROBERTS:  And the reason that I'm asking that

22    question is because I also have one of the Vice Lords.  Mine

23    is in Group 7 for trial.  So it's not the conflict of the

24    time, but in that case the marshals have advised and we're

25    planning around their suggestion that they only bring four

1    in-custody defendants to trial at the same time because of

2    their staffing.  And I thought I'd bring that up to your

3    attention at this point, because it --

4        (Discussion held off the record at 10:38 a.m.)

5            MR. ROBERTS:  So that was -- and then the other

6    question I had, if I -- if the Court could ask of the

7    prosecution here, what is the volume of Production 4?  Because

8    we're getting -- in other cases, we're getting two terabytes

9    worth of stuff when the social media and the telephones are

10   included.

11           THE COURT:  Right.  And I -- that's why I started

12   with this.

13           MR. ROBERTS:  Sure.

14           THE COURT:  And they tell me that there are ways that

15   you all can hone in here on what's relevant.  And so these

16   dates I'm giving you are going to be sufficient time from how

17   much time you have already had to deal with the discovery.

18           I mean, I'm fine to ask Mr. Cowen, how voluminous is

19   Production 4?

20           MR. ROBERTS:  Thank you, your Honor.

21           MR. COWEN:  Judge, I don't know the exact gigabyte

22   take on it, but it's significantly smaller than Production 3,

23   I would imagine, which was the bulk of the hard drive

24   requirements.  A lot of Production 4 would be reports,

25   possibly some recordings, a few social media accounts that

```
 1   weren't turned over.  There possibly could be a phone or two.
 2            And then a lot of it would be -- for instance, we had
 3   a lot of pictures from when the defendants would have been
 4   arrested on those dates, which isn't really relevant to this
 5   trial, but we're cleaning up that aspect.
 6            And so without being able to know the size of the
 7   bytes involved electronically, that's what we're looking at
 8   as far as, I believe, much smaller than the amount of data
 9   in Production 3.
10            THE COURT:  All right.
11            MR. ROBERTS:  Thanks for asking.
12            THE COURT:  Okay.
13            MR. ROBERTS:  Your Honor, but the only other comment
14   that I would make, and I am duty bound to say it, is that my
15   client is saying March and April is too long.  Fair enough?
16            MS. GREENE:  No, straight up.
17            THE COURT:  Okay.  And Ms. Gracey.
18            MS. GRACEY:  Your Honor, I too have a partial
19   practice of state work as well.  I have three murder trials
20   that are set between now and January of next year.
21            In hearing what the government has indicated, what
22   the Court has indicated as far as its availability, as well
23   as the other co-defendants, I was prepared today to indicate,
24   based on that information and the fact that the Court is going
25   to try all of the defendants together, to say that the --
```

1            THE COURT:  Well, nobody has asked me not to.

2            MS. GRACEY:  Okay.

3            THE COURT:  I don't have any severance motions.

4    I don't have -- so right now my plan is to try everyone

5    together.

6            MR. AMBERG:  May I chime in on that, your Honor?

7            THE COURT:  No.

8            MS. GRACEY:  And with that being said, Judge, based

9    on the information the Court gave this morning, that the

10   March or the April date would be -- in terms of efficiency

11   and my availability as well would be acceptable.

12           However, my client has always, from the beginning,

13   indicated -- and without divulging any attorney-client

14   privileged information -- that the expectation of when the

15   trial would happen has been an unrealistic expectation based

16   on the amount of discovery, et cetera, and the complexity

17   and the number of defendants in this case.

18           So it's my understanding that a March or April date

19   would not be acceptable and she feels that it's too long.

20           More importantly, throughout this case, I have not

21   had any issues as far as representation of my client; however,

22   this Court knows through the filing, the ECF filings, that a

23   lot of the co-defendants in this case have, what would appear,

24   to have had some type of discussions with each other with the

25   same, similar filings, et cetera, and the fact of asking the

1    Court for new counsel.

2            In speaking with my client this morning in detention,

3    she indicated that she too now is going to ask the Court

4    for other appointed counsel.  That is completely -- it was

5    unbeknownst to me until approximately 9:40 this morning that

6    I was told.

7            So nothing has been filed, but that -- and I don't

8    know the reason why.  She has received all of the discovery.

9    I have had numerous, countless meetings with her.

10           But just to let the Court know that perhaps I might

11   not be on the case much longer either.

12           THE COURT:  Okay.  Well, for some of you, I think you

13   should plan to continue to be.  If motions for new counsel are

14   going to be solely because they don't like the fact that it's

15   not going to be tried as quickly as they might like, I don't

16   know that I'm going to find that's an irreconcilable breakdown

17   in the attorney-client relationship.

18           And as I said at the outset, it isn't going to solve

19   this problem.  If I'm going to be in a position of appointing

20   new lawyers, who are then going to tell me they have to start

21   from scratch and review all of this material starting in

22   September or October, then I recognize even these trial dates

23   are not going to be realistic.

24           But I'm going to take it one step at a time, and I'm

25   going to set a trial date.  And if that happens, I'll have

1    to -- I'll have to deal with it.

2          So let me hear from Mr. Gonek.

3          MR. GONEK:  Your Honor, I just want to make sure

4    I'm answering your question directly.

5          You're asking each defendant's lawyer what their

6    trial availability is?

7          THE COURT:  Well, if these dates work.  And I

8    recognize from hearing from all of you, it doesn't appear that

9    putting you on the trailing docket for January is going to be

10   realistic.  So I had dates for March 5 or April 2.  We may be

11   able to look and see if there is a space we can put you in in

12   February.

13         MR. GONEK:  Judge, in terms of my schedule I would

14   be available for the January trail docket.  I would be

15   available -- and I didn't have a conflict with the March

16   or April date, of course.  In February, my February is kind

17   of jammed up with two homicide trials.

18         THE COURT:  All right.  And Mr. Gleeson?

19         MR. GLEESON:  Your Honor, I have a delivery of a

20   controlled substance causing death with Judge Drain at the

21   end of January.  I believe that would be the only trial in

22   the window that the Court is examining right now.

23         I have discussed trial strategy with Mr. Lewis and I

24   think we're agreeable to a date that the Court sets.  We're

25   not seeking a speedy trial at this time.  I do foresee --

1    maybe not by me, but I do foresee a motion to sever being
2    filed by some or all based on this window that the Court is
3    discussing of relevant evidence.  That window also might be
4    the window of the conspiracy.  And if the government is
5    seeking to introduce statements outside the conspiracy, there
6    may be some questions about whether that should be admissible
7    against some or all of the defendants.
8         Likewise, I think some defendants may also seek to
9    file Fourth Amendment challenges to the way in which the
10   government acquired all of this evidence at the beginning,
11   through search warrants for felon in possession, and it
12   suddenly gathers a whole bunch of other evidence.  And so
13   the breadth of the search warrants in this case may be subject
14   to some litigation as well.  And certainly if the Court ruled
15   in the defendants' favor, that would eliminate some of the
16   incriminating evidence that the government feels it would want
17   to use at trial.
18        So there's certainly reasons to delay to file those
19   motions that would benefit all of the defendants, I think.  A
20   motion to sever also may benefit all of the defendants.  An
21   Enright hearing, although the Court, I recognize, has
22   generally preferred to do that at trial, again, might be
23   beneficial to all of the defendants.
24        I certainly am mindful of the co-defendants'
25   interests in a speedy trial, but in speaking with Mr. Lewis,

1     we understand the benefit to all of the defendants of having

2     an opportunity to litigate those motions and have the Court

3     consider the Fourth and Sixth Amendment issues that are going

4     to be raised.

5         Likewise, my view of the world is, the real evidence

6     in this case is the Jencks material.  Never been a big fan of

7     the Jencks Act, especially when we kind of know what it is,

8     we just haven't seen it, because we're smart enough to realize

9     what it is.

10        And so being able to have the time to timely acquire

11     that, fairly review it, and be able to meet the challenge at

12     trial, I think, is something that all of the attorneys are

13     considering as well.

14        I have not spoken to the marshals about how many

15     defendants.  That's usually, I guess, I think a thing for the

16     Court to do.  But my understanding is there are some concerns

17     about how many defendants can be in a courtroom at one time

18     for a jury trial.

19        But I think being able to do that substantive motion

20     practice -- and I'm speaking to all of the defendants right

21     now -- would be in everybody's best interests.

22        But I can be -- absent Judge Drain's trial -- I

23     apologize for talking too much -- but I think certainly that

24     the February, March, April window, we will be prepared to try

25     the case if that's what Mr. Lewis desires at that time.

1          THE COURT:  Okay.  Thank you.

2          And just -- I'm sure you all have discussed this with

3    your clients, and I addressed this a little bit at the last

4    status conference, this notion of a speedy trial.  And I don't

5    want there to be the "but."  It's not, "They want a speedy

6    trial, but."

7          There are a lot of things that have to be considered

8    and evaluated in determining what is a speedy trial.  And

9    the Sixth Circuit has recently given a pretty good, succinct

10   explanation.  And if it helps the defendants, under the Speedy

11   Trial Act a defendant who enters a not guilty plea is entitled

12   to a trial within 70 days from the filing of the indictment

13   against him or her or from the date of his or her first court

14   appearance, whichever comes later.  18 United States Code

15   Section 3161(c)(1).

16         The Act's 70-day limitation, however, comes with

17   several caveats.  To start, in a case where multiple

18   defendants are charged together and no severance has been

19   granted, one Speedy Trial clock governs.  And what that means

20   is that the excludable delay of one defendant is also excluded

21   for his or her co-defendants.

22         Moreover, the Act broadly excludes any period of

23   delay resulting from a continuance granted by any judge on his

24   own motion or at the request of the parties or counsel if the

25   judge granted such continuance on the basis of his findings

1   that the ends of justice served by taking such action outweigh

2   the best interests of the public and the defendant in a speedy

3   trial, 18 United States Code 3161(h)(7)(A).  And that can

4   include things like time for lawyers to prepare for trial,

5   time for the parties to engage in plea negotiations.

6           Also, the Speedy Trial Act excludes from that 70-day

7   time period delays resulting from any pretrial motion from the

8   filing of the motion through the conclusion of the hearing on

9   or other prompt disposition of such motion.  18 United States

10  Code Section 3161(h)(1)(D).

11          So if I have motions -- there are some motions that

12  are currently pending, and so right now the Speedy Trial clock

13  is not running.  If -- as several counsel and Mr. Gleeson just

14  summarized, if there are going to be motions to sever, if

15  there are going to be suppression motions, all of those things

16  will toll the Speedy Trial clock.  So the defendants will

17  still have a speedy trial, will still have their rights under

18  the Speedy Trial Act, it just won't be the initial 70-day time

19  period.  But the Act doesn't require that.  And so those are

20  all things that counsel, I think, need to explain to the

21  defendants, because I don't know that they fully understand

22  that.

23          And when they come in here and say the trial date is

24  too late, I understand that personally, that they want it to

25  go faster, but if there are going to be motions that I have to

1    decide and that time isn't included under the Speedy Trial

2    Act, then from my perspective, as a matter of law, legally,

3    the trial is not too late.  But those are things that I'm

4    going to rely on the lawyers to explain to the clients.

5          I raised this with the government at the last

6    hearing, and maybe it's something that you all have conferred

7    about or should confer about is whether there should be a

8    severance of some sort here.  And we may need to think about

9    it practically if we can't have all of the defendants in the

10   courtroom at the same time because they all are detained and

11   we have limitations, or if there are other reasons to sever,

12   and in which case, if there is going to be a severance, I

13   would be looking at these dates as the first trial.  So

14   whichever defendants would go first would be the March or

15   April trial dates that I'm looking at.

16         And from the responses it looks like, Mr. Amberg, I

17   think with the exception of you, the April 2 trial date would

18   work.

19         Oh, yes, Mr. Roberts?

20         MR. ROBERTS:  Sorry to interrupt, your Honor.  I

21   didn't want to derail your eloquent presentation of what we

22   have been telling our clients all along; however, I realize

23   that I didn't voice my availability on the January slot.  And

24   for the record, I'm fine with that.  That would work for me.

25         THE COURT:  Okay.  It doesn't look like that's going

1    to be workable for many others and I'm going to have to give

2    you -- in addition to a trial date, I'm going to have to give

3    you a final plea cutoff and a final pretrial and a motion

4    cutoff date.  And I -- but I want to work backwards from the

5    trial date.

6            And so, Mr. Amberg, is the Vice Lords case -- is that

7    one where there may be a severance?

8            MR. AMBERG:  No, your Honor.  We have already broke

9    down the seven groups and that one is going to go for sure on

10   March 4 or whatever it is.

11           THE COURT:  How many groups?  How many defendants are

12   in that group?

13           MR. AMBERG:  I believe four in each.  And as

14   Mr. Roberts pointed out, that was because the marshals can

15   only have four jailed defendants in there at a time in the

16   courtroom.

17           I think that I had contemplated a severance motion.

18   I wanted to see what happened here today, for timing

19   issues, also, maybe for some other legal issues.  And I know

20   Mr. Turner and I would be okay being in the second group here,

21   and that would allow us a summer trial.

22           And, you know, I do know -- I very much recognize

23   that there are certain defendants in this case that want a

24   trial faster and maybe that will allow the defendants who

25   are -- have lawyers that are just getting on the case,

1    Mr. Gleeson, myself, and if anybody else ultimately has a
2    new attorney, we could go in that second group if your Honor
3    were inclined to just set two separate groups.
4              THE COURT:  But this March 4, you're in that one?
5              MR. AMBERG:  Correct.  And I don't believe, due to
6    the nature -- my client is charged with, like, a racketeering
7    with a murder component to it, and I think that that is going
8    to be the -- sort of the main issue in that.  I'm not sure if
9    Judge Grey would allow me to move into Group 3.  I could ask.
10   I don't know what they would say.
11             THE COURT:  Okay.  So there may be that possibility.
12             Other than -- other than Mr. Roberts, I think I know
13   the answer.  Let's see.
14             Mr. Gleeson has a trial with Judge Drain the end of
15   January.  Ms. Gracey has murder trials.  Mr. Gonek, January
16   was the only date not good for you.
17             Other than Mr. Roberts, can anybody else do a January
18   trial date on the defense side?
19             MR. LEE:  As I said, I cannot, your Honor.
20             THE COURT:  Right.  Anybody who can?
21             MR. LEE:  Oh, I'm sorry.
22             THE COURT:  Okay.  So that's not the most feasible.
23             Ed, do you know, would we be limited here in the
24   number of defendants that we could try, given that they are
25   all detained?

 1            THE MARSHAL:  Ma'am, I was told by my supervisor,

 2    given this situation, this scenario, we will do what we

 3    need to do and get a detail here from other districts to

 4    accommodate trying all seven people at once.

 5            THE COURT:  Okay.  Thank you.  And I do appreciate

 6    that.  I know it is subject to manpower.  So I do want to be

 7    possibly prepared with a plan B.

 8            And so, Mr. Cowen, Ms. Brunson, can we think about

 9    a possible split?

10            MR. COWEN:  Judge, we would oppose a severance for

11    a variety of factors.  It would be, in our view, the same

12    evidence each trial, and so that's one big component in

13    evaluating whether a motion should be severed -- should be

14    granted.

15            THE COURT:  Well, if we have this practical issue

16    that it sounds like many of my colleagues are dealing with,

17    where they are splitting up cases like this --

18            MR. COWEN:  So this one seems to be a little -- I

19    forget the total number of Vice Lords, but it seems like

20    there's a difference between a 30-defendant case and a

21    seven-defendant case, even from the Marshal's perspective.

22    I'm hearing seven people in a courtroom is certainly different

23    than 30 or 20 or things of that nature.  But I'm mindful of

24    the practical nature.

25            THE COURT:  I guess I was thinking more of the tax

1   case, Judge Leitman's tax case.  How many -- I thought someone

2   said that was severed or no?

3          MR. AMBERG:  No.  So that was the one that I have in

4   January.  That's -- we just had a status conference.  It's

5   going to be severed.  We have submitted a stip order that just

6   needs one more lawyer to sign it.

7          THE COURT:  But that has to be for other reasons,

8   because those people aren't detained, so they don't have that

9   same marshal issue.

10          MR. AMBERG:  Correct, your Honor.  But for the

11   March date, for Vice Lords on March 4, it's going to be

12   four defendants that are all incarcerated going to trial.

13   So I understand --

14          THE COURT:  Right.  But how many total?  They have

15   severed it because there are how many?

16          MR. AMBERG:  Oh, I mean, 35, 40.

17          THE COURT: Okay.  That's what Mr. Cowen was saying.

18   All right.  Okay.  So this one we may be able to do everybody

19   together.

20          MR. AMBERG:  But, your Honor, even with -- and I

21   apologize for interrupting you.

22          I do know in that case, I mean, I have been there at

23   those status conferences where the Marshal has gotten up and

24   said we cannot have any more than four defendants at a time.

25          And my thought is that even in April, the April date

1   here, if the Vice Lords is going on, you're going to have four

2   in-custody defendants on a case that's going to require a lot

3   of manpower even for that one, and then to somehow have seven

4   here on this one, I just -- I don't -- I don't want to speak

5   for the marshals, I just -- from what I have heard in the

6   other case, I don't know how that would be feasible.

7       So -- but as Mr. Cowen said, it sounds like there is

8   no objection to maybe splitting this into two groups, and I

9   know Mr. Turner would have no objection to being in Group 2

10   in this case.

11       MS. BRUNSON:  The government did not agree to that.

12       THE COURT:  No, they do.  They do object.

13       MR. COWEN:  Yeah, we would be opposed to severance,

14   especially at this stage.

15       MR. AMBERG:  Oh.  Oh.

16       MR. COWEN:  And I'm also very mindful -- on the one

17   hand, I'm respectful and mindful of the logistics involved in

18   this, but -- and everyone is thinking with their Speedy Trial

19   hat on at this point, and the Court calendar and some of these

20   logistics are not considered appropriate justifications for a

21   speedy trial.

22       So I think at this point we're still under the ends

23   of justice 3161(h)(7) hat on, which helps protect the record

24   the most.

25       If we get towards this potential April setting,

1    certainly, you know, if every defendant still wants their

2    trial at that date, if the Court is faced with a practical

3    severance, maybe we would have to address that at that time,

4    but this far out, severing into groups of three or four, I

5    think, is way too premature because something might come up

6    where someone in the second group could go to the first group

7    or vice versa and that totally disrupts the calendar.

8         And in a case, especially, with the same evidence

9    and the same victim, the government's opposition to severance

10   is even more heightened just given that -- that situation.

11   I'm respectful of the speedy trial of these defendants and

12   for the public.

13        THE COURT:  Right.  I think, frankly, very little of

14   this discussion has to do with the Court's calendar and much

15   more to do with the nature of the discovery, the amount of

16   the discovery, and really, giving the defendants time to hone

17   in on the relevant discovery and then just the -- I mean, the

18   practical reality of, I have got seven defendants and nine

19   lawyers.  So I'm trying to accommodate all of your schedules

20   into a trial date that works.

21        I don't disagree that a key aspect here is the ends

22   of justice exclusion, which I can also explain to the

23   defendants, if it's helpful.

24        Another way that the Court can stop the Speedy Trial

25   clock is to continue a case based on the Court's findings that

1   the ends of justice served by taking such action outweigh the

2   best interests of the public and the defendant in a speedy

3   trial.

4          In determining whether the ends of justice outweigh

5   the public's and the defendants' interest in a speedy trial

6   the Act requires the Court to consider several factors,

7   including whether the failure to grant the continuance would

8   result in a miscarriage of justice, whether due to the nature

9   of the case, the case is too complex to reasonably expect

10  adequate preparation within the Act's time limits, or whether

11  a refusal to continue the case would deny the defendant

12  reasonable time to obtain counsel or would unreasonably

13  deny either party time for effective preparation.

14         And the focus so far has been on giving the

15  defendants and their lawyers reasonable and effective time

16  for preparation.

17         So what I'm going to do, and I'm going to hope that

18  maybe, Mr. Amberg, you can work something out, as you said,

19  with Judge Grey and be in a position to perhaps be in an

20  earlier or later group, I'm going to set the trial date for

21  April 2 at 8:30, and that's the day that we will pick the

22  jury.

23         And then we will have a final pretrial conference

24  and a final plea cutoff.

25      (Discussion held off the record.)

1      THE COURT:  So we will have the final plea cutoff

2  and final pretrial conference will be March 5 at --

3      THE CLERK:  Is it easier for the marshals if we do

4  it early in the morning?

5      THE MARSHAL:  Yes.

6      THE COURT:  Okay.  So March 5, March 5 at 9:00 a.m.

7  will be the final pretrial, final plea cutoff.

8      And then motion cutoff will be -- so we will have --

9  motion cutoff will be November 27.  Actually, I'm going to

10  make that -- I'm going to make that November 13.

11      MS. BRUNSON:  Your Honor, just with respect to the

12  motion cutoff, Mr. Cowen and I have already discussed with the

13  Court that he starts a trial in one case on November 30th, I

14  start one on November 28th.  Depending upon the type of motion

15  that is filed the government will have 21 days to respond, and

16  that's going to essentially flow into the time when we are

17  going to start trial.

18      So I'm hoping that the Court can be a little liberal

19  with us in terms of when our responses would be due.

20      THE COURT:  Yes.

21      MS. BRUNSON:  Thank you.

22      THE COURT:  And in light of what I have heard here

23  today, I will make the similar findings that I made with

24  respect to the prior order, and that is, more specifically,

25  that the government has advised they are about to release

1    Production Number 4, which is not going to be as voluminous as

2    Production 3, and it's going to be more targeted, but it's

3    also going to be some of the more key discovery, including

4    some Jencks Act material.

5          And obviously the defendants need time to be able to

6    review that discovery, continue to review the discovery that's

7    already been produced, effectively engage in plea negotiations

8    to determine whether any negotiated resolution is possible, to

9    prepare any pretrial motions along the lines that have been

10   raised today, and then to give the Court adequate time to deal

11   with them.

12         Also, to ensure that the defendants, as I have said,

13   have the effective representation of counsel, all of whom

14   have identified numerous other trials that they have during

15   earlier time periods that would, as they have explained,

16   likely prevent them from being able to adequately prepare for

17   this trial or even be available for this trial if I assigned

18   an earlier date.

19         And so for all of the reasons that we have been

20   discussing today, I will find that the ends of justice here

21   served in finding excludable delay outweigh the best interests

22   of the public and the defendants in a speedy trial, and I

23   will exclude the time from the present trial date, which I

24   believe --

25              THE CLERK:  It's past, your Honor.

1          THE COURT:  It's past.

2          Through the past trial date through April 2nd.

3          And then, now that we do have a trial date, and

4    recognizing that the discovery is coming to an end -- and

5    Mr. Cowen, you believe the discovery is coming to an end

6    after you do this last production?

7          MR. COWEN:  Other than Jencks or any new material

8    that might come up that we're not aware of.

9          THE COURT:  Okay.  Other than some additional

10   Jencks that they will get closer to trial, still before

11   trial but closer to trial, and maybe something unexpected,

12   so recognizing that -- and tell me again when you intend to

13   produce this last batch.

14         MR. COWEN:  Certainly in the next -- in the next

15   one to two weeks is our goal, Judge.  We both are in trial

16   starting on September 18 and so we certainly have basically

17   a spreadsheet that we're into the final review process of

18   highlighting what's going out.  We're going to be handing that

19   over to our paralegal next week for her to process, and then

20   it can be rolled out.

21         I don't know yet if it's one of those situations

22   where we will get a drive or it could be a USAfx, but we will

23   be working with the attorneys on a delivery method.

24         THE COURT:  Okay.  So in the next few weeks the

25   defendants will have the bulk if not virtually all of the

1    discovery.  They have got a trial date.  They have got a

2    motion cutoff date.

3            I think, then, the only motion presently before me to

4    deal with is the motion -- two motions, one by Mr. Blake and

5    one by Mr. Lee, Mr. Lee's to withdraw and Mr. Blake's to have

6    him withdraw.

7            So Mr. Lee, you filed yours first, so why don't I

8    hear from you first.

9            MR. LEE:  That's correct, your Honor.  On Monday I

10   filed this motion to withdraw.  I didn't want to file it.

11   The day after, you had a letter from Mr. Blake.

12           Your Honor, the bottom line here is that over the

13   past five or six weeks our relationship has deteriorated so

14   much.  He clearly does not want me in this case.  He doesn't

15   want to communicate with me.

16           I tried to salvage this in a couple visits to Milan.

17   He is now in a special housing unit.  I was there about a week

18   and a half ago.  He walked out of the room.  He just does not

19   want to hear what I have to say.

20           I have been doing this a while now, your Honor.

21   I don't see how I can represent him effectively with this

22   environment.  Even today he is making comments and berating

23   me here at counsel table.  I have had worse, but it's no way

24   to really try a case.

25           This is a very serious matter.  This young man has a

1   lot at stake.  I feel for him.  I understand his frustration.

2   But things work the way they do in the federal system.  He is

3   just not amenable to hearing anything I have to say anymore,

4   and I think he does need a new lawyer.

5          I've put in a lot of time in this case.  I would love

6   to try this case with this outstanding group of lawyers.  But

7   I just don't see us being able to communicate anymore, Judge.

8   And that has a lot to do with him.  He refused to talk to me

9   at the last time that I visited with him, mostly because I

10  won't do things that I'm being asked to do, and I will not

11  do them.

12         I don't know, maybe -- he asked for an experienced

13  trial lawyer.  I think I am one.  Maybe even give him somebody

14  with more experience.  I don't know.  I know it's not up to

15  you.  I know FDO does that.

16         THE COURT:  If he were to communicate with you,

17  because I know you know the law, and a defendant's decision to

18  not communicate with his counsel is not necessarily a reason

19  to give him new counsel, if he were to communicate with you,

20  do you believe that this relationship can be salvaged?

21         MR. LEE:  Judge, I don't.  And I didn't want to file

22  this motion.  I've spent a lot of time.  I -- three separate

23  visits to try to salvage our relationship.  Most importantly,

24  the one right before our last conference, when I went to him

25  and explained in great detail how things were going to work,

1    that last hearing was horrible.  I wasn't even able to listen

2    to half of what the Court had to say because of the things

3    that he was saying, things that he was asking me to do during

4    that hearing.

5           So my short answer is, no.  Again, I know that

6    there is a lot of rough water when you're in these multiple

7    defendant conspiracies, but in this case I am drowning.

8    I just don't see us being able to salvage our relationship.

9           And more importantly, I -- this is what he wants.

10   And I think that if the Court voir dired him, this is what you

11   would hear from him.  He has his heart set on me not being

12   his lawyer, and he's made that very clear, even today, where

13   he asked me just now why I'm even taking notes here.

14          THE COURT:  All right.  No, I'm -- I'm going to

15   hear --

16          MR. LEE:  Thank you, Judge.

17          THE COURT:  -- from him.  I have to hear from him.

18          All right.  Mr. Blake, I have heard from Mr. Lee.  So

19   why don't you tell me your dissatisfaction with your counsel.

20   And if you could come up to counsel table, I would like to

21   have you talk into the microphone.

22          No, just up to the table is fine.

23          DEFENDANT BLAKE:  It's -- we got an issue when he --

24   when he come and see me, he address me like I'm ignorant.

25   Like, even today, like, even when I'm talking, he just

1    laughing.  He don't want to listen.  Like, he not

2    understanding, this is my life.  This is a big case.  This

3    is my life.  I got -- I'm facing up to life and he not

4    understanding that.

5           He come and tell me stuff like, well, regardless, I'm

6    going to go home at the end of the day.  Like, he even say it

7    like, he not -- he not understanding.

8           Like, I ask him stuff about the discovery and he

9    don't even know.  We had -- we had Production 1 for a long

10   time.  We had Production 1 for a real long time.  He don't

11   know nothing about it.  Ask him something right now, he not

12   going to know.

13          Production 2, we didn't have Production 2 for a

14   minute.  I go down there, I view it every day.  I ask him

15   stuff about it.  He don't know nothing.

16          He trying to make it seem to y'all like I'm the

17   problem.  He come here and say all his big words, all that,

18   and try to make me look like I'm ignorant and it's really him.

19          He come -- when he just came and seen me when I was

20   in the special housing unit, I showed him a motion.  I got the

21   motion in my pocket.  It's not a frivolous motion at all.

22   It's a great motion.

23          You know what he told me to do?  And excuse my

24   language.  He said, "When you go back to your cell, wipe your

25   ass with that motion."  Literally, them was the exact words

1    he told me.  And he my lawyer.  This is how you address your

2    client?

3              And I'm trying to tell -- I'm sitting up here trying

4    to tell him certain stuff.  I understand you're a lawyer.  I

5    understand you been doing this for a long time.  But at the

6    end of the day, if I'm in the law library all day because I

7    understand this is my life, if I feel like it's a motion that

8    could impeach a witness or stuff like this -- I got a witness

9    on this case.  So if I feel like it's a motion that could help

10   impeach my witness, why wouldn't you want to bring it?  Why

11   wouldn't you -- why would you tell me -- why would you sit up

12   there and tell me, wipe my ass with that motion when I get

13   back to my cell?  That's disrespectful.  When it's a great

14   motion.

15             THE COURT:  Okay.  Now, you all may disagree about

16   the strength of the motion, and you need to respect that the

17   lawyers have training.  They have knowledge.  They have better

18   understanding of the law and the rules than a lot of people

19   who are not lawyers.

20             If you all were able to communicate better, if I gave

21   you an opportunity to go meet without everybody in the room

22   and have a discussion about this case, how this case is going

23   to proceed, do you think that this is a relationship that

24   could be repaired?

25             DEFENDANT BLAKE:  Your Honor, no.  I don't feel like

 1      that at all.  No.

 2              THE COURT:  And why not?

 3              DEFENDANT BLAKE:  He -- he -- he don't like the -- he

 4      can't be told nothing.  Like you just talking to a kid.  Like,

 5      I'm trying to tell you just how I'm going -- I'm going through

 6      the discovery, he's not going through it.  So I'm trying --

 7      when I'm telling him stuff, he telling me, like, "Oh, no."

 8              Like, the same stuff Lewis lawyer just brought up,

 9      just brought up about how they got the search warrant for

10      the felon in possession, I wasn't even a felon.  And I'm

11      trying to bring this up to him and he's not understanding.

12      How do you get a search warrant for a felon in possession for

13      people that's not felons?

14              THE COURT:  So if -- if I were to give you new

15      counsel and you were to meet with counsel and talk to them

16      about motions that you want them to bring and they think that,

17      in their experience, their knowledge, their understanding,

18      that they don't think that's a motion that they should bring,

19      are you going to be back here asking me for another lawyer?

20              I mean, I guess I'm really asking you, Mr. Blake, do

21      you understand you have a right to counsel, you have a right

22      to the effective assistance of counsel, but you don't have a

23      right to a lawyer who does whatever you want?

24              DEFENDANT BLAKE:  Yes, ma'am.

25              THE COURT:  And that sometimes they make decisions

```
 1   based on their training, their knowledge, their experience,
 2   their sense of what's best for you, what's best for the case,
 3   and that might not be exactly what you want them to do.  They
 4   may have reasons to not file a motion that you think is a
 5   great motion.
 6            DEFENDANT BLAKE:  And I understand what you saying,
 7   and I'm not saying -- I understand if a lawyer sit -- he came
 8   and seen me, so it's like if he break it down to me like, this
 9   is why I don't feel like it this way.
10            He grabbed the motion.  He just looked at it.  I
11   don't know even -- he didn't read a line of it.  He grabbed
12   it and said, "I represented a lawyer before.  You know how
13   much advice I took from him?  None.  When you get back to
14   your cell, wipe your ass with that motion."
15            You didn't even read it, so how do you know?
16            MR. LEE:  I didn't say --
17            DEFENDANT BLAKE:  That's exactly what you said.  Why
18   you lying?  That's true.  That's what you said.
19            MR. LEE:  Go ahead.
20            THE COURT:  Okay.  All right.  Okay.  Anything else
21   that you want to say?
22            DEFENDANT BLAKE:  That's it.  I just want -- I want
23   a lawyer that is going to come up and see me and we can
24   view the discovery together.  Me and him never viewed the
25   discovery together.  I been indicted since November 3.  Me
```

1   and him never looked at nothing together.  He never broke

2   nothing down together.

3          He is just coming -- he come and say something, and I

4   be like, I have a rebuttal to it, and he -- and he just, like,

5   act like he don't understand.  Like, if you viewing it and you

6   seen what I'm seeing, it's no way you could understand it.

7          THE COURT:  Okay.  All right.  Thank you.

8          Let me ask the government, do you have any position

9   here on these requests for -- both Mr. Lee wants to withdraw

10  and Mr. Blake would like to have him withdraw.

11         MR. COWEN:  Judge, we don't have a position either

12  way.  I think the record is properly documented for the Court.

13         THE COURT:  All right.  I do have some very short

14  motions that set forth a breakdown in the relationship.  I

15  have heard more from Mr. Lee and Mr. Blake today.  It's very

16  obvious from what has transpired in the courtroom that there

17  is a breakdown in this relationship and that Mr. Lee is not

18  going to be able to effectively represent Mr. Blake.

19         I also think I have set a schedule that is a schedule

20  that a new lawyer will be able to comply with if I -- if I do

21  that quickly, because, Mr. Blake, there are a few factors

22  that I have to consider when somebody asks me for a new

23  lawyer, somebody who can't afford a lawyer.

24         I have to consider the timeliness of the motion, and

25  at this stage of the case both of you have made the request

1    in a timely fashion.

2           I have to inquire into the issues with the

3    relationship. I have done that. And as I said, it's clear

4    to me there has been a breakdown here, that you all are not

5    communicating. And I don't see a way that you are going to

6    effectively communicate in the future.

7           I have to determine if the extent of the conflict

8    is so great that it has resulted in a total lack of

9    communication, and it has. And then I have to balance that

10   with the public's interest in the prompt and efficient

11   administration of justice.

12          And again, given the schedule that I have set, I

13   will grant both of your motions.

14          MR. LEE:  Thank you.

15          DEFENDANT BLAKE:  Thank you, your Honor.

16          THE COURT:  I will immediately reappoint the Federal

17   Defender Office to represent Mr. Blake.

18          What that means, Mr. Blake, they are going to

19   designate somebody else to take over your representation.

20          I'm going to ask, Mr. Lee, that you -- as soon as

21   they get appointed, which I hope would be by Monday -- they

22   tend to do that quickly. I'm going to ask them to do that

23   quickly, because we're under some time pressure here.

24          So, Mr. Lee, whatever you can do to transfer your

25   file as soon as possible, and we should have new counsel

1    before the government makes this next production.  You can

2    make that to new counsel so that they can have everything.

3           I'll probably include in the order, the appointment

4    order, that this new counsel needs to be advised that this

5    is the schedule.

6           MR. LEE:  Thank you, your Honor.  I'll notify FDO and

7    have them call me when they get the name of the new counsel.

8    I'll meet with them.

9           THE COURT:  That they need counsel who isn't going

10   to come in with conflicting trial dates, who recognizes that

11   there is significant discovery, that they are going to have to

12   be able to review and jump on quickly.

13          MR. LEE:  Thank you.  Like I said, I'll let FDO know

14   and I'll speak to the successor attorney as soon as possible

15   and get with them immediately.

16          THE COURT:  All right.

17          MR. LEE:  As the Court is instructing me.

18          THE COURT:  Okay.

19          MR. LEE:  Thank you, your Honor.

20          THE COURT:  Then I think that covers my agenda items,

21   but let me see if you all have other items that you want to

22   address today.

23          So go ahead, Ms. Brunson.

24      (Discussion held off the record.)

25          MS. BRUNSON:  Thank you.

1           THE COURT:  All right.  Sure.

2           Then for the government, Ms. Brunson or Mr. Cowen,

3     anything further that you all wanted to address today?

4           MR. COWEN:  Judge, I don't anticipate it being a

5     source of delay, but as this Court, I think, is aware, the

6     Public Defender's Office has a conflict, so I know it will

7     go back to them, but then they will have to outsource it to

8     the panel.

9           THE COURT:  Yes.  That's what I was trying to explain

10    when I said they will -- I have appointed them, but they will

11    then designate somebody to represent Mr. Blake.

12          MR. COWEN:  Other than that, no.  Nothing for the

13    government.

14          THE COURT:  Okay.  All right.  Anything, then, from

15    any of the other defense counsel?

16          MS. GRACEY:  Judge, Judith Gracey on behalf of

17    Ms. Kimbrough.

18          I indicated that just this morning Ms. Kimbrough

19    indicated that she wanted other appointed counsel.  I'm going

20    to talk with her, being that this was the first time that

21    I heard it.  And I think the Court has addressed as far as

22    the time frame and the delay and the Court has gone over

23    it very -- not only completely but thoroughly, and with

24    that information given to Ms. Kimbrough as well, I will speak

25    with her following this hearing this morning.  And then if a

1    motion needs to be filed for me to withdraw, I will do so.

2    But I want to speak with her and find out the reasons

3    regarding that.

4              THE COURT:  Okay.  Yes, please do.  I appreciate that.

5              MS. GRACEY:  Thank you.

6              THE COURT:  Thank you, Ms. Gracey.

7              Anything else from any of the other defendants?

8              All right.  Then it looks like the next scheduled

9    court appearance here, unless we get some motions and I

10   schedule hearings, and then this will change, but right now

11   the next scheduled court appearance is the final pretrial/

12   final plea cutoff, March 5 at 9:00 a.m.

13             All right.  Everyone stay well.  We will see you in

14   a few months.

15             THE CLERK:  All rise.  Court is adjourned.

16             (Proceedings adjourned at 11:31 a.m.)

17                        *        *        *

18

19                 **CERTIFICATE OF COURT REPORTER**

20

21       I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23

24   _____        _____
     *s/ Rene L. Twedt*                     **September 28, 2023**
     RENE L. TWEDT, CSR-2907, RDR, CRR, CRC        Date
25      Federal Official Court Reporter