Motion Hearing - May 3, 2024

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                    Plaintiff,

 5        vs.                                  Case No. 22-20519

 6   CORTEZ BLAKE, ET AL,

 7                    Defendants.
     _____/
 8
                            MOTION HEARING
 9           BEFORE THE HONORABLE LAURIE J. MICHELSON
                  United States Magistrate Judge
10          Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
11                      Detroit, Michigan
                      Friday, May 3, 2024
12

13   APPEARANCES:

14   FOR THE PLAINTIFF:

15   David Patrick Cowen
     Jeanine Brunson
16   United States Attorney's Office
     211 W. Fort Street
17   Suite 2001
     Detroit, MI 48226
18   313.226.9100/313.226.9597

19   FOR THE DEFENDANT:

20   Jerome Sabbota               James W. Amberg
     (Defendant Cortez Blake)     (Defendant Karamoh Turner)
21   Ribitwer & Sabbota           Amberg and Amberg
     26862 Woodward Avenue        32121 Woodward Avenue
22   Suite 200                    Suite 305
     Royal Oak, MI 48067          Royal Oak, MI 48073
23   248.543.8000                 248.681.6255

24

25
```

Motion Hearing – May 3, 2024

2

```
 1   APPEARANCES CONTINUED:

 2

 3   Samuel J. Churikian          Gerald J. Gleeson, II
     (Defendant Semaj Ayers)      (Defendant Nasir Lewis)
     Samuel J. Churikian          Miller Canfield Paddock & Stone, PLC
 4   500 Griswold                 840 W. Long Lake Road
     Suite 2340                   Suite 200
 5   Detroit, MI 48226            Troy, MI 48098
     313.961.4315                 248.267.3296

 6
     Randall C. Roberts          Alvin C. Sallen
 7   (Defendant Maijah Greene)   (Defendant Shatonnia Kimbrough)
     120 N. 4th Ave.             Alvin C. Sallen Associates
 8   Ann Arbor, MI 48104         30100 Telegraph Road
     734.677.3393                Suite 360
 9                               Bingham Farms, MI 48025
                                 248.646.4686
10
     Christopher W. Quinn, II
11   (Defendant Armond Williams)
     The Law Offices of Quinn & Associates, PLLC
12   400 Monroe
     Suite 330
13   Detroit, MI 48226
     313.967.7847
14

15

16

17

18

19

20

21

22

23                             - - -

24          To obtain a certified transcript, contact:
                April A. Kurtz, CSR-7347, RPR, FCRR
25                    www.transcriptorders.com
```

USA v. Cortez Blake, et al - 22-20519

Motion Hearing - May 3, 2024

## TABLE OF CONTENTS

MATTER                                                          PAGE

**Motion Hearing**


**Motion to Suppress**

Argument by Mr. Gleeson............................. 10

Argument by Mr. Cowen.............................. 13

Argument by Ms. Brunson............................ 34

Argument by Mr. Amberg............................. 43

Ruling by the Court................................ 63


**Motion for Enright Hearing**

Argument by Mr. Cowen.............................. 66

Ruling by the Court................................ 96


Certificate of Reporter............................ 101

1  Detroit, Michigan

2  Friday, May 3, 2024

3  9:06 a.m.

4                              *  *  *

5          THE CLERK:  All rise.

6          The United States District Court for the Eastern

7  District of Michigan is now in session.  The Honorable Laurie

8  J. Michelson presiding.

9          You may be seated.

10         Court calls Case Number 22-20519, United States of

11 America versus Cortez Blake, Karamoh Turner, Semaj Ayers,

12 Maijah Greene, Shatonnia Kimbrough, Armond Williams and Nasir

13 Lewis.

14         Counsel, please state your appearances for the

15 record.

16         MR. COWEN:  Good morning, your Honor.

17         David Cowen and Jeanine Brunson on behalf of the

18 United States.

19         THE COURT:  Good morning.

20         MR. QUINN:  Good morning, Judge.

21         Christopher Quinn appearing on behalf of Armond

22 Williams, who is present.

23         MR. SALLEN:  Good morning, your Honor.

24         Alvin Sallen on behalf of Ms. Kimbrough, who is also

25 present.

 1          MR. CHURIKIAN:  Good morning, your Honor.

 2          Samuel Churikian appearing on behalf of Semaj Ayers,

 3 who is present.

 4          MR. AMBERG:  Good morning, your Honor.

 5          It's good to see you.  I can sort of see you behind

 6 Mr. Quinn.

 7          Jim Amberg on behalf of Mr. Turner.  He is here.

 8          MR. SABBOTA:  If it please the Court, Jerome Sabbota

 9 on behalf of Mr. Blake.

10          MR. GLEESON:  Good morning, your Honor.

11          Gerald Gleeson on behalf of Nasir Lewis, who is

12 seated behind me.

13          MR. ROBERTS:  Good morning, your Honor.

14          I'm Randall Roberts.  I represent Maijah Greene.  She

15 is seated to my left.

16          THE COURT:  All right.  Thank you.  You may all be

17 seated.

18          Good morning, counsel.  Good morning to all of the

19 defendants.

20          Before the Court are two motions to suppress, one by

21 Defendant Nasir Lewis, ECF number 205, and one by Defendant

22 Karamoh Turner, ECF number 207.  Mr. Lewis' motion is joined by

23 Defendants Armond Williams, Maijah Greene, Cortez Blake and

24 Semaj Ayers.  And Mr. Turner's motion is joined by Defendants

25 Green, Blake and Ayers.

1    There are six search warrants at issue, a January

2    26th, 2022, state warrant to obtain information from

3    Mr. Blake's Instagram account from October 1, 2021, through

4    January 25, 2022, ECF number 206-2, or Exhibit B; a March 4,

5    2022, state warrant to obtain information from Mr. Blake's

6    Instagram account from January 25, 2022, through March 3, 2022,

7    ECF number 206-3, or Exhibit C; an April 7, 2022, federal

8    warrant to obtain information pertaining to possession of a

9    firearm by a convicted felon and possession of a firearm by a

10   drug user or addict from six Instagram accounts, including

11   those of Defendants Blake, Ayers, Williams and Turner, ECF

12   number 206-5, or Exhibit E; two August 4, 2022, federal

13   warrants, focused on the November 14, 2021, carjacking and

14   alleged kidnapping, one to obtain information from Google

15   accounts for Defendants Ayers and Williams, ECF number 206-8,

16   or Exhibit H; and one to obtain information from Meta for 17

17   Instagram accounts, including those of Defendants Blake, Ayers,

18   Williams and Lewis, ECF number 206-9, or Exhibit I; and an

19   October 14, 2022, federal warrant, quote, to correct three of

20   the 17 accounts from the August 4, 2022, search warrant that

21   had slight spelling errors and, therefore, could not be

22   processed by Meta, end quote, ECF number 206-10, or Exhibit J,

23   none of the three corrected accounts pertain to a named

24   defendant.

25        Lewis' motion to suppress is broader and captures the

1    essence of Mr. Turner's motion.  In sum, Lewis argues that the

2    two state search warrants used to seize social media and other

3    evidence from Cortez Blake pertaining to the 1125 gang were

4    overbroad and did not reference any particular crime to justify

5    the searches, so they were unconstitutional.  Lewis contends

6    that ATF and DPD were acting in conjunction and sought the two

7    state warrants to identify individuals and get access to their

8    private chats and photographs.

9         Lewis says that the information gathered from these

10   unconstitutional warrants was then used as the probable cause

11   to support subsequent federal warrants for the search of other

12   defendants' social media allegedly for evidence of unlawful

13   firearm possession, thus making the federal warrants invalid as

14   fruits of the poisonous tree, ECF number 205.

15        And the results of those search warrants were then

16   used to secure kidnapping-related evidence pertaining to the

17   charges in this case.

18        Turner's motion is focused exclusively on the April

19   7, 2022, federal warrant claiming there was insufficient

20   probable cause of him being a regular drug user.

21        The Government opposes the motions, ECF numbers 227

22   and 3347.  Replies were filed, ECF numbers 240 and 242, and

23   this is the date and time scheduled for oral argument.

24        Beyond just an oral argument, Lewis, joined by Blake,

25   for whom standing is not an issue, also requests a Franks

1  Hearing because he says the, quote, federal affiants did not

2  disclose the state warrants to the magistrates who issued the

3  federal warrants, end quote.

4         ECF number 205 at page ID 1243, quote, of course, a

5  presumption of validity exists with respect to the affidavit

6  supporting the search warrant, end quote.

7         Franks v. Delaware, 438 U.S. 158 and 171, 1978.  And,

8  quote, whether to hold an evidentiary hearing based upon a

9  challenge to the validity of a search warrant's affidavit,

10  given alleged mis-statements and omissions, is committed to the

11  sound discretion of the district court, end quote.

12         United States v. Young, 847 F.3d, 328 at 348, Sixth

13  Circuit, 2017, citing United States v. Graham, 275 F.3d 490 at

14  505, Sixth Circuit, 2001.  Quote, a defendant challenging the

15  validity of a search warrant's affidavit bears a heavy burden.

16  To be entitled to a Franks Hearing, he must, one, make a

17  substantial preliminary showing that the affiant knowingly and

18  intentionally were with reckless disregard for the truth,

19  included a false statement or a material omission in the

20  affidavit; and two, prove that the false statement or material

21  omission is necessary to the probable cause finding in the

22  affidavit, end quote.

23         United States v. Bateman, 945 F.3d 997 at 1008, Sixth

24  Circuit, 2019.  Lewis argues, quote, once the federal affiants

25  had the materials from the state law process, only then did

1  they seek a federal warrant, now armed with illegally-seized

2  information that constituted probable cause for access to

3  numerous social media accounts.  Access they would not have had

4  but for the initial illegal state law warrants.  And they were

5  granted the expansive federal warrants by failing to include

6  the full facts of what had transpired, end quote.  ECF number

7  205 at page ID 1244.

8          The Government presents a different version.  Indeed,

9  the Government is emphatic that the affidavits in support of

10  the federal warrants did not contain any information from the

11  state warrants.  The Government says, quote, as to the federal

12  warrants, the defendants seek a Franks Hearing claiming that

13  the affiants supposedly failed to disclose that information

14  from the state warrants was used and that the state warrants

15  were invalid.  But aside from the fact that the state warrants

16  are valid, the defendants do not and cannot establish that any

17  of the information from the state court warrants was even used

18  in the affidavits supporting those motions because it was not,

19  end quote.  ECF number 237 at page ID 1647.  See also id. at

20  1658, indicating, quote, nothing seized from these state

21  warrants found their way into the federal warrants in any

22  event, end quote.

23          And so let me stop here and ask a few questions.

24          And I think, Mr. Gleeson, I'll start with you.  And

25  maybe if somebody could just make sure you have a microphone.

Motion Hearing - May 3, 2024

1          MR. GLEESON:  Would you prefer I address the Court

2     from the podium?

3          THE COURT:  Since I'm going to go back and forth

4     between the two of you, I'm okay if you stay there.

5          MR. GLEESON:  Yes, your Honor.

6          THE COURT:  Do you have anything to rebut the

7     Government's argument, that the federal warrants did not

8     include any information from the evidence seized in the state

9     warrants?

10          MR. GLEESON:  Your Honor, I'm at a slight

11     disadvantage because, obviously, I was not present at the time

12     with the agents at the time this happened.  However, looking

13     circumstantially at the exhibits we provided, it appears that

14     Agent Nether, who, I believe is the case agent, reviewed the

15     materials from the state warrants prior to the first round of

16     federal warrants was sought.  I believe that review is

17     identified in the affidavits for that first round of federal

18     warrants.

19          So it's pretty clear that that review took place and

20     that those materials were in the custody of the investigators

21     in this case prior to the affiants coming to the magistrate for

22     the first round of federal warrants.

23          I would also point out that the --

24          THE COURT:  Wait.  Let me stop you there.

25          So they reviewed them.  So a fortiori they used them?

Motion Hearing - May 3, 2024

1          MR. GLEESON:  Well, your Honor, there's been no --

2    there's been no proof, I guess, no counter-affidavit, nothing

3    to say that these material -- there's a statement in the

4    response that they -- they may have got them from some other

5    location, but there's nothing that I see in the affidavit that

6    talks about an undercover account or -- or an informant or

7    anyone else who is providing that information.

8          As I read the affidavits, and certainly the Court may

9    read them differently, and the Government may point out

10   something different, I don't pretend to be omniscient, but my

11   view of those affidavits is the only -- the only reference is

12   the review by Agent Nether, the only evidence that we've been

13   provided in discovery so far, subject to the Jencks Act and

14   things like that, I haven't seen -- and I'll defer to my

15   colleagues -- any other sources of the quote, unquote, probable

16   cause that is found in the first round of affidavits.

17         THE COURT:  Well, give me an example.  Give me an

18   example of something that's in the federal warrant, or

19   warrants.

20         I think you're probably more focused on the August

21   warrant than the April, but maybe not.  But something from the

22   August -- let's say the August warrant that had to have come

23   from information the Government --

24         MR. GLEESON:  Do you want the August or the April?

25   Because I --

Motion Hearing - May 3, 2024

1          THE COURT:  Either.

2          MR. GLEESON:  Okay.  I apologize for not having it

3   quite handy, your Honor.

4          Paragraph 2 of Exhibit -- 22 of Exhibit E, which is

5   one of the April warrants, states, "I am -- I, ATF Interstate

6   Nexus Agent and who reviewed the above photographs, 1, 3, 4, in

7   my opinion, one Turner is holding a firearm."  There's -- and

8   that continues on various paragraphs on the nexus agent, and

9   I've reviewed.

10          THE COURT:  And none of these photos are in a -- were

11   in a public Instagram account?  You couldn't have viewed these

12   separately?

13          MR. GLEESON:  I don't believe so, your Honor.  I'll

14   defer to the Government.

15          If -- my understanding is that all of these with

16   individuals had private accounts, which is why they needed the

17   search warrant, is to -- and they needed the search warrant

18   originally to get Mr. -- I think it's Turner's, the original

19   state warrants.  The basis was they were all private accounts.

20          THE COURT:  Okay.

21          MR. GLEESON:  And again, subject to my correction

22   with the Government.  My conversations were with my client

23   about what was private and what was not, and then what was the

24   rules and regulations of Instagram.

25          But the -- I don't think -- and again, I'll let

1   Mr. Cowen correct me if I'm wrong.  Paragraph 14, again of

2   Exhibit E, While investigating 1125 gang membership, ATF and

3   the Detroit Police Department have identified several Instagram

4   accounts maintained.  Several of these, including the subject

5   accounts identified in this affidavit, had their privacy

6   settings adjusted so that content is not available to the

7   public."  And then they say, "Even when the account is public,

8   law enforcement is still limited in the scope of what can be

9   reviewed."

10          THE COURT:  And then your understanding is these

11   photographs came from Mr. Blake's account, which they recovered

12   from the state warrants?

13          MR. GLEESON:  That is my -- that is the inference I

14   make from the fact that there is a warrant.  There is a review

15   by the officer in charge of the materials that were supplied to

16   the Detroit Police Department as a result of those state court

17   warrants and then the federal warrant follows.

18          And I have nothing -- excuse me -- nothing to

19   contradict or otherwise suggest there was some other source

20   there based on the materials provided me to date.

21          THE COURT:  Okay.  Mr. Cowen?

22          MR. COWEN:  Judge, we maintain that the federal

23   warrants did not use the returns from the two state agency

24   search warrants.

25          The ATF, as we maintain in our brief, accessed the

14

1    social media accounts of various members in this case, charged

2    and uncharged, either by open social media access or just

3    anyone could follow them, or through the account allowing law

4    enforcement to follow them or essentially friend them so that

5    they could access their private photos as they're being posted.

6            THE COURT:  So the photos in Exhibit E, in the April

7    2022 -- and Mr. Gleeson referenced some of them.  We've got

8    paragraph 20, 21, and they're sprinkled throughout, where did

9    those come from?

10           MR. COWEN:  Those all came from law enforcement

11   taking screenshots through their access either from public view

12   or through law enforcement's account that was allowed to follow

13   these individuals.

14           THE COURT:  So somebody undercover was allowed to

15   friend the account or --

16           MR. COWEN:  Yes, they -- essentially, a friend or you

17   can proactively request to follow and then the user would have

18   to accept that or sometimes individuals can have their settings

19   where once you click follow, they're automatically following

20   them.  So it all depends on an individual's user settings.

21           But, essentially, my understanding is there's three

22   ways you can access someone's account.  They have settings that

23   are public, where anyone can just follow you and look at your

24   information.

25           THE COURT:  Mr. Gleeson thought these were private

1    accounts.

2              MR. COWEN:  Some of these are --

3              THE COURT:  So if they're not public, what are the

4    other two ways?

5              MR. COWEN:  Law enforcement would then request to be

6    followed, in which case they would either automatically be

7    allowed to follow, depending on the user's settings, or the

8    suspect account would have to proactively accept the following.

9    But, either way, their settings would have to be such that they

10   would allow it one way or the another.

11             And then once you begin following that individual,

12   you can see their posts, their stories, things of that nature.

13   And that's where these photographs came from by law

14   enforcement, viewing these accounts, either through that

15   private process or through public settings.

16             THE COURT:  Okay.  And let me just diverge for just

17   one second and ask Mr. Gleeson, the August warrants are much

18   more focused on the underlying event in this case, the November

19   14 incident.  And so do you have any reason to believe that

20   anything from Mr. Blake's Instagram account that was recovered

21   from the state warrants was utilized for that warrant?

22             MR. GLEESON:  Well, in a way, yes.

23             My view of the world -- and again, I --

24             THE COURT:  Your building blocks?

25             MR. GLEESON:  My building blocks.

1          THE COURT:  Your state, to April to August.

2          MR. GLEESON:  Correct.

3          And I would like to point out, in my brief -- I have

4     to find it.

5          I did reference another opinion by Judge Goldsmith

6     where he encountered this undercover account that is being

7     referenced by the Government here.  My recollection, and I'd

8     have to dig that out, I believe they actually reference the

9     undercover account in the warrant that Judge Goldsmith

10    reviewed.

11         I don't see, in any of these warrants, a magistrate

12    being told that there's an undercover account being used, so

13    there's -- looking at the four corners of the document to start

14    with, I don't see anything where the magistrate was told, "Hey,

15    we have an undercover account that's being used to view these."

16    And if they did, if they did have that, then that -- that

17    should have been told as well to the magistrate because that

18    would suggest that they don't need a search warrant, that

19    they're getting the information they need from this undercover

20    account.

21         THE COURT:  Well, it doesn't mean you get everything.

22         MR. GLEESON:  Well, Judge, that's -- and --

23         THE COURT:  Or everything they're asking for in the

24    warrant.

25         MR. GLEESON:  Well, that's an overbreadth issue.

1  That's different.

2        But my point is, it's not there in the -- in the
3  warrant affidavit itself.

4        And with all due respect to Mr. Cowen, you know, he
5  didn't view any.  He wasn't running an undercover account.

6        So I don't have any -- any actual proof via an agent
7  or an affiant or anybody saying, "Yes, we used an undercover
8  account," other than Mr. Cowen saying, "It's my understanding."

9        So when I look at the way this rolls out and look at
10 it as a whole instead of parsing affidavit by affidavit, the
11 question immediately comes to mind is, they use a series of
12 warrants to get to a kidnapping that they knew about at the
13 beginning, because the kidnapping had occurred before even the
14 state warrants.  And so it looks, to me, that when we have DPD
15 and ATF working together, that they could have come to a
16 federal magistrate right off the bat with an affidavit, as they
17 often do in investigations.  They didn't do that.

18       So a choice was made somewhere, let's go to Wayne
19 County.  And when you look at the warrants that are being used
20 in the Wayne County warrants, the affidavits there, they're not
21 that great.  And in my opinion, they fail.  And I've shown the
22 Court why in my brief.

23       THE COURT:  And we're going to get to -- I just want
24 to deal, right now, with whether we're going to have a Franks
25 Hearing.

Motion Hearing - May 3, 2024

1       MR. GLEESON:  All right.

2       THE COURT:  And so that does lead to the next step.

3       So what is that next step, that you come to a federal

4    magistrate judge and you say, "We sought a warrant from Wayne

5    County Circuit Court, it was granted, here it is," and now you

6    get to re-evaluate whether you think it was properly granted or

7    not?

8       MR. GLEESON:  I think that the mechanism that the --

9    the concern I have is the way in which the Government went

10    about, from my view, gathering this evidence.  And they went to

11    a singular account, they went to a court that's not a federal

12    court, they -- they, I think, knew that Wayne County's perhaps

13    standards were a little less than those of a magistrate or an

14    Article III judge and they got information that they then

15    rolled into a federal search warrant affidavit.

16       THE COURT:  Which they say they didn't.

17       MR. GLEESON:  Mr. Cowen says he didn't, right?

18       Judge, I apologize.  I don't know.  I'm just looking

19    at the -- at the circumstantial evidence that strongly

20    suggests, at least to me, and would argue it should to the

21    Court, that first set of warrants has photographs in it, that

22    if they were available -- I mean, these are older photographs,

23    they could have been used in the state court -- I mean, if

24    we're going to -- if we're going to play a little bit of Monday

25    morning quarterback, if in fact these photographs were in the

1   agent's and DPD's possession, then they -- why aren't they in

2   the original state court affidavit?  Why aren't they --

3            THE COURT:  Something had to be public, right?

4   Something on Mr. Blake's Instagram account was public, that's

5   how they got the photo of the gun, which was in the original

6   state warrant.

7            MR. GLEESON:  I'm not sure how they got that, your

8   Honor.

9            THE COURT:  Okay.  Mr. Cowen, is the affiant here to

10  just indicate whether he did or did not utilize anything from

11  the state warrant, or the affiants who prepared the affidavits

12  in support of Exhibits E, H and I?

13           MR. COWEN:  Yes, Judge.

14           I would direct the Court's attention to paragraph 2

15  in both warrants:  "Access was gained to the private social

16  medial accounts after 1125 gang members accepted follower

17  request from undercover ATF accounts."  From the very beginning

18  of these warrants, the affiant spelled out that they got these

19  account -- this information from undercover accounts that were

20  private or open to anyone.

21           And that appears in paragraph 2 of both the April 7th

22  warrant and paragraph 2 -- no, that's April 7th again.  I'm

23  sorry.

24           THE COURT:  And we're just dealing a little more

25  broadly.  I mean, as I said, you made very clear in the

Motion Hearing - May 3, 2024

1   briefing that the affidavits in support of the federal warrants

2   did not utilize any of the information obtained as a result of

3   the evidence seized from the state warrants.

4            MR. COWEN:  Correct, we --

5            THE COURT:  But there wasn't any affidavit from the

6   affiant that said that, it was just the Government made that

7   representation.

8            And so I think the defendant's position is the

9   Government says that in its brief, but is the affiant prepared

10  to swear to that?

11           MR. COWEN:  Well, I understand as well, your Honor,

12  and we -- first of all, in the original federal warrant,

13  paragraph 2, it does say they were using undercover accounts,

14  but then, also, as part of our preparation for this hearing and

15  our briefing, we absolutely met with law enforcement to verify

16  that that claim was not true.  And as officers of the court, we

17  absolutely confirmed that they didn't use anything from the two

18  state search warrants as part of the basis of the photographs

19  or whatnot for the basis of these federal warrants.

20           We had several different investigations going on here

21  involving the carjacking, the state originally started

22  investigating the kidnapping.  And then the ATF was separately

23  investigating this group as well.  And I know -- I recognize

24  Mr. Gleeson's position, that he wants this Court to believe

25  that the Federal Government just instantly had all of this

1   information all at one time, but that's just not simply the

2   truth.  Different agencies were investigating different crimes,

3   different groups.  And then, not until the first federal

4   warrant was it beginning to be clear that these different

5   crimes were related.

6          THE COURT:  Okay.  Well, as I started, it is -- and I

7   realize, you know, the defendants are at -- somewhat at a

8   disadvantage here, that they don't know exactly what the agents

9   did or didn't do until they're advised of it by the Government,

10  but it is a high burden and the defendants do have to, as I

11  said, make a substantial preliminary showing that the affiant

12  knowingly and intentionally included a false or material

13  omission in the affidavit.

14         And I -- that showing hasn't been made here, that

15  there's a false omission.  The representation has been made

16  that the affiants in support of the federal warrants did not

17  use any of the information gathered from the evidence seized

18  from the state warrants.  And that does seem at least somewhat

19  supported by the representation that they had access to

20  information from the defendant's social media accounts.

21         So I don't think there's been enough of a showing to

22  have a Franks hearing, but we'll certainly have oral argument.

23         And before I deal with the substantive issues, I do

24  have a few questions I want to direct to counsel.

25         Mr. Cowen, I'm going to start with you.

Motion Hearing - May 3, 2024

1    Is there any way to simplify this a bit?

2    Does the Government intend or need, at trial, which

3  will be focused on this November 14 to 15 incident, to

4  introduce, at trial, any evidence seized from the state

5  warrants?

6    MR. COWEN:  No.

7    THE COURT:  So can you just agree that you won't

8  introduce any evidence seized from the state warrants and we

9  can take that issue out?

10    MR. COWEN:  Certainly, in our case in chief, Judge, I

11  think we'd be prepared to agree to that.  I can't fully

12  analyze, whether on cross or rebuttal, if that information

13  would become relevant, but the defendant is not -- Mr. Blake is

14  not charged with, in this case, being a felon in possession.

15    THE COURT:  Right.

16    MR. COWEN:  So the photographs of him with a gun and

17  pills.  So yes, off the top of my head, I can't see --

18    If I can have a minute.

19    THE COURT:  Some communications, he's having well

20  before November?

21    MR. COWEN:  Because the -- Judge, I don't recall

22  every piece of information recovered from the state warrants,

23  but looking at the time frame that the warrant allowed a

24  search, from October 21 through January 25, I mean, the scope

25  of that warrant was ten or so months before the kidnapping, so

1    I'd be hard-pressed to advocate any omission of that evidence

2    or that it would be permissible.

3          I suppose there's a potential -- our 404(b) deadline

4    is still about three weeks away, but I don't believe we have

5    any basis to introduce evidence from Mr. Blake's two state

6    warrants.

7          THE COURT:  Okay.  I looked at -- I think it's ECF

8    206-4, Exhibit D, which is a summary report from the execution

9    of the warrant.  I just -- nothing jumps out at me that looks

10   like it pertains to the November 14 incident.

11         MR. COWEN:  Yeah.

12         And, Judge, I don't -- and I think that's the case.

13   I'd imagine we would have been advocating for that, by now

14   anyways, based on if we had found something so intricate to the

15   kidnapping that happened ten days -- ten months later but this

16   is a case with a -- as this Court knows, a carjacking, and

17   then, hours later, was the result and the motive behind the

18   kidnapping.  So Mr. Blake's account from ten months before, I

19   don't -- I can't think of anything off the top of my head that

20   would --

21         THE COURT:  Okay.  And I can ask the defendants as

22   well, or Mr. Gleeson, and then any of the defendants who joined

23   in.

24         Is there anything seized or obtained from the state

25   warrants that the defendants in particular would like to keep

1    out?

2            What are you asking me to suppress from the state

3    warrants?

4            Now, maybe, it's everything.

5            MR. GLEESON:  That's exactly what I was going to say.

6            THE COURT:  Well, in particular, now that the

7    Government is saying, off the top of their head, they don't see

8    the need to introduce anything, what in particular, so that we

9    could deal with this now or at least pretrial if we needed to,

10   that you want to keep out?

11           MR. SABBOTA:  Everything that's seized, including

12   the --

13           THE COURT:  I want to know specifically, what

14   particular --

15           MR. GLEESON:  Well, I'm not -- I can't, right now,

16   tell you specifically, but going through discovery that I've

17   received, all the conversations that were going on that

18   Mr. Blake was having back and forth with people on the

19   Instagram.

20           THE COURT:  Okay.  Anybody else?

21           MR. GLEESON:  And the photographs that depict various

22   things.  There was -- there's various photographs that depict

23   various things.  You know, guns, money, drugs, that kind of

24   thing.  Because it looks, to me, when I first became --

25           THE COURT:  That were seized from Mr. Blake's --

1    MR. GLEESON:  Yes.

2    THE COURT:  -- account in the state warrants?

3    MR. GLEESON:  Yes.

4    THE COURT:  What particular conversation?

5    MR. GLEESON:  Well, there's conversations going back

6  and forth between various individuals that are here, and

7  they're going to attempt, at their trial -- I believe the

8  Government will attempt to create an image that they're a gang

9  back and forth.  And there's conversations that it might raise

10  that inference.

11    THE COURT:  Okay.  So it sounds like probably

12  something we can deal with if it's a rebuttal issue.

13  Government, right now, is suggesting they don't think they need

14  to introduce anything from the state warrants.  And I don't

15  have a sense that they're going to need to introduce anything

16  from the state warrants.

17    So let's just put that to the side.

18    I know there are a few specific group chats that are

19  more at issue than others and so I'm going to reference them as

20  kind of the key group chats.

21    Mr. Cowen, did the Government obtain those group

22  chats, because I know one of them, I believe, involved 11

23  individuals, and we only have seven defendants?

24    Did the Government obtain any of the group chats that

25  I know the defendants are looking to exclude from the social

Motion Hearing - May 3, 2024

1   media accounts of anyone who is not a defendant challenging a

2   warrant?

3          MR. COWEN:  Yes.  In fact, the conversations that are

4   continuously being referenced, I believe, are all seized from

5   what's identified in the Government's response brief as subject

6   to Count Number One, and that individual is not charged in this

7   case.

8          Everyone else's account, I believe, had those

9   conversations deleted.  And -- but this one individual did not

10  delete his social media.  And so, therefore, the Government got

11  these group chats from that, which is, in large part, a

12  position we take as it relates to standing.

13         THE COURT:  Okay.  And that's why, just

14  preliminarily, I want to know if the defendants are in a

15  position at all to identify specific evidence that they're

16  seeking to exclude as opposed to, "We want to exclude

17  everything that was seized from these warrants when there is a

18  chance that some of the information came from identical

19  information came from elsewhere, where there wouldn't be a

20  basis to exclude it."

21         There may be a basis to exclude it from Mr. Blake's

22  account, but if there's somebody else on that group chat who is

23  not challenging it, then it would come in that way.

24         So do you have specifics or is the defendant's

25  position today, "We want to exclude everything"?

Motion Hearing - May 3, 2024

1        MR. SABBOTA:  On behalf of Mr. Blake, your Honor, my

2   position is to exclude everything.

3        THE COURT:  All right. Well, let me hear from

4   Mr. Gleeson, because you joined in his motion.

5        MR. GLEESON:  Correct.

6        THE COURT:  So what is the scope of the motion?

7        MR. GLEESON:  Your Honor, my -- the scope was that

8   all of the results that were provided by Meta, Facebook, what

9   have you, should be suppressed.

10       THE COURT:  Okay.  And what if it's independently

11  obtained from elsewhere?

12       MR. GLEESON:  And I don't mean to go back to the

13  Franks issue, and I understand the Court's ruling.  I don't

14  want to be heard as trying to revisit that.  I hear paragraph 2

15  that Mr. Cowen mentioned, and it's noted in my brief, that they

16  say this without any reference.  I don't know about any of the

17  other defendants.

18       I don't believe that I've seen any reports of review

19  of Instagram accounts that were open to the public.  The

20  materials that I've seen, I believe, all come from the search

21  warrants that I'm challenging.

22       So if there is an independent non-search warrant

23  police activity that resulted in items that are going to be

24  offered by the Government that were out there publicly or what

25  have you, that would be a different issue, obviously.  But I

1  don't have the information to talk about those because I don't

2  --

3         THE COURT:  You mean if individual accountholder one

4  --

5         MR. GLEESON:  I think that's Mr. Ramone Turner, I

6  believe, is subject account one.

7         THE COURT:  Okay.  If Mr. Ramone Turner gave the

8  Government his copy of the group chat, you haven't been given

9  anything in discovery that says that?

10         MR. GLEESON:  May I consult with Mr. Cowen on that?

11         THE COURT:  Sure.

12         (Inaudible conversation held between Mr. Gleeson and

13         Mr. Cowen at 9:46 a.m.)

14         MR. GLEESON:  Your Honor, in speaking with Mr. Cowen,

15  and I'll let him speak for himself, obviously, but subject --

16  Mr. Turner, subject one, that information was acquired by a

17  search warrant.

18         THE COURT:  Okay.  But it's not being challenged.

19         MR. GLEESON:  Based --

20         THE COURT:  And you don't have standing to challenge

21  that.

22         MR. GLEESON:  That just -- that's two questions.

23         First --

24         THE COURT:  Well, they were statements, but I'll turn

25  them into questions.  Fair enough.  They should be questions.

1  That's fair.

2          MR. GLEESON:  I'm asking leading questions.

3          THE COURT:  Because we're going to get to the

4  standing issue.

5          MR. GLEESON:  Right, right.

6          The materials in subject account number one, Ramone

7  Turner, that were there to be seized, were seized by one of the

8  search warrants.  I think the first ones that I was -- I am

9  challenging.  So it's not an independent other search warrant

10 solely for Mr. Turner's account, it is the search warrants at

11 issue that --

12         THE COURT:  And you probably have standing to

13 challenge the search warrant as it pertains to Mr. Lewis'

14 account, but you don't have standing to challenge the search

15 warrant as it pertains to Mr. Ramone Turner's account.

16         MR. GLEESON:  I believe that the changing electronic

17 communication environment kind of puts a different analysis for

18 standing, the idea of a reasonable expectation of privacy and

19 all of that.

20         My understanding is that these group chats that the

21 Government is going to offer from Mr. Turner's, subject matter

22 one's, account were private -- and I think I -- I put this in

23 my brief -- were private conversations that were private, not

24 public, not available, and there was an expectation of privacy

25 amongst these individuals because it was member-only, you had

1    to be admitted by the administrator.

2            THE COURT:  But Mr. Turner can't receive it and give

3    it to the Government himself?

4            MR. GLEESON:  That didn't happen, though.

5            THE COURT:  Right.  But what happened is they got it

6    from his Instagram account, and he's not challenging that.  So

7    what's the difference between that -- because I agree with you

8    and we're going to get to that.

9            MR. GLEESON:  Right.

10           THE COURT:  The law is a little bit mixed.  But even

11   assuming that, that the people on the group chat have a

12   reasonable expectation of privacy and somebody who gets the

13   chat hands it to the Government.

14           That's one scenario.

15           Somebody who gets the chat, there's a warrant for it

16   and he doesn't oppose that, he says, "Fine, you have a warrant

17   for my account."  Okay.  That's --

18           MR. GLEESON:  I think --

19           THE COURT:  The -- all the people in the group chat

20   then can say that's unconstitutionally seized?

21           MR. GLEESON:  My view is, Judge, I think the

22   practical result of following your reasoning would be that

23   there's never an expectation of privacy in a group chat then,

24   so -- and I think that that --

25           THE COURT:  There may be at some point in time, but I

Motion Hearing - May 3, 2024

1  could see where somebody might change their mind.  And at the

2  time, they engaged in the chat, they fully intended it to be

3  private, but down the road, they decide to turn it over.

4        MR. GLEESON:  Right, but that -- that can happen at

5  any point in time.

6        So my view of the Court's assessment, or at least its

7  proposed assessment to me, is that any time there's a group

8  chat on Instagram or Facebook, where it's private, where it's

9  utilizing the Instagram features to keep it private, that no

10 one has standing to challenge a Government search of that -- of

11 that private --

12       THE COURT:  No, I'm not saying -- because there's law

13 that says you do.

14       MR. GLEESON:  Right.

15       THE COURT:  You do have a right to challenge that,

16 but the law is the Government needs a warrant.

17       MR. GLEESON:  Correct.

18       THE COURT:  And the Government had a warrant.  And

19 they served that warrant and said, "We want Mr. Ramone Turner's

20 group chats, so let's make it simple."  And they got them.  And

21 nobody's challenging that.

22       MR. GLEESON:  Well --

23       THE COURT:  I don't see any case law -- I mean, the

24 person who can challenge is that is not challenging that.

25       MR. GLEESON:  Right.  And that puts the standing in

Motion Hearing - May 3, 2024

1   the hands of the Government.  They could then elect who they

2   want to prosecute and who not.  And they can just say, "Well,

3   we don't want to prosecute person A.  We'll keep them out."  So

4   they can't assert a challenge.

5          I mean, that doesn't seem to me to be a very fair or

6   due process, if you will, result, when it puts standing in the

7   hands of the Government by selecting who they want to

8   prosecute.  And sometimes it may be fortuitous, sometimes it

9   may not, but putting that --

10         THE COURT:  Maybe there's somebody on that group chat

11  who wasn't involved in the incident and there's no basis to

12  charge them.

13         MR. GLEESON:  That may be.  That may be one example.

14         THE COURT:  Okay.

15         MR. GLEESON:  But we're still -- we're still --

16         THE COURT:  All right.  Because that's not what we're

17  dealing with here.  We're dealing with suppressing what was

18  obtained from the warrants that are at issue.

19         I'm just asking you all a few questions because I

20  know one of the issues I'm going to have to deal with is

21  inevitable discovery or discovery from some other means, which

22  might impact, even if I suppress things, whether it would come

23  in a different way.

24         Actually, Mr. Cowen, I'm going to put my question to

25  you to the side because I think I'm going to stick with the

1  position that we're not going to be introducing into evidence,

2  at trial, any of the materials seized from the state warrants.

3  So I'm going to kind of put those aside.

4       And so, then, Ms. Brunson, I know you did the

5  briefing on the Turner motion, which is focused on the April 7,

6  2022, warrant that was seeking information from the social

7  media accounts for Blake, Ayers, Williams and Karamoh Turner,

8  also his brother, but I'm going to deal with the four

9  defendants.

10      And the essence of the affidavit is we're looking for

11 evidence of felon in possession, which I know pertains to

12 Mr. Blake.  And I think one of the others had a -- had a prior

13 felony.  And possession by a substantial drug user.

14      So I'd like, Ms. Brunson, if you -- for each of the

15 four defendants, if you could just give me the bullet point

16 version.

17      For Mr. Ayers, the bullet point, what's the probable

18 cause that Mr. Ayers was a substantial drug user?

19      MS. BRUNSON:  Just one moment, your Honor.

20      THE COURT:  Okay.  It is -- I think it is just

21 Mr. Blake who had the prior felony conviction.

22      MS. BRUNSON:  Correct.

23      THE COURT:  So we'll put that to the side.

24      So the other three, the focus is possession of a

25 firearm by a drug user, which, we know from the case law, has

Motion Hearing - May 3, 2024

1    to be more than just an occasional or one-time --

2              MS. BRUNSON:  Correct.

3              So, regarding Mr. Ayers, in February of 2022,

4    Mr. Ayers is depicted in a photograph with suspected marijuana

5    smoke hanging in the air.  That's at paragraph 38.

6              And in August of 2020, Mr. Ayers discussed, during a

7    recorded call, being so high that he could not recognize

8    someone that he knew.

9              On January 23rd, February 23rd, July 1st and August

10   10th of 2021, Mr. Ayers was arrested with real guns.  He was in

11   possession of a Glock, an AK-47 and an AR-15.

12             THE COURT:  Okay.  I'm sorry.  I want to focus on the

13   drug use.

14             MS. BRUNSON:  Right.  Okay.  That's fine.

15             THE COURT:  So there's the one photo -- one photo and

16   one call.

17             MS. BRUNSON:  I referenced paragraph 38, I referenced

18   paragraph 41.  And in the Government's view -- and the Court

19   knows that it has to look at the affidavit in its entirety and

20   not piecemeal.  But when you read the entire thing, all of this

21   information that was contained therein is not a coincidence.

22   There's several 1125 members and associates are encircled in

23   smoke, or holding what appears to be marijuana, cigars, and/or

24   guns, and that members in these pictures or are in these

25   pictures on their own social media pages, as well as these

1    others, and this behavior went on for months.

2            The issuing magistrate did not make --

3            THE COURT:  You might be in a photo with other people

4    smoking, but you, yourself, are not.

5            MS. BRUNSON:  True.

6            THE COURT:  So that's why I'm just trying to focus

7    on -- the underlying basis of the warrant is, we have reason to

8    believe that there's unlawful possession of a firearm.

9            MS. BRUNSON:  Correct.

10           THE COURT:  And we have people who, other than

11   Mr. Blake, don't have convictions.  So --

12           MS. BRUNSON:  Correct.

13           THE COURT:  -- were not felon in possession, but

14   people who were substantial drug users are also prohibited from

15   possessing guns.

16           MS. BRUNSON:  Yes.

17           THE COURT:  So that's where we're going with that on

18   the affiant.

19           So I'm just trying to get a sense of -- for the three

20   individuals who fall under that category.

21           MS. BRUNSON:  And those three individuals meaning --

22   and I want to make sure we're on the same page -- Mr. Turner,

23   Mr. Blake and Mr. Ayers.

24           THE COURT:  I was thinking Ayers, Williams, Turner.

25           MS. BRUNSON:  Williams has not join this motion and

1   he struck his joinder on yesterday.

2           THE COURT:  Well, he joined the other one, so the

3   Lewis one covers all of them.  That's a -- Lewis' motion covers

4   everything.  That's why I started with Turner's motion, I

5   think, is subsumed within Lewis' motion, and he joined in that

6   one.  So it was untimely and I didn't think it was needed.

7           MS. BRUNSON:  Right.

8           Well, again, we're confined to the four corners of

9   the affidavit.  The affidavit --

10          THE COURT:  Right.  And so is the magistrate judge.

11          MS. BRUNSON:  Correct.

12          THE COURT:  Yeah.

13          MS. BRUNSON:  And the magistrate, who, in the

14  Government's view, did not make an overzealous inference but,

15  rather, her decision to sign this warrant was based on things

16  like reason, common sense.  And the training experience of the

17  affiants, as well as the totality of the circumstances that

18  there was circumstantial evidence of these young men, including

19  the ones that we've named, were engaged in the regular use of

20  marijuana while armed with guns.

21          Circumstantial evidence is sufficient to sustain --

22          THE COURT:  Right.  I don't want the argu -- I get

23  the argument.  That's why I said I just have a few questions

24  for each side here.

25          I've read the briefs.  I just wanted some bullet

Motion Hearing - May 3, 2024

1    points.  And did you for Ayers.

2                MS. BRUNSON:  Right.

3                THE COURT:  So you said there's a photo and a call.

4                MS. BRUNSON:  Yep, there's a photo and a call.

5                As it relates to Mr. Turner, the affidavit includes a

6    picture of Mr. Turner smoking what looks like a marijuana blunt

7    in December of 2021.  That's at paragraph 54.  He was observed

8    with firearms and suspected marijuana on his brother's

9    Instagram page in October of 2021, at paragraph 55.

10               He's present in pictures with firearms where others

11   are smoking what appears to be marijuana in paragraph 21.

12               And then there is -- in paragraph 38, Mr. Turner is

13   tagged in a photo that's posted in February of 2022, of an

14   individual who was smoking what appears to be marijuana.

15               As it relates to Mr. --

16               THE COURT:  Is it someone else or is that Mr. Turner?

17               MS. BRUNSON:  It was someone else.

18               Did you want me to address Mr. Blake, or no?

19               THE COURT:  No, I'm focused more on the -- I guess my

20   sense was, the focus of Mr. Blake was more of a felon in

21   possession.

22               MS. BRUNSON:  That's correct.

23               THE COURT:  So then we have Williams.

24               MS. BRUNSON:  Yes.

25               And hold on one second and I'll get to those

1 paragraphs.

2     Mr. Williams is account -- subject to account number

3 four.  In paragraphs 46 through 49, there's information that's

4 provided by the affiant, as well as photographs of Mr. Williams

5 in possession of firearms.  There were stories that were

6 Instagram stories from Mr. Williams' account in July of 2020

7 and May of 2021, where it appears he is smoking a marijuana

8 blunt.

9     There is a picture depicted in paragraph number 50 of

10 Mr. Williams, where he is in a cloud of smoke that says, "We

11 smoke that dope back to back, got me floating."

12     So, again, there's information contained within the

13 affidavit of him in possession of firearms, but, also, there

14 are Instagram stories of pictures of him where he's talking

15 about smoking dope and he's encircled in a cloud of smoke in

16 connection to those photographs.

17     So, again, based upon the training and experience of

18 the affiant, who -- hold on one second -- the affiant had a

19 dearth of knowledge and experience with drug crimes and gangs,

20 so he's familiar with the hallmarks and behaviors associated

21 with gun, gangs and drug use.  And he's also familiar with

22 firearms, given his training and experience and personal

23 knowledge.  More, he gathered considerable evidence regarding

24 the activities of the 1125 gang.

25     So there is a fair probability that the litany of

1    guns and rifles depicted in the social media accounts, along

2    with what the affiant suspected to be marijuana use was enough

3    for the magistrate to issue this warrant to search for evidence

4    of the crimes outlined on page 1 or the cover sheet of the

5    search warrant.  And they're not for nothing.

6            Magistrate Judge Altman also has significant

7    experience in reviewing search warrants.  She is no babe in the

8    woods, and she signs search warrants and complaints.  So

9    sometimes she rejects them, too.

10           And a magistrate's determination of probable cause

11   should be paid a great deference by this Court.

12           THE COURT:  Okay.  So, Ms. Brunson, the -- both sides

13   rely on similar law for what you need to show under 922(g)(3).

14   The one time or infrequent use of a controlled substance is not

15   sufficient to establish the defendant as an unlawful user.

16   Rather, the defendant must have been engaged in use that was

17   sufficiently consistent and prolonged as to constitute a

18   pattern of regular and repeated use of a controlled substance.

19           And so do you think, you know, a photo or two and a

20   reference to being high and smoking dope, does that satisfy

21   that standard?

22           MS. BRUNSON:  Yes.

23           And in particular, just when you look at the range,

24   and that's why the Government was sure to point out that this

25   wasn't just, as you said, one day, but this was over a range of

Motion Hearing - May 3, 2024

```
 1   dates.

 2           So, for example, for Mr. Ayers, it was from February

 3   of 2022.  The jail call was in 2020.  So this is a long period

 4   of time.  And I think that can be said of all of the

 5   individuals that you've asked the Government to focus on, that

 6   it wasn't just one incident, but there are a series of

 7   incidents over the course of several months.  And again, it

 8   shouldn't be looked at in a vacuum, but rather when you just

 9   take into account the entire search warrant and the information

10   contained therein --

11           THE COURT:  But do you think the defendants then have

12   standing to challenge the entirety of the warrant or only the

13   portions that pertain to their accounts?

14           MS. BRUNSON:  Only the portion that pertains to their

15   account of the -- I think the Government, in its response brief

16   --

17           THE COURT:  Okay.  So if you want me to focus on

18   their side of just their account, if I were to do this more

19   narrowly and say, "Okay.  I'm going let Mr. Ayers have his turn

20   and I'm going to let Mr. Williams have his turn," then I would

21   be focusing, right, on whether there's sufficient probable

22   cause to obtain the information requested from each of their

23   individual accounts?

24           MS. BRUNSON:  I understand the Court's question.

25           But, again, you have to -- you can't -- you can't do
```

 1   that because you have to look at the four corners of the entire

 2   warrant, so that means looking at everything.

 3          THE COURT:  So then would they have standing to

 4   challenge everything?

 5          MS. BRUNSON:  I don't think they would have challenge

 6   to stand -- to -- I don't think they would have standing to

 7   challenge everything.

 8          THE COURT:  Okay.  Even if I looked at it in its

 9   entirety, is that helpful or harmful?

10          Do I see -- I see a very voluminous affidavit.  Do I

11   see, throughout that affidavit, Mr. Ayers smoking marijuana

12   other than in one photo?

13          MS. BRUNSON:  Yes, because the affidavit, in its

14   entirety, have to contain facts that indicate a fair

15   probability that evidence of a crime would be located in the

16   place to be searched; in here, on these Instagram accounts.  So

17   you have to take all of it into consideration.

18          THE COURT:  Okay.  All right.  Then let me ask -- I

19   suppose it would probably be Mr. Gleeson, but -- Mr. Gleeson, I

20   know you're needed elsewhere.  Are you all right to have other

21   defense counsel cover the hearing?

22          MR. GLEESON:  I am.  We're not doing the Enright

23   hearing today?

24          THE COURT:  We are.

25          MR. GLEESON:  We are.

1          Because I can -- I talked about that with Mr. Lewis,

2    that I'm in trial in front of Judge Hood, and I'm already a few

3    minutes late.  More than a few.

4          I believe he is okay with the other -- I mean, these

5    are some of the best lawyers in town around me.  I have no

6    problem --

7          THE COURT:  And everybody joined or lots of people

8    joined.

9          MR. GLEESON:  Correct.

10          Mr. Lewis, you understand that?

11          THE DEFENDANT:  Yes.

12          MR. GLEESON:  You have no problem if I go to the

13    trial and let these guys finish it up?

14          THE DEFENDANT:  No.

15          MR. GLEESON:  You understand they might even do a

16    better job than I did?

17          MR. GLEESON:  Yes.

18          THE COURT:  Is there unanimity on the --

19          Thank you.

20          MR. GLEESON:  On that side there is, yeah.

21          Yes, Judge, may I be excused?

22          THE COURT:  Thank you for your accommodation here.

23    Good luck to you.

24          Actually, probably, Mr. Amberg, is a question I

25    should ask you.

1          So the questions I just asked Ms. Brunson --

2          MR. AMBERG:  Yes.

3          THE COURT:  -- are within the purview of a federal

4    magistrate judge.  And within the four corners of the

5    affidavit, the agent provided the law to the magistrate judge,

6    "Here's the law, here's my training and experience, here's my

7    evidence, and a federal magistrate judge evaluated that and

8    issued the warrant."

9          How is that not good faith on the part of the -- or

10   how can I find there's not good faith on the part of the agent

11   executing that warrant?

12         MR. AMBERG:  Well, regarding good faith, I mean, this

13   is a -- at least for Mr. Turner, for Karamoh Turner, it is as

14   bare bones affidavit as I've ever seen.  There's a difference

15   between guessing, and this is what that is.  If you actually

16   look at the four or five parentheticals that are put on there

17   for Mr. Turner about why there's probable cause that he is

18   somehow a drug user with a gun, using drugs with regularity, I

19   mean, there is nothing here.  Any --

20         THE COURT:  Okay.  But I'm saying to you, a federal

21   magistrate judge did not find that.  A federal magistrate judge

22   issued this.

23         MR. AMBERG:  Sure.

24         THE COURT:  And so then the question is, the legal

25   question, assuming you can even raise this, because I don't

1  think you are raising a good faith defense, and maybe that's

2  the simple answer, or you're not challenge -- the Government is

3  saying the good faith exception applies, it may be that you're

4  not rebutting that or even trying to rebut it, but if I'm -- if

5  I want to raise it and say she looked at it and didn't think

6  that way, so then why would an agent not be able to rely on the

7  fact that he laid all this out, "Here's what I think is

8  sufficient evidence, I've got photographs, I've got

9  communications, I've got my training and experience, I'm giving

10  you the law, and you issue it," why is that not classic good

11  faith reliance?

12         MR. AMBERG:  Again, your Honor, when we look at good

13  faith, we look at the -- you know, is this warrant affidavit a

14  bare bones affidavit?

15         And, I mean, I think I even said that in my motion,

16  anticipating that may be a likely argument to say, "Hey, well,

17  it was good faith, the agent, in good faith, went in there and

18  did this, but it's bare bones."

19         The fact that the magistrate signed on this, I don't

20  think that makes a difference.  If a magistrate signs on

21  something, like a warrant, and we consider that to be enough,

22  then we would never have a suppression hearing, never, ever.

23  People do make mistakes, but it goes beyond that here.

24         When you look at the actual facts for Mr. Turner --

25  because you have to think about what's going on here in this

1  search warrant affidavit.  It's not just one piece of evidence

2  that the agents are trying to get.  They're trying to get a lot

3  of different stuff.

4          So, really, I think, in proper practice, it probably

5  should have been separated out into separate search warrant

6  affidavits, because if a magistrate is seeing all the stuff,

7  you know, for all these different people, you know, I could see

8  the magistrate coming to the wrong conclusion.  Because,

9  really, what should have happened here is a very narrowed

10  analysis of Mr. Turner and why there was probable cause to

11  believe that he was a drug user with regularity.

12          And when you actually look at what was provided -- I

13  mean, look at that photo.  Think about this.  The agent says,

14  "In my training and experience, you know, I'm making these

15  assumptions."  And when you look at the first picture of

16  Mr. Turner, it's Mr. Turner with a cigar in his hand.  And what

17  the agent basically says is, "Hey, it looks like you smoking

18  suspected marijuana."

19          Well, what is the difference between that picture and

20  if I am at a country club, smoking a cigar?  Would he make that

21  same conclusion for me?

22          I can tell you what the difference is.  And the

23  difference is simply that we have a young African American man

24  with, what looks to me to be, a cigar in his hand.  There's

25  nothing else to indicate that.

Motion Hearing - May 3, 2024

1          So what little we do have as far as, like, the

2    probable cause proffered evidence, it really is nothing more

3    than a guess, and a guess is not enough to get a search

4    warrant.  You have to have actual evidence.

5          So what the agents should have done was actually

6    figure out to see if in fact whatever is going on here in this

7    first picture is Mr. Turner with marijuana as opposed to just a

8    cigar.  You can't make these inferences.  I'm sorry, it is not.

9    It's, like, the optics are very bad on that.

10         You can see poor President Trump walking around with

11   a cigar in his hand on videos all the time, on TV all the time,

12   at golf courses.  Would your Honor, for one second, think that

13   was evidence of him smoking marijuana?  I don't think so.

14         And so when you look at, like, the good faith

15   exception, it's not there for agents who provide these bare

16   bones affidavits and, rightfully so, because if it was the

17   other way around, something like this where I -- as I looked at

18   this, and I looked, I said, "Wait.  Wait.  That's it?"  I'm

19   like, "Where is the meat and potatoes here?"  There was none.

20         I mean, you even -- my client, I don't think, has any

21   prior criminal history.  The times that they're saying he has a

22   firearm are in what looks to be a private place.  I wasn't

23   aware that you weren't allowed to have a gun in a house,

24   especially if, you know, you have no other reason not to be

25   able to carry a gun.  There's nothing in here that indicates he

1  was using marijuana.  And even so, your Honor, as you said

2  before, you can use marijuana once in a while and have a gun,

3  and that's fine.

4          So when we go back to looking at how Magistrate

5  Altman looks at this, why weren't those questions being asked?

6  Because that would have been the first thing I would have

7  asked.  "Wait a second, sir, Agent Jacobs.  How do you know

8  that's even marijuana?  Wait a second, Agent Jacobs.  Show me

9  evidence that this is more than just, like, maybe one time or

10 two times of Mr. Turner using marijuana," even if it is

11 marijuana.  And none of that happens.

12         And that's why this has to be suppressed here,

13 because it was Magistrate Altman -- I give her much respect;

14 been in front of her many times.  But that's why we have these

15 hearings here.  This has to get suppressed.  If this is a good

16 bare bones -- I mean, it's a bare bones affidavit.  If this is

17 good, I don't know what could be bad.

18         THE COURT:  Okay.  Thank you.

19         All right.  Turning back to the motions, the Fourth

20 Amendment requires that warrants be issued only, quote, upon

21 probable cause supported by oath or affirmation and

22 particularly describing the place to be searched and the

23 persons or things to be seized.

24         That's the Fourth Amendment.

25         A warrant is valid when the supporting affidavit

1    provides a substantial basis for the issuing magistrate judge

2    to believe there is a fair probability that contraband or

3    evidence of a crime will be found in a particular place.

4            Illinois v. Gates, 462 U.S. 213, 238 (1983).  The

5    Supreme Court has repeatedly emphasized that, quote, probable

6    cause is not a high bar to clear.

7            District of Columbia v. Wesby, 138, Supreme Court

8    577, 586.  A magistrate judge's determination of probable cause

9    supporting a warrant is entitled to great deference.  Id. at

10   236.

11           Lewis argues, in essence, that the state warrants

12   lacked probable cause and thus, any information used from them

13   to secure the federal warrants is fruit of the poisonous tree.

14           Likewise, says Lewis and the concurring defendants,

15   the affidavits for the final three federal search warrants,

16   Exhibits H, I and J, quote, used the improperly seized group

17   chats and contacts to identify and seize information about

18   Mr. Lewis and other defendants.

19           That information was from the first -- I'm sorry --

20   that information was from the first federal search warrant,

21   which, in turn, relied on the evidence supplied by the illegal

22   state law search warrants, end quote, and thus, were fruits of

23   the poisonous warrants.  ECF page 242, page ID 1714.

24           For most of the defendants, these arguments are

25   procedurally and legally unavailing, even setting aside that

1  information from the state warrants was not used in connection

2  with securing the federal warrants.

3        First, the Court agrees with the Government that

4  because the state warrants obtained information from only

5  Blake's Instagram account, the other joining defendants do not

6  have standing to challenge the use of this information.

7        To establish that police violated his Fourth

8  Amendment rights, a defendant must show that he had, quote, a

9  legitimate expectation of privacy, end quote, in the place that

10  was searched.  Hicks v. Scott, 958 F.3d, 421, 431, Sixth

11  Circuit, 2020, quoting Rakas v. Illinois, 439 U.S. 128, 144,

12  1978.  Quote, a legitimate expectation of privacy comes in two

13  parts.  First, defendants must have exhibited an actual, paren,

14  subjective, end paren, expectation of privacy.  Second, that

15  expectation must also be one that society is prepared to

16  recognize as reasonable, end quote.  United States v. Rogers,

17  2024, U.S. App. LEXIS, 8604, at *2, 6th Circuit, April 10,

18  2024.

19        It is well-established that, quote, Fourth Amendment

20  rights are personal rights, which, like some other

21  constitutional rights, may not be vicariously asserted, end

22  quote.  That's Rakas, 439 U.S., 133 to 134.  United States v.

23  Knox, 839 F.2d 285, 293 at F.3d.  Sixth Circuit 1988.

24        Quote, it follows that suppression of the product of

25  a Fourth Amendment violation can be successfully urged only by

1   those whose rights were violated by the search itself, not by

2   those who are aggrieved solely by the introduction of damaging

3   evidence.  Co-conspirators and co-defendants have been accorded

4   no special standing, end quote.  United States v. Williams, 354

5   F.3d, 497, 510 to 511.  Sixth Circuit, 2003, quoting United

6   States v. Padilla, 508 U.S. 77, 81 to 82, 1993.

7          Thus, the moving and joining defendants can challenge

8   only the warrants that pertain to their own social media

9   accounts, not warrants pertaining to the social media accounts

10  of their co-defendants.

11         The first two state warrants pertained only to the

12  social media accounts of Mr. Blake.  He has joined Lewis'

13  motion and thus, he has standing to challenge the two state

14  warrants.

15         But because the other defendants do not have standing

16  to challenge the two state warrants, their arguments that the

17  federal warrants that pertain to their social media accounts

18  are fruit of the poisonous tree is precluded.

19         As the Sixth Circuit has ruled, quote, evidence taken

20  in violation of one defendant's Fourth Amendment rights and

21  thus, inadmissible against him is nonetheless admissible

22  against a co-defendant, whose rights had not been violated, end

23  quote.  United States v. Noble, 762 F.3d, 526.

24         The Williams case helps make the point.  As the Court

25  explained, quote, the district court stated:  It is undisputed

1    that if Agent Henderson's first warrantless entry of the

2    Bluegrass residence was unconstitutional, then all subsequent

3    evidence was obtained unlawfully because the subsequent search

4    and arrest warrants were derived solely in evidence obtained by

5    Agent Henderson during that entry.  On appeal, the Government

6    argues that even if the warrantless entry of the Bluegrass

7    residence was unconstitutional, Williams lacks standing to

8    challenge the subsequent searches and the fruit of the

9    poisonous tree doctrine cannot extend to him.  Williams

10   concedes that he lacks standing to contest the warrantless

11   entry but counters the Supreme Court's decision in Wong Sun v.

12   United States, 371 U.S. 471, 1963, requires suppression of all

13   evidence obtained as a result of the information derived from

14   the warrantless entry into the Bluegrass residence.  We

15   disagree, end quote.

16            And after stating general standing law, the Sixth

17   Circuit continues, indeed, quote, this Court has previously

18   rejected the reading of Wong Sun urged upon us by defendant.

19   This Court has twice held that Wong Sun precludes the argument

20   that a defendant is entitled to the suppression of evidence

21   simply because it is the fruit of a violation of his

22   co-defendant's Fourth amendment rights.  Accordingly, we affirm

23   the district court's denial of Williams' motion to suppress,

24   end quote.  And that's Williams 354 F.3d, 510 to 511.

25            Without a viable fruit of the poisonous tree

1    argument, Lewis alleges for the first time in his reply brief

2    that the moving defendants have a legitimate expectation of

3    privacy in, quote, the group chat conversation that Instagram

4    disclosed in response to each of the search warrants, starting

5    with the state law warrants, end quote.  ECF number 242 at page

6    ID 1710.  They were shielded from public review first by the

7    privacy of the account and second by the security of the

8    invitation process.  Id. at page ID 1711.

9           Lewis argues, quote, private messages on social media

10   are, like email, inherently private, end quote, because such

11   messages, quote, are not readily accessible to the general

12   public, end quote.  ECF number 242 at page ID 1709.

13          Aligned with the standing law, courts have held that,

14   quote, a person has no expectation of privacy in another

15   person's email account, end quote.  United States v. Lustyik,

16   L-U-S-T-Y-I-K, 57 F. Supp. 3d, 213, 223, Southern District of

17   New York, 2014.  See also United States v. Almaleh,

18   A-L-M-A-L-E-H, 2022 U.S. Dist. LEXIS 35260, at *34 to 35,

19   Southern District of New York, 2022, stating, quote, because

20   defendant lacks standing to challenge the search of another's

21   email account, the Court denies his motion to suppress all

22   evidence obtained pursuant to the email warrant.

23          The Sixth Circuit has also previously determined that

24   the sender of an email loses a legitimate expectation of

25   privacy once the email reaches the recipient, analogous to a

1  letter-writer, whose, quote, expectation of privacy ordinarily

2  terminates upon delivery of a letter.  Guest v. Leis, L-E-I-S,

3  255, F.3d, 325, 333, Sixth Circuit, 2001.  Quoting United

4  States v. King, 55 F.3d, 1193 and 1196, Sixth Circuit 1995.

5       Additionally, in Warshak, W-A-R-S-H-A-K, versus

6  United States, the Sixth Circuit held that a subscriber enjoys

7  a reasonable expectation of privacy in the contents of emails,

8  quote, that are stored with, or sent or received through, a

9  commercial ISP.  The Government may not compel a commercial ISP

10 to turn over the contents of a subscriber's emails without

11 first obtaining a warrant based on probable cause, end quote.

12 631 F.3d, 266 at 286.  Sixth Circuit, 2010.

13      There, though, the Court analogized a search and

14 seizure of emails through an ISP to the interception of a

15 letter at a post office and so were focused on the pre-delivery

16 phase.  And courts have found that, quote, a person's

17 reasonable expectation of privacy may be diminished in

18 transmissions over the Internet or email that have already

19 arrived at the recipient, end quote.  United States v.

20 Lifshitz, 369 F.3d 173 at 190.  Second Circuit, 2004.

21      But more recently, especially with respect to social

22 media communications, quote, most federal courts to rule on the

23 issue have agreed that Facebook and other social media users

24 have a reasonable expectation of privacy in content that they

25 exclude from public access, such as private messages, end

1    quote, even after received by the recipient.  See United States

2    v. Z E-L-A-Y-A-hyphen-V-E-L-I-Z, 321, at 333 to 334.  Fourth

3    Circuit, 2024, citing United States v. Bledsoe, 630 F. Supp. 3d

4    1, 18, at District of D.C., 2022, finding the, quote, weight of

5    persuasive authority holds that non-public content on social

6    media accounts is protected under the Fourth Amendment, end

7    quote.  In United States v. Chavez, 423 F. Supp. 3d 194, at 201

8    to 205, Western District of North Carolina, 2019, finding,

9    quote, as with sealed packages and private phone calls, it is

10   objectively reasonable for an individual to expect privacy in

11   non-public content that is entrusted to a social media website

12   as the intermediary of the ultimate recipient, end quote, and

13   noting, quote, to be sure, the ultimate recipient of such

14   content may share it with law enforcement, as the Fourth

15   Amendment does not protect a wrongdoer's misplaced belief that

16   a person to whom he voluntarily confides his wrongdoing will

17   not reveal it.  But here, the Government obtained the

18   information from Facebook, the intermediary, not from the

19   recipient, end quote.

20        Quote, such an approach reflects the consensus of

21   federal courts that private electronic communications are

22   generally protected by the Fourth Amendment, even when

23   transmitted over third-party platforms, end quote.  Zalaya-

24   Veliz, 94 F.4th, at 334.

25        The court is going to assume that Lewis and the

1    concurring defendants maintained a subjective expectation of

2    privacy in the group chat messages that was objectively

3    reasonable.

4           So, in sum, Blake has standing to challenge the state

5    warrants and the use of any information obtained from them to

6    secure the federal warrants for his accounts, Exhibits B and C,

7    and E and I.  And again, that's minimized a little bit because

8    the Government has represented they don't intend to introduce

9    any evidence obtained from the state warrants.

10          The other moving defendants have standing to

11   challenge the federal warrants directed at their individual

12   social media accounts.  This includes Mr. Ayers have standing

13   to challenge Exhibits E, H and I; Mr. Williams having standing

14   to challenge Exhibits E, H and I; Mr. Lewis having standing to

15   challenge Exhibit I.  Ms. Green is not the subject of any of

16   the warrants and so does not have standing to challenge them.

17          The defendants, through Lewis, challenge the warrants

18   as overly broad, that they are all, quote, general warrants,

19   end quote, lacking in any particularity and all authorized the

20   collection of the entire Instagram set of records.  ECF number

21   205 at page ID 1240.  The Fourth Amendment requires that a

22   search warrant must, quote, particularly describe, end quote,

23   where law enforcement may search and the things they may seize.

24   United States v. Castro, 881 F.3d, 961 at 964.  Sixth Circuit,

25   2018.  Quote, a warrant satisfies the particularity requirement

1   if its text constrains the search to evidence of a specific

2   crime, end quote.  Id. at 965.  The Government says that,

3   quote, these were not limitless general warrants.  The search

4   warrants sought only Instagram/Google account records for

5   specific persons covering a specific period of time for

6   evidence of specific crimes, end quote.  ECF number 237 at page

7   ID 1662.

8          If one carefully read the state warrants, I suppose

9   they could be identifying the offense of felon in possession

10  and the second one identified additional offenses involving

11  fraud, narcotic sales, and the theft of vehicles.  And if

12  that's how it was read, that would constrain the scope of the

13  search to evidence of only those crimes.  ECF number 237 at

14  page ID 1660 to 1661.

15         The first federal warrant was limited to felon in

16  possession and possession of firearms by drug users.  It's

17  Exhibit E.

18         The other federal warrants were clearly limited to

19  information solely pertaining to the alleged kidnapping.

20         All of the federal warrants are narrowed to specific

21  time frames.

22         The defendants also challenge the existence of

23  probable cause.  And this, again, is going to be minimized

24  because I don't expect that the Government's going to be

25  introducing evidence from the state warrants.

1          With respect to those warrants, the initial
2    affidavit, relying on a photograph of a pistol and Mr. Blake's
3    prior criminal record, stated the requested information would
4    help in the investigation of Blake for gun offenses and in his
5    apprehension due to outstanding warrants for his arrest and
6    then the second warrant expanded the scope of the criminal
7    conduct being investigated, without much specific information
8    about these criminal acts.

9          Lack of probable cause is also the essence of
10   Mr. Turner's motion.  He says the first federal warrant lacks
11   probable cause that he and several of the joining defendants
12   was a regular drug user or that Mr. Blake was a felon in
13   possession to support a warrant for social media information
14   for those gun offenses.

15         I do not disagree that the evidence to establish that
16   the defendants were regular drug users is thin.  The agent
17   presented a few photos of a few defendants smoking what could
18   be marijuana joints and a few references to a few
19   communications.

20         With respect to felon in possession charge, which
21   would only permit the search of information after the date
22   Mr. Blake had his conviction, that evidence is a little
23   stronger than the drug user evidence.  There were photos of
24   guns on his Instagram account, and a photo that suggested
25   trying to shield a serial number, and a photo of a gun on

1   someone's lap.

2          Ultimately, though, the Court does not need to get

3   bogged down in or decide whether the warrants were overbroad or

4   the supporting affidavits lacked probable cause, because even

5   if so, the good faith exception to the exclusionary rule does

6   apply here.

7          It is questionable whether the defendants can even

8   challenge the good faith exception.

9          Lewis asserts it in a sentence in a footnote, and

10  Turner addresses it in a sentence at the very end of his

11  motion.  See United States v. Hills, 27 F.4th, 1155, at 1187.

12  Sixth Circuit, 2022, recognizing that arguments are forfeited

13  when they are, quote, adverted to in a perfunctory manner,

14  unaccompanied by some effort at developed argumentation, end

15  quote, citing United States v. Bradley, 917 F.3d, at 493 and

16  509.  Sixth Circuit 2019.  United States v. Clark, 469 F.3d,

17  568 and 569 to 70.  Sixth Circuit, 2006.  An issue is deemed

18  forfeited if it is merely mentioned and not developed.

19          The Court, however, has considered the issue.  The

20  Supreme Court has long recognized that the exclusionary rule

21  does not apply when the evidence at issue was, quote, seized in

22  reasonable, good-faith reliance on a search warrant that is

23  subsequently held to be defective, end quote.  United States v.

24  Leon, 468 U.S. 897, at 905, 1984.  See United States v.

25  Christian, 925, F.3d, 305, at 312.  Sixth Circuit, 2019.  After

1    all, the, quote, error in such a case rests with the issuing

2    magistrate judge, end quote.  Davis v. United States, 564 U.S.

3    229, at 239, 2011.  And, quote, punishing the errors of judges

4    is not the office of the exclusionary rule, end quote.  Id.,

5    quote, the relevant question is whether the officer reasonably

6    believed that the warrant was properly issued, not whether

7    probable cause existed in fact, end quote.  United States v.

8    Hython, H-Y-T-H-O-N, 443 F.3d 480, at 487.  Sixth Circuit,

9    2006.

10          Leon, however, outlined a few circumstances in which

11   an officer's reliance would not be objectively reasonable,

12   including where the affidavit was, quote, so lacking in indicia

13   of probable cause that no reasonable officer would rely on the

14   warrant, end quote.  United States v. White, 874 F.3d, 490, at

15   496.  Sixth Circuit, 2017.  Quoting Leon, quote, to avoid the

16   bare-bones designation, end quote, an affidavit need only,

17   quote, establish a minimally sufficient nexus between the

18   illegal activity and the place to be searched, end quote.

19   United States v. Christian, 925 F.3d, 305, at 313.  Sixth

20   Circuit, 2019.  En banc, quoting United States v. Brown, 828

21   F.3d, 375, at 385.  Sixth Circuit, 2016.

22          The lengthy affidavits in support of the federal

23   warrants surpass this low bar.  See ECF numbers 206-5, 206-8,

24   206-9 and 206-10.

25          They've described, for the issuing magistrate judge,

1   the gun possession and the drug use, they attached

2   corroborating photos, they provided the relevant law that was

3   then analyzed by a federal magistrate judge, and the other

4   affidavit discussed how Facebook and Instagram is used as a

5   communication tool between 1125 gang members.  They discussed

6   gang activity and they describe the information the Government

7   was seeking.  See United States v. Bailey, 2022 U.S. App.

8   LEXIS, 18441 at *56 to 57.  Sixth Circuit, 2022.

9           The two state warrants are clearly not as detailed.

10  And again, may not even be at issue.  But all of these warrants

11  are more detailed than the warrant in United States v. Castro,

12  and I was the district court judge that suppressed that warrant

13  in United States v. Castro, which the Sixth Circuit found that

14  that warrant did satisfy and fall under the good faith

15  exception.

16          And when I compare and review these affidavits, and,

17  as I said, especially that the affidavit, the April warrant,

18  not only included the information the affiant believed showed

19  the regular drug use, it included, I believe, the relevant law

20  for the judge to evaluate.  So the agent laid all that out for

21  the magistrate judge, the warrant was issued.  The state

22  warrants, again, which pertain only to Mr. Blake's Instagram

23  accounts, were also supported by an affidavit with photo

24  evidence indicating that Mr. Blake was in possession of a

25  firearm despite prior felony convictions and outstanding

Motion Hearing - May 3, 2024

1    warrants out for his arrest.

2          The first warrant was supported by an affidavit from

3    a Detroit Police Officer assigned to the Gang Intelligence Unit

4    investigating, quote, weapon-related offenses conducted by

5    known individuals, end quote.  ECF number 206-2, at page ID

6    1256 to 1258, the affiant was monitoring Blake's Instagram page

7    and saw that Blake had posted to his Instagram story a photo of

8    what appeared to the officer to be a Glock semi-automatic

9    handgun.  The photo was included in the affidavit along with

10   the affiant's description that the photo showed how the slide

11   was locked to the rear and that pills covered both the ejection

12   port of the gun and the place where the serial number would be.

13   The affiant concluded from this image that the Glock was a

14   functional firearm and that Blake was trying to avoid it being

15   identified as such.

16         The affiant also concluded that Blake was illegally

17   possessing the firearm in the Instagram photo and averred that

18   he believed that information from Mr. Blake's Instagram account

19   would assist in the investigation and in locating Blake.  The

20   second state warrant, Exhibit C, sought records for the same

21   account but for a later period, the ending date from the

22   previous warrant, through March 3 of 2022.  The second

23   affidavit is identical to the first one, with one additional

24   paragraph with information gleaned from the first warrant.

25         And again, even if those warrants did not pass

1    constitutional muster, that is a challenge that only Blake

2    could make.  No information was used, or there's been nothing

3    presented, and the Government has represented that no

4    information was used from the results of these warrants to

5    secure the federal warrants for Mr. Blake's account.

6           On these facts, this, quote, is not a case in which a

7    simple glance at the warrants would reveal deficiencies glaring

8    enough to make reliance on them unreasonable, end quote.

9    Castro, 881 F.3d at 966, citing United States v. Watson, 498

10   F.3d, at -- 429, at 432.  Sixth Circuit, 2007.  Nor are the

11   warrants, quote, so lacking in indicia of probable cause as to

12   render official belief in their existence entirely

13   unreasonable, end quote.  United States v. Watkins, 179 F.3d

14   489, at 494.  Sixth Circuit, 1999.  Quote, all in all, this was

15   not the kind of deliberate, reckless or grossly negligent

16   disregard for Fourth Amendment rights that trigger suppression,

17   end quote.  Castro 881 F.3d, at 966, citing Davis v. United

18   States, 564 U.S. 229, 2011, see also, United States v. Hines,

19   H-I-N-E-S, 885 F.3d, 919, at 927.  Sixth Circuit, 2018.  Noting

20   that bare-bones affidavits provide, quote, nothing more than a

21   mere guess that contraband or evidence of a crime would be

22   found, either completely devoid of facts to support the

23   affiant's judgment that probable cause exists, or so vague a as

24   to be conclusory or meaningless, end quote.

25           Lastly, quote, the exclusionary rule has no

Motion Hearing - May 3, 2024

1   application where the Government learned of the evidence from

2   an independent source, end quote.  Segura, S-E-G-U-R-A, versus

3   United States, 468 U.S. 796, at 805, 1984, see also United

4   States v. Flores, 30 F. Supp. 3d 559, at 605, Eastern District

5   of Kentucky, citing United States v. Kennedy, 61 F.3d 494, at

6   499.  Sixth Circuit, 1995, and United States v. Witherspoon,

7   467 F. Appx'd 486, at 490.  Sixth Circuit, 2012.

8          According to the Government, the group Instagram

9   chats on November 14, 2021, and November 15, 2021, that

10  allegedly discussed the kidnapping were recovered from an

11  uncharged associate's account, subject account one, from the

12  April 7, 2022, search warrant for six Instagram accounts,

13  subsequently verified from the August 4, 2022, search warrant.

14         If the Government obtained the November 2021 group

15  chats at issue during a search of a Facebook account not at

16  issue here, i.e., from a non-defendant, it would also not be

17  excludable under the Fourth Amendment.  See United States v.

18  Hamilton, 2019, U.S. Dist. LEXIS 159077, at *21, Eastern

19  District of Kentucky, 2019.

20         So, for all of those reasons, I am going to deny the

21  motions to suppress.  But, again, we do have -- at least the

22  Court has an understanding that, at trial, the Government,

23  other than perhaps on rebuttal with a showing of need, does not

24  intend to introduce evidence gleaned or recovered from the

25  initial two state warrants.

64

1          And so that takes us, then, to the motion for the

2   Enright hearing.

3          And let me start either with Mr. Cowen or --

4          MR. SALLEN:  Your Honor?

5          THE COURT:  Yes.

6          MR. SALLEN:  I'm asking for an emergency comfort

7   break for my client.

8          THE COURT:  Oh, okay.  Yes.  I'm sorry.  Sure.

9   Absolutely.

10          Let's take a short recess and we'll reconvene at

11   11:10, 11:15.

12          11:15.

13          THE CLERK:  All rise.  Court is in recess.

14          (Off the record at 10:49 a.m.)

15          (Back on the record at 11:12 a.m.)

16          THE CLERK:  All rise.

17          The United States District Court for the Eastern

18   District of Michigan is now in session.  The Honorable Laurie

19   J. Michelson presiding.

20          You may be seated.

21          The Court recalls Case Number 22-20519, United States

22   of America versus Cortez Blake, Karamoh Turner, Semaj Ayers,

23   Maijah Greene, Shatonnia Kimbrough, Armond Williams and Nasir

24   Lewis.

25          Counsel, please state your appearances for the

Motion Hearing - May 3, 2024

1    record.

2          MR. COWEN:  Good morning again, your Honor.

3          David Cowen and Jeanine Brunson on behalf of the

4    United States.

5          MR. QUINN:  Good morning, Judge.

6          Christopher Quinn appearing on behalf of

7    Mr. Williams, who is present.

8          MR. SALLEN:  Good morning, your Honor.

9          Alvin Sallen on behalf of Ms. Kimbrough, who is

10   present.

11         MR. CHURIKIAN:  Good morning, your Honor.

12         Samuel Churikian appearing on behalf Mr. Semaj Ayers,

13   who is present.

14         MR. AMBERG:  Good morning again, your Honor.

15         Jim Amberg on behalf of Karamoh Turner.  He is here.

16         MR. SABBOTA:  Judge, good morning.

17         Jerome Sabbota.  I am with Cortez Blake.

18         And I know Mr. Lewis has no objection if I stand in

19   for Mr. Gleeson, correct?

20         So he's spoken to me, so he has no objection to this

21   hearing that I stand in as his counsel.

22         THE COURT:  Okay.  Very good.  Thank you.

23         MR. ROBERTS:  Good morning, your Honor.

24         My name is Randall Roberts.  I appear on behalf of

25   Maijah Greene, who is the last person against the wall.

Motion Hearing - May 3, 2024

1      THE COURT:  Thank you.

2      And did we hear from the Government?

3      MS. BRUNSON:  Yes.

4      THE COURT:  All right.  You may be seated.

5      I want to turn to the motion for Enright hearing,

6  which, to me, is more focused on what should be the more

7  relevant evidence that we're going to be dealing with at the

8  trial than a lot of what might have been seized from the

9  Instagram accounts.  And I recognize a lot of information has

10 been obtained, but this underlying offense is limited to a

11 pretty specific time frame.

12      And the first superseding indictment charges from on

13 or about November 14, 2021, through on or about November 15,

14 2021.

15      And, Ms. Brunson or Mr. Cowen, is that the time frame

16 of the conspiracy?

17      MR. COWEN:  Yes, your Honor.  For those -- for those

18 two periods, yes, the 14th through the 15th, subject to what we

19 may still be adding in for the 404(b) deadline in the next

20 three weeks, but the charged conspiracy is that two-day time

21 frame, yes.

22      THE COURT:  Okay.  And in that two-day time frame,

23 what is the volume of potential co-contributor statements

24 during that -- this two-day or day and a half time frame?

25      MR. COWEN:  So, your Honor, the way I look at it is

1    there's several different phases that is no real secret to

2    anyone.  There's -- the conspiracy essentially started after

3    the carjacking, where Mr. Blake was shot, along with the person

4    identified as victim one.  Mr. Blake, along with assistance,

5    then goes to nearby hospital to be treated, which is there,

6    where the victim is there for a brief period of time and then

7    is offered a ride home by members of the conspiracy.

8         Instead of going home, she's taken to a vacant area,

9    which is where she realizes this is against her will.  And so

10   phase one is essentially carjacking to the hospital.  Phase two

11   would be from the hospital to the abandoned or vacant area, and

12   then more members join at that location, and then culminate at

13   the residence, where the brunt of the kidnapping takes place,

14   including the video that this Court has seen of the victim

15   being beaten.

16        The final --

17        THE COURT:  That's phase three?

18        MR. COWEN:  Yes.

19        The final phase is the departure of some members of

20   the conspiracy with the victim from the house to identify -- to

21   make the victim identify the home of what is believed to be

22   people who were involved in the carjacking.

23        Now, throughout that, members are doing -- members of

24   the conspiracy are doing different things.  You know, the whole

25   group isn't a part of every phase, at least physically.  Some

1  people are driving or -- and that's where then the Instagram

2  conversations are a little bit commingled.

3          But we believe the Instagram conversations on the

4  14th and into the 15th, and then the separate one on the 15th,

5  are all in furtherance of the conspiracy, which -- so, in

6  essence, we're identifying at minimum that evidence as these

7  conversations are part of as the kidnapping is going on.

8          THE COURT:  What is the volume of that?

9          MR. COWEN:  What -- I guess, what do you mean by

10  volume?  Like, number of pages or number of --

11          THE COURT:  Number of communications.

12          Volume to identify them, put them in a chart.

13          MR. COWEN:  Those -- they're essentially already

14  identified in the search warrants that have been disclosed

15  where we lay out the substance.  Now, there might be a few more

16  tail end or -- front end to tail end to establish the context

17  and other important details, but the majority of those

18  conversations are all in those little threads that have been

19  disclosed and described.

20          So, as far as volume, we're not talking about pages

21  and pages and, like, hundreds of back and forth conversations.

22  These are -- these are relatively small collection of

23  conversations between -- I believe the first conversation has

24  11 members, but not everyone is always chiming in throughout

25  the thread.

1    THE COURT:  So if I had you prepare a chart of them

2    for me, and I can evaluate them and whether there might be any

3    hearsay issues, and the defense can evaluate them, in effect,

4    that's almost already done?

5    MR. COWEN:  For Instagram, yes.

6    There are other conversations in evidence of

7    conversations as -- throughout the kidnapping that would not be

8    identified in the -- in the Instagram conversations, which

9    would be a little bit more of a task as far as some of the

10   concerns we raised about volume, witness identification, things

11   of that nature.  But the Instagram conversations are what this

12   Court just ruled are admissible.  So those are not --

13   THE COURT:  So if I asked you to do, in essence, a --

14   and write proffer as opposed to an Enright hearing, would that

15   be a burdensome task?

16   MR. COWEN:  As it relates to the Instagram

17   conversations or everything?

18   THE COURT:  Well, let's start with the Instagram

19   conversations.

20   MR. COWEN:  That would be much more doable, of

21   course, depending on the Court's timeline, because, yes, we do

22   have those accounts identified and those statements written

23   out.  Those aren't something we have to go draft or verify from

24   another witness.  These are their own statements.

25   THE COURT:  Okay.  And then, in addition to Instagram

Motion Hearing - May 3, 2024

1    conversations, there are additional social media conversations

2    or what are these other conversations?

3            MR. COWEN:  Judge, I guess we'd ask if we can sidebar

4    that issue with you.

5            THE COURT:  Okay.  Yes.

6            Maybe we could have a representative or two from the

7    defense side to come up.  I mean, if you all want to come up,

8    that's okay.  We'll make room.

9            (Sidebar held at 11:21 a.m.)

10           MR. COWEN:  Judge, this is David Cowen.  I guess I'll

11   start.

12           Part of our concern about going into this, which we

13   didn't believe would be more towards Jencks is just, you know,

14   either who said what or, more importantly, who heard the

15   statement being made.

16           So that's where we get into what we believe is

17   impermissible Jencks, which would be outlined even much more if

18   the Government's witnesses and the scope of their involvement

19   in the trial, which we would then --

20           THE COURT:  From my sense, there are kind of two big

21   picture issues.  There's the -- if they're going to be

22   challenges whether statements were made in furtherance of the

23   conspiracy, I'd like to deal with them ahead of time.  And I

24   think there could be some of those within this November 14,

25   November 15 time frame.  And then, I don't know.  I have some

1    sense from some of the motions that some of the statements made

2    during the arrests may be at issue, but I -- my sense is that

3    may not be under a co-conspirator hearsay exception, it may be

4    those are coming in as to a particular defendant because

5    they're well after November 15, and so I don't need to deal

6    with that here.

7            But for the November 14 to November 15 time frame,

8    including -- you mentioned the Instagram.  If I had you do just

9    the proffer, here are the statements we intend to introduce

10   under the co-conspirator hearsay exemption, is that voluminous?

11           You said the Instagram are mainly done because

12   they're the ones set forth in the affidavit, so that would

13   be -- so it's really the other, the non-Instagram.

14           Mr. Sabbota?

15           MR SABBOTA:  Jerome Sabbota.

16           I can tell the Court that when we tried the Howard

17   case up in Flint in front of Judge Gillis, I think there were

18   eight of us or nine of us, and he did -- he required the

19   Government to do that, then to furnish them to the defense

20   counsel.  And the Government had to say exactly under what

21   theory it was coming and what Rule of Evidence.

22           Defense counsel then had to respond whether there was

23   an objection or not, then the Court ruled on the objections.

24           THE COURT:  And I'm talking about not doing that but

25   giving you all a chart of what they intend to introduce under

1    the co-conspirator exception.  This is a little narrower.

2            MR. SABBOTA:  I can tell the Court, it cut a lot of

3    time down in the trial.

4            THE COURT:  And selfishly, I'd like to have it before

5    trial to deal with if there are any evidentiary issues, and

6    there may not be.  But this is a unique -- none of us have a

7    lot of cases where it's a day and a half time period.  You

8    know, you're talking huge conspiracy.  So our inclination is

9    not to do this and we just we admit it conditionally, and

10   because it's unwielding.  It's -- as the Sixth Circuit says,

11   it's burdensome.  But here, it's a little bit different because

12   it's two days, it's November 14 and November 15.

13           MS. BRUNSON:  I'm sorry.  I have to go cover this

14   hearing.

15           MR. COWEN:  You know, I think that comes back to our

16   fallback -- or not fallback, but primary concern of this case.

17           David Cowen on behalf of the United States.

18           Our big concern about getting into specific

19   statements that took place and the phases, as I've described,

20   would identify witnesses who are unknown at this time.

21           And I know defense -- some of the briefings said we

22   know a lot of these people already.  There's a difference

23   between suspecting who is going to be a Government witness, who

24   is going to make statements, and basically outing them once

25   before trial when we have these documented --

1    THE COURT:  Can we put those aside for now, do a

2    chart of all the others, and then, as we get closer to trial,

3    you release -- you're saying if it's Jencks, you release it

4    when you release the Jencks information?

5    MR. COWEN:  And that was going to be my other --

6    unlike some cases, like, we have agreed upon fair structure of

7    what evidence is now going to come out, when three weeks, we

8    have 404(b) notice, so defense would now then be, if we do get

9    any notice, we'll have that privy.  And then 30 days later,

10   July 1st, is our Jencks disclosure, so -- and then there's the

11   ability to file motions in limine to keep out statements, which

12   is typically the way this works.  We give Jencks defense files

13   a motion in limine saying this is not a co-conspirator

14   statement.  It should be out-ruled.

15   So there's these safeguards already in place involved

16   in this case and, generally, that we think are more important

17   than putting the Government still through with this arduous

18   task of committing this far out to these specific statements in

19   the name of -- like, trying to protect --

20   THE COURT:  And I'm not talking about that.  I'm just

21   trying to get a sense, because I haven't decided anyway yet, of

22   if I were to say -- might want you to do some type of proffer,

23   some type of pretrial proffer, and it's, these are the

24   statements made by the defendants during the November 14,

25   November 15 time frame that we're intending to introduce under

1  the co-conspirator hearsay exception, and here's a chart of

2  them, that that's not a terribly burdensome task from the

3  Instagram.

4  MR. COWEN:  From the Instagram, no, because that

5  would essentially be us choosing -- either just saying, Judge,

6  we think this whole thread comes in for these reasons or which

7  I suspect, given the nature of that conversation, we're going

8  to say that the majority of these back and forth are coming as

9  a specific statement or to give context to why the statement

10  was made.

11  THE COURT:  Then you've got non-Instagram statements

12  that you're intending to provide when you provide the Jencks.

13  MR. COWEN:  Correct.

14  THE COURT:  And that's the end of July?

15  MR. COWEN:  The Court set it for July 1st.

16  THE COURT:  July 1st.  Beginning of July.

17  So if, on July 1st, you then -- could you then add

18  them to the chart so there's one cohesive place?  Because they

19  are going to get them in -- as Jencks, they're going to get

20  this person's statement, this person's, if you then took all of

21  them, added them to the chart?

22  MR. COWEN:  Yeah, I think that would -- certainly

23  doable.  Certainly if the Court orders us to.  But we're also

24  going to be a month from trial and dealing with a lot of other

25  preparation issues.  And so I -- that does fall back to some of

1    the burden that's then attributed to as being not necessary by

2    the Sixth Circuit and local practice where we see now we're

3    just creating the Government's roadmap ahead of trial by --

4             THE COURT:  You already provided it as Jencks.  I'm

5    just saying -- I just, before trial, would like to have one

6    cohesive chart, not as extensive as what Judge Goldsmith did.

7    Now, here's a statement, here's what we intend, these are the

8    statements we think should come in under the co-conspirator

9    hearsay exception.  And then they're all going to be in a

10   chart --

11            MR. COWEN:  I guess --

12            THE COURT:  -- or maybe just listed.

13            MR. COWEN:  Yeah.  I guess the only caveat or

14   safeguard for us, as this Court knows, and all these attorneys

15   know, as you're preparing for trial, like, I wouldn't want to

16   be limited to that being -- I'd be afraid that if something

17   else is brought up by a witness, trial prep, things like that,

18   all of a sudden, everyone's saying this isn't on the chart,

19   this isn't --

20            THE COURT:  Okay.  Right.  No.  We'd have to have --

21   and we can do this on the record, but we'd have to -- that's

22   not what I'm intending.  I just would like to not have to spend

23   a lot of time during the trial in evaluating whether something

24   really is rightfully within the co-conspirator exception or if

25   the defense has challenges they want to make prior to trial,

1  that there's a way to do this in an organized fashion.

2       I don't typically have an Enright hearing.  But, as I

3  said, I don't typically have a case where the time period is

4  this limited.  And we're -- this might be a case where there

5  has benefits to it without putting that typical burden on the

6  Government.

7       So that's why I still don't have a good sense of

8  within this two-day time frame, what the volume of

9  communications going back and forth is.

10       MR. COWEN:  It's really not going to be that vast.  I

11  mean, it's going to be witnesses saying, "I heard this as part

12  of this."  I mean, it's not --

13       THE COURT:  Okay.  That's what you'd rather wait

14  until you do --

15       MR. COWEN:  Yeah, I don't want to identify statements

16  made by people, because even if we gave the statement without

17  attributing how we're -- they're going to know who the

18  Government's witnesses are, and that's what we're trying to

19  protect.

20       So yeah, after Jencks, you're pretty much committed,

21  not necessarily to the witness list, but you're -- cat's out of

22  the bag as far as --

23       MR. AMBERG:  Thank you, your Honor.

24       Jim Amberg.

25       I've been down this road in, basically, all these

1    cases, Bell, Angelo, Cheddar Grove, and all of those.  In Bell,

2    we had a similar situation where Judge Goldsmith grants that

3    proffer ahead of time.  And I think, from what I remember, the

4    same concerns were there that Mr. Cowen has said today, which

5    is, "Hey, we're releasing things from Jencks, which should come

6    later."

7         But what we did this that case was, that was filed --

8    the proffer itself was filed under seal and the names and

9    identifying information was redacted.  So, that way, and --and

10   I was able to take that and then do my, you know, challenges to

11   the co-conspirator statement that way.  And I thought that

12   worked out great.

13        And so if it's not that much, maybe we can do it like

14   that.  I mean, this is a document that's going to be in

15   attorneys' hands only.  And it worked.  It worked in the case

16   where there was a lot of different witnesses that were saying

17   stuff.

18        THE COURT:  But here, Mr. Amberg, because this is

19   more narrow, from the production of the Jencks, would you be

20   able to discern that?

21        MR. AMBERG:  The only problem is, Judge, is that a

22   month out from trial, now we're putting in our Enright

23   arguments.  And, I mean, that's -- now it's coming into --

24   well, if your Honor does exclude some of this, it might change

25   trial strategy and things like that.

```
 1              And as Mr. Cowen said, in the final thrust of this
 2   before trial, I think -- at least it would be my preference to
 3   have these arguments fleshed out, you know, at least a month
 4   before then.  So if, like, for example, your Honor orders this
 5   proffer to be provided in a month, that would give us ample
 6   time to then go back and challenge --
 7              THE COURT:  We think we'd sort of be at those dates,
 8   because I'd be inclined to give them, you know, the 30 days to
 9   start the chart with the Instagram stuff, and then 30 days to
10   put the other stuff, which probably puts us right at that --
11              MR. AMBERG:  It might just take care of itself then.
12              MR. COWEN:  The Government's big concern is the
13   pre-Jencks disclosure of essentially what amounts to Jencks and
14   outing witnesses.
15              THE COURT:  That's not a -- as I understand, that's
16   not a significant amount of stuff.  I mean, if you could give
17   them a chart of everything else and then we deal with the --
18   what's the concerns, statements that were heard by people who
19   are going to be witnesses, you did that at the time of Jencks,
20   so they've got a good chunk to start on.  And then what they
21   get in July is a much narrower range.
22              MR. COWEN:  So you're saying --
23              THE COURT:  So you hold back the stuff that you're
24   concerned about, the stuff where there's maybe security issues
25   or witness issues, that, you're going to produce during the
```

1   Jencks.  But everything else, all other statements that you're

2   going to seek to introduce under the co-conspirator hearsay

3   exception, you put a proffer together now, or the next 30 days,

4   by the end of May.

5            MR. COWEN:  So everything besides -- like, outside of

6   Jencks?

7            I guess I'm just -- the scope is what I'm more --

8            THE COURT:  Anything out -- anything other than what

9   you're concerned about disclosing to them.  If you didn't have

10  a concern about disclosing it, you would just do it.  But

11  there's some things you're concerned about disclosing now, is

12  the sense I have.

13           MR. COWEN:  Correct.

14           THE COURT:  Those things you'll wait until the date

15  of Jencks.  Everything else, you put in a proffer chart.

16           MR. COWEN:  Yeah.  I mean, I think the biggest

17  concern is that safety measures, then we're -- I think we're

18  still left pretty much everything -- I mean, I don't want to be

19  accused of --

20           THE COURT:  It's not exclusive.  It's what you know

21  of now.

22           MR. COWEN:  Because, outside of Instagram, a lot of

23  that is going to fall under that Jencks category, so I don't

24  want to give the appearance that we say, "Here it is."  And

25  everyone says, "Well, we knew about this already."

1        Because a lot of the information we have is their

2   admissions and statements in this group chat, which is frozen

3   in time.  But then everything else is what's happening in the

4   car ride to the house, and at the house.  And so all that is

5   the Jencks that we're concerned about, about identifying people

6   who were involved or who were present as witnesses.

7        THE COURT:  Okay.

8        MR. COWEN:  And so the Instagram stuff -- I mean, if

9   you're talking about a rolling chart, the Instagram and stuff

10  is much more doable because that's already been disclosed.  And

11  then --

12       THE COURT:  Yeah, there's probably some stuff outside

13  the Instagram that doesn't necessarily fall within that same

14  level of concern.

15       MR. COWEN:  Likely, yes.  I mean, off the top of my

16  head, you know, obviously, we've been more focused about the

17  house safety concerns than the Instagram stuff because that's

18  the most obvious.  But non-victim transport/house statements is

19  my biggest concern about protecting integrity of the source of

20  that information than those statements.

21       THE COURT:  Okay.

22       MR. COWEN:  All of these -- I mean, I don't -- the

23  other thing, in this case, this is pretty -- I think the

24  argument cuts both ways about the simplicity.  You know, when

25  you have these larger cases, you might have statements two

1  years apart.  And how does that play into a conspiracy within

2  such a narrow time frame?  I think that argument cuts into the

3  Government's benefit as well because, for instance, the

4  Instagram conversation where you're talking about getting guns,

5  kidnapping, destroy the video, I mean, those are kind of

6  no-brainers as far as they're talking about getting these

7  people back.

8         And so the whole purpose of some of these requests

9  are, "Hey, Judge, this is such a long period, we want to make

10  sure something bad doesn't come in."  In this case, it's either

11  -- it seems to be much more --

12         THE COURT:  Look, like all of you, we want to protect

13  the record.  We don't want to do this, admit all of this

14  conditionally, and then, you know, there's an issue at the back

15  end.  So because this is a case where it's a very narrow time

16  frame -- and we could perhaps avoid that problem by having some

17  preliminary sense of what are the statements that you're going

18  to ask at the beginning, let all of it in because we'll show a

19  conspiracy.  If we don't have the issue of extreme

20  burdensomeness, that's when the Sixth Circuit says don't do an

21  Enright hearing, because it is.  It is burdensome.  And I'm not

22  even talking about doing a hearing.  I just think a proffer for

23  me, a proffer for the defense on something that's not terribly

24  burdensome would be helpful.

25         You've raised there are some statements that cause

Motion Hearing - May 3, 2024

1   some security concerns that you didn't intend to provide to the

2   defendants until you released the Jencks.  And I don't have a

3   strong problem with that.  I don't know that they have a strong

4   problem with that.  But they'd get something now to be able to

5   evaluate.  They'd get something July 1 to be able to evaluate,

6   which isn't going to be voluminous because it's a short time

7   period.  And we go from there.  And you're not limited to it.

8   If you forget something, you overlook something, this is not

9   the exclusive set of what the Government is permitted to

10  introduce at trial.

11          MR. COWEN:  Yeah.  I mean, if the order or the

12  understanding laid that out, just because I wouldn't want to

13  be, over the next four weeks, going through all these accounts

14  and just -- I mean, therein lies part of that burden that we

15  talk about where I'd be worried about missing something and

16  then just not foreclose about bringing that up ever again.

17          THE COURT:  Do you have an issue with that?

18          What do you do when there is an Enright trial and you

19  forget something?

20          MR. COWEN:  I mean, I think it depends on the Court,

21  or the Judge.  I mean, if they say, "Give me everything," and

22  the Government says, "Here's everything," and you forget it,

23  the Court either accepts the apology or says, "No, it's not

24  coming in."

25          But, here, as --

1              THE COURT:  But I don't -- I don't -- yeah, I don't
2    think it doesn't come in.  I mean, this is just to avoid the
3    concern at the end of the trial, you say, "This isn't what I
4    thought it was going to be.  You haven't proven a conspiracy."
5    And we let all of this evidence in, it doesn't mean there
6    aren't other things that you could introduce during the course
7    of the trial that maybe a defendant says, "Objection.
8    Hearsay."  And you say "No, it falls under the co-conspirator."
9    And you say "Well, it's not on the chart."
10             I'm not going to exclude -- understanding you're
11   making a good faith effort and representation that you're going
12   to provide what you're aware of.  You might make a mistake and
13   they understand that.
14             Right?  You all understand?
15             MR. AMBERG:  As long as that goes both ways, because
16   every once in a while --
17             THE COURT:  Yes.
18             Do you want to do a chart?
19             MR. AMBERG:  No.
20             THE COURT:  No.
21             MR. AMBERG:  No.  I actually -- I completely
22   understand.  I think these charts are very helpful, especially
23   in a case like this.  I get it.  It's a narrow case.  But, at
24   the same time, and it's also a case where the issue of whether
25   this is conspiracy, I think is much more prevalent than maybe

84

1    some other ones.

2            I understand where Mr. Cowen --

3            THE COURT:  Mr. Gleeson, it's his motion.

4            What we're talking about is --

5            MR. AMBERG:  Man of the hour here.

6            THE COURT:  -- having the Government put up a proffer

7    chart together that lays out the statements that they would be

8    seeking to introduce under the co-conspirator hearsay

9    exception.

10           For Instagram, that's not a problem.  They're able do

11   that.  They got most of that done.  Even outside of Instagram,

12   there's some things they can do.

13           There's some statements, because of concerns about

14   witnesses, so statements overheard by people, said to people,

15   that they don't want to produce until their Jencks is due,

16   which is July 1.  So we're talking about they do a proffer

17   chart in 30 days, by June 1, and then July 1, they give you the

18   rest as part of Jencks.

19           MR. GLEESON:  I think that works for everybody.

20           The one thing in addition to that I wanted -- the one

21   other thing I was looking for was because we have a discreet

22   conspiracy to commit kidnapping, when it begins and when it

23   ends, because whether statements are made after, they're not

24   furthering the conspiracy anymore.

25           THE COURT:  Mr. Cowen put on the record, it's kind of

Motion Hearing - May 3, 2024

1    four phases, it's carjacking to hospital, then going to the

2    abandoned area, then what happens at the residence, then phase

3    four, when they take the alleged victim home, but first have

4    her point out the home of the people they think are involved in

5    the carjacking. And I think it's phase four where most of this

6    other stuff is. So it's November 14 to the 15th.

7         And then we talked some of these posts, some of these

8    later statements, maybe comments made when people got arrested,

9    aren't coming in through the co-conspirator hearsay exception.

10   They might come in as admissions or -- and only against certain

11   people.

12        So does that answer -- did I answer that accurately?

13        MR. GLEESON: I think that answers my questions about

14   --

15        THE COURT: See this? We're talking about, can

16   everybody live with that?

17        (Multiple attorneys said yes at the same time)

18        THE COURT: How do we -- we can just --

19        MR. COWEN: Just looking at -- today is May 3rd. I

20   think our pretrial is Thursday, May 30th, which is Memorial

21   Day.

22        May we have that Friday after, so whatever that first

23   Friday, just to -- knowing today -- I don't want to lose three

24   days automatically from today going into the weekend when we're

25   not going to --

Motion Hearing - May 3, 2024

1        THE COURT:  We --

2        MR. COWEN:  And then, I don't know, quite frankly,

3   what -- is this -- I mean, is this chart going to be our eyes

4   only for the assistance of legal -- I mean, I don't want to

5   commit to, like, a demonstrative exhibit through this process.

6        THE COURT:  I was thinking just for counsel.  Not for

7   attorneys' eyes only because you're going to be giving the

8   Jencks -- this chart isn't going to contain the things you're

9   concerned about.

10       So I was just -- but not a demonstrative.  However

11  you want to put the chart together.  A list, I mean, it can be

12  a chart, a list, whatever.

13       MR. GLEESON:  Most of the discovery has been marked

14  attorneys' eyes only, so there hasn't been much we can share

15  with the clients.

16       THE COURT:  Okay.

17       MR. GLEESON:  That's part of the problem.

18       MR. COWEN:  Well, you're allowed to discuss it under

19  the protective order.  We just don't want that material sitting

20  in the jails, being copied and passed around.  I mean, if you

21  have a conversation with someone that says, "Hey, did you say

22  this," I mean, I think that's --

23       THE COURT:  So it would be a chart that would go to

24  counsel.  You can share it when you're with the clients but

25  they don't take a copy to the jail with them.

1          MR. COWEN:  Right, which I think would fall under the

2    parameters of a --

3          THE COURT:  All right.  So you want me to issue a

4    ruling for purposes of your clients and we'll lay this --

5          MR. GLEESON:  Yes.

6          Judge, I do need to go back to Judge Hood.  We were

7    on a break.

8               (Sidebar concluded at 11:45 a.m.)

9          THE COURT:  All right.  Thank you, everyone, for your

10   patience.  And I know it can be challenging when the counsel

11   are up at sidebar with me.  But when we're in the courtroom,

12   the conversation is confined to either I'm speaking or counsel

13   are speaking.  If any of the defendants have a need to confer

14   with your counsel, just let them know, try to get their

15   attention in some way.  And I do appreciate that there are

16   probably friends and family members here in support of the

17   defendants.  And that is all fine.  But there should not be any

18   communication by and in between any of the defendants and the

19   people that are here with them while the court is in session,

20   okay?

21          We need to just maintain the purpose of the

22   proceedings here, which is to address the pretrial motions.

23   And I've been addressing, with counsel, a potential protocol or

24   procedure for dealing with the request for an Enright hearing.

25          And let me first ask the lawyers, is there anything

1   else that anybody wants to place on the record aside from what

2   we discussed at sidebar?

3          Mr. Cowen, anything for the Government?

4          MR. COWEN:  Judge, just now that I've looked at the

5   calendar, the dates we discussed, I believe the Government's

6   request would be that Friday, June 7th, which is that first

7   full week in June, to comply with, I guess, phase one, or chart

8   one, of the Court's anticipated order.

9          THE COURT:  And then the Government intends to

10  produce the Jencks material on July 1?

11         MR. COWEN:  Yes, your Honor.

12         Your Honor, according to ECF number 225, Jencks,

13  Giglio and Brady, must be disclosed no later than Monday, July

14  1st.

15         THE COURT:  All right.  Thank you.

16         Anything from any of the defense counsel that you'd

17  like to place on the record, from any of our --

18         Okay.  No one.

19         All right.  Give me just one moment.

20         THE COURT:  All right.  Defendant Lewis, joined by

21  the other defendants, Blake, Turner, Ayers, Greene, Kimbrough

22  and Williams, has moved for a pretrial Enright hearing, ECF

23  number 199.

24         The Government opposes the request, ECF number 224,

25  and the Court had an opportunity, both in open court and at

1  sidebar, to address the issues raised in the motion with

2  counsel.

3        The first superseding indictment alleges the

4  kidnapping conspiracy took place on or about November 14, 2021,

5  through on or about November 15, 2021.  And Mr. Cowen has then

6  provided some additional information as to a grouping of the

7  communications at issue into approximately four phases.  Phase

8  one is the carjacking to the hospital; phase two is from the

9  hospital to the abandoned area; phase three is at Mr. Blake's

10  residence; and phase four is what occurred -- allegedly

11  occurred after the departure from the residence and some

12  identifications that were requested.

13        The indictment further alleges that the object of the

14  conspiracy was to kidnap and hold the victim against her will,

15  to one, obtain information from her about the carjacking of

16  Mr. Blake; and two, to retaliate against her for the belief

17  that she was involved in the carjacking, ECF number 106.

18        Included in the Government's pretrial discovery is a

19  significant volume of social media and other electronic

20  communications between the alleged co-conspirators, Lewis,

21  joined by the other defendants, quote, requests that the Court

22  set a pretrial hearing to determine the admissibility of these

23  alleged co-conspirator statements, end quote, or in the

24  alternative, quote, for an order requiring the Government to

25  submit a written proffer outlining the theory of admissibility

1  for each co-conspirator statement it seeks to admit, end quote.

2  It's ECF number 199.

3        Generally speaking, an out of court statement or

4  assertion is hearsay if, quote, offered in evidence to prove

5  the truth of the matter asserted, end quote.

6        A statement offered for a purpose other than to prove

7  the truth of the matter asserted is not hearsay.  See Federal

8  Rule of Evidence 801(c).  It is only once a statement is

9  considered hearsay that the Court is required to consider the

10 applicability of hearsay exclusions, for example, Federal Rule

11 of Evidence 801(d), or exceptions.  For example, Federal Rule

12 of evidence 803, 804, 807.  As defendants recognize some out of

13 court statements contained in the social media evidence will be

14 admissible under Federal Rule of Evidence 801(d)(2)(E), the

15 co-conspirator exception.  That rule provides that a

16 co-conspirator statement made, quote, during and in furtherance

17 of conspiracy, end quote, is not hearsay.  And the Government

18 may use it against any co-conspirator at trial to prove the

19 truth of the matter asserted.  That's Rule of Evidence

20 801(d)(2)(E).

21       For a statement to fit within this exception, the

22 Government must establish three elements by a preponderance of

23 the evidence.  One, that a conspiracy existed.  Two, that the

24 defendant against whom the statement is offered was a member of

25 that conspiracy.  And three, that the statement was made in the

1  course and in furtherance of the conspiracy.  United States v.

2  Vincent, 606 F.2nd 149, at 152.  Sixth Circuit, 1979.  This

3  preliminary finding is made by the trial judge.  See Federal

4  Rule of Evidence 104(a).  Quote, a statement is made -- I'm

5  sorry -- a statement is in furtherance of the conspiracy if it

6  is intended to promote the objectives of the conspiracy, end

7  quote.  United States v. Clark, 18 F.3d, 1337, at 1342.  Sixth

8  Circuit, 1994.  Thus, statements in furtherance of a conspiracy

9  include those that keep co-conspirators apprised of other's

10 activities or induce continued participation in the conspiracy.

11 United States v. Kelsor, K-E-L-S-O-R, 665, F.3d 684, at 694.

12 Sixth Circuit, 2011.

13        They also include statements that, quote, prompt a

14 listener to act in a manner that facilitates the carrying out

15 of the conspiracy, end quote.  United States v. Jenkins, 871

16 F.2d 598, at 608.  Sixth Circuit 1989.  And that, quote,

17 identified participants and their roles in the conspiracy, end

18 quote.  Clark, 18 F.3d, at 1342.  However, out of court

19 statements that were made after the conclusion of the

20 conspiracy are not made, quote, in furtherance of the

21 conspiracy, end quote, and therefore, are not admissible under

22 Rule 801(d)(2)(E).  United States v. Conrad, 507 F.3d 424, at

23 430.  Sixth Circuit, 2007.  Similarly, quote, mere idle chatter

24 or casual conversation about past events is not considered a

25 statement in furtherance of the conspiracy, end quote.  That's

1   id.  Quote, it is crucial that the conspiracy be ongoing as
2   statements regarding concealment that are made after the
3   subjects of the conspiracy have been completed are not made in
4   furtherance of the conspiracy, end quote.  United States v.
5   Payne, 437, F.3d 540, at 547.  Sixth Circuit, 2006.  See also
6   Krulewich, K-R-U-L-E-W-I-C-H, versus United States, 336, U.S.
7   440, 1949.  Holding that an agreement to conceal a completed
8   crime does not extend the life of the conspiracy.
9        And United States v. Martinez, 430, F.3d 317, at 327.
10  Sixth Circuit, 2005.  Collecting Sixth Circuit case law.
11       The Sixth Circuit has recognized three alternative
12  means for a trial judge to make a preliminary determination on
13  the admissibility of evidence under Rule 801(d)(2)(E).  See
14  Vincent Supra.  See also United States v. Barrett, 933 F.2nd
15  355, at 358.  Sixth Circuit, 1991.  First, the district court
16  may conduct a mini-hearing outside of the presence of the jury
17  where the Court hears the Government's proof of conspiracy and
18  makes the preliminary finding.  See Vincent 606 F.2nd, at 152.
19  Second, the trial court may require the Government to establish
20  the conspiracy by a preponderance of the evidence through
21  independent evidence at trial prior to making the preliminary
22  finding concerning the hearsay's admissibility, id., third, the
23  Court can conditionally, quote, admit the hearsay statements
24  subject to later demonstration of their admissibility by a
25  preponderance of the evidence, end quote, id. at 153.  Quote,

1    no requirement of a pretrial hearing or ruling exists, although

2    it is available to the Court as an option, in which the Court,

3    without a jury, hears the Government's proof of conspiracy and

4    makes the Enright finding, end quote.  United States v.

5    Johnson, 2014, U.S. Dist. LEXIS, 39900, at *2, Eastern District

6    of Michigan, March 26, 2014, quoting, United States v.

7    Holloway, 731 F.2nd 378, at 381.  Sixth Circuit, 1984.  Most

8    significant, the Sixth Circuit has recognized that, quote, this

9    procedure has been criticized as burdensome, time-consuming and

10   uneconomic, end quote.

11          Vincent 606 F.2nd, at 152, the Government argues

12   citing United States v. Holloway, 740 F.2nd, 1373, at 1375,

13   note 2.  Sixth Circuit, 1984.  That, quote, the Court should,

14   instead follow the firmly entrenched course in this circuit and

15   conditionally admit co-conspirators' statements at trial

16   subject to later demonstration of their admissibility, end

17   quote.  ECF number 224 at page ID 1550.

18          In Vincent, the Sixth Circuit established procedures

19   to follow when selecting this third option.  Quote, the court

20   should stress to counsel that the statements are admitted

21   subject to defendant's continuing objection and that the

22   prosecution will be required to show by a preponderance of the

23   evidence that a conspiracy existed, that the defendant against

24   whom the statements are hearsay was a participant, and that the

25   statement was made in the course and in furtherance thereof.

Motion Hearing - May 3, 2024

1    At the conclusion of the Government's case in chief, the Court

2    should rule on the defendant's hearsay objection.  If the Court

3    finds that the Government has met the burden of proof

4    described, it should overrule the objection and let all the

5    evidence, hearsay included, go to the jury, subject, of course,

6    to instructions regarding the Government's ultimate burden of

7    proof beyond a reasonable doubt and the weight and the

8    credibility to be given to co-conspirator statements.  If, on

9    the other hand, the Court finds that the Government has failed

10   to carry its burden, it should, on defendant's motion, declare

11   a mistrial unless convinced that a cautionary jury instruction

12   would shield the defendant from prejudice, end quote.

13          And that's Vincent 606 F.2nd, at 153.

14          The Government is correct that courts in this

15   district often use this approach.  And the Sixth Circuit has

16   repeatedly approved it.  See, for example, United States v.

17   Lamar, 446 F. App'x 495.  Sixth Circuit, 2012.  Holloway, 740,

18   F.2nd, at 1375, United States v. Boykins, 1990 Westlaw, 143559.

19   Sixth Circuit, 1990.

20          But it is also true, as defendant points out, that

21   Judges Goldsmith and Leitman have recently ordered pretrial

22   proffers prior to making a determination as to whether to

23   conduct an Enright hearing.  See United States v. Mills, 2019,

24   Westlaw 77032, Eastern District of Michigan, January 2nd, 2019,

25   United States v. Angelo, Case Number 20-20599, at ECF number

1   313, Eastern District of Michigan, February 27, 2023.

2            Further, as the Sixth Circuit explained in Vincent,

3   quote, a trial judge has considerable discretion in controlling

4   the mode and order of proof at trial, end quote.  606 F.2nd, at

5   152.  And there are no, quote, hard and fast procedures.

6   Rather, there are alternative means for district judges to

7   structure conspiracy trials that will allow the Government to

8   present its proof while at the same time protecting defendants

9   from inadmissible hearsay evidence, end quote.

10           To that end and having had the opportunity to address

11  the issue with counsel and recognizing that the period of time

12  charged in the indictment here is a narrow and limited period

13  of time, I don't think, at least having the Government identify

14  pretrial in some type of proffer, the statements, that they

15  intend to introduce under the co-conspirator exception to be

16  overly burdensome or unduly taxing in this case.

17           So what I'm going to do so that I have an opportunity

18  to hear from the parties if they have challenges to some of

19  this potential evidence and can be in a position to deal with

20  it prior to trial, which I think will make the trial more

21  efficient, I'm going to have the Government prepare a chart by

22  June 7th of 2024, that identifies the Instagram communications

23  that they will be seeking to introduce under the co-conspirator

24  hearsay exception, as well as any other non-Instagram

25  communications that don't have any implications for any

1    potential trial witnesses.

2           For those remaining statements, the Government is

3    going to produce those as part of their Jencks production on

4    July 1st of 2024.

5           So it will be produced in two phases.  There will be

6    -- the chart will be produced on June 7th, and then the other

7    communications, I think, with some type of identification when

8    you produce the Jencks, that those are statements the

9    Government intends -- or is indicating would fall within the

10   co-conspirator exception.  And those would be -- that you would

11   do when you produce the Jencks on July 1st.

12          And so the Court is not going to conduct a full-

13   fledged Enright hearing but is going to order this limited

14   pretrial proffer to assist in both pretrial preparation and

15   potential pretrial rulings.

16          And so, with that, I suppose I'm granting in part and

17   denying in part the motion, and I'll do an order to the effect

18   of the oral ruling on that as well.

19          Other than that, I'll advise the defendants that your

20   next court appearance is -- for most of you, your next court

21   appearance is May 30th at 9:30 a.m.

22          I do have a separate motion for one of you that will

23   have a hearing on prior to that May 30th date, but the final

24   pretrial and the final plea cut-off is May 30th at 9:30 a.m.

25          All right.  So, with that, is there anything else we

1  need to do on this case today?

2         For the government?

3         MR. CHURIKIAN:  I'm sorry, Judge.  Samuel Churikian

4  appearing on behalf of Mr. Ayers.

5         It's my understanding your calendar was adjusted, and

6  that the plea cut-off and final conference has been adjourned

7  to July 15th; is that correct?

8         MR. COWEN:  That was the first one.  That got moved

9  back to the 30th.

10        MR. CHURIKIAN:  Oh, I'm sorry, Judge.  I'm out of the

11 loop here, Judge.  I'm very sorry.  I apologize.

12        THE COURT:  Okay.

13        MR. COWEN:  My understanding is it was originally set

14 for July 15th, but then the Court amended that and moved it up

15 to the 30th.

16        THE COURT:  I see the issue.  I want to have it

17 before.  So I'm going to have to move up your date, just the

18 phase one, the chart.  So would the 24th -- so we'll have you

19 do that chart by the 24th.  Although, the -- I mean, if you

20 need the 27th, that's fine, because the -- I've given you a

21 later date, I think, for motions in limine.

22        MS. BRUNSON:  I'm sorry.  The 27th is Memorial Day.

23        The 28th?

24        THE COURT:  Yeah.  If you can try to do it by the

25 24th.  If not, the 28th.

1    MS. BRUNSON:  Thank you.

2    THE COURT:  And the final pretrial -- final plea cut-

3    off is -- I mean, either we might have some change in plea

4    proceedings, I don't know, or we'll have a final pretrial where

5    I'll go over more the trial procedures.  But then you all have,

6    I think, later dates for dealing with motions in limine, which

7    I could do at the final pretrial.

8    MR. COWEN:  And then as far as delivery, your Honor,

9    are we just providing over email, or do you want this filed

10   over seal, or how do you want this to be disclosed, the charts?

11   THE COURT:  Why don't you file it under seal?  And

12   I'll grant that --

13   MR. COWEN:  Thank you.

14   THE COURT:  -- now.

15   Okay.  For the Government, anything further that we

16   need to do today?

17   MR. COWEN:  No, your Honor.  Thank you for your time

18   today.

19   THE COURT:  All right.  And just in time,

20   Mr. Gleeson.  I was just inquiring anything --

21   MR. CHURIKIAN:  I'm sorry, Judge.  My client did

22   point out something to me today and he asked me to bring it

23   before the Court.

24   Samuel Churikian appearing on behalf of Mr. Ayers.

25   He's being housed at the Milan detention facility.

Motion Hearing - May 3, 2024

1   And he says that co-defendants and he are being segregated to

2   one another.  They have they have no contact with one another.

3   And he's wondering if it would be possible for them to at least

4   communicate with each other on an occasional basis considering

5   that we have an upcoming trial.

6          THE COURT:  All right.  Government, I don't know, is

7   there a segregation order --

8          MS. BRUNSON:  Yes.

9          THE COURT:  -- in place?

10          MR. COWEN:  There is, your Honor.

11          We would request that it remain intact given the

12   circumstances of this case.  All the witness safety concerns

13   we've discussed throughout the proceedings, and as trial gets

14   even more close, we think those issues are even more upfront.

15          THE COURT:  All right.  Do any of the defendants wish

16   to be moved to a different facility?

17          I mean, I don't get to make that, but I'll make a

18   request of the marshals if any --

19          MR. GLEESON:  The defendants, if they want to have

20   contact with one another, when the Government stands up and

21   says it's for safety concerns, they --

22          MR. AMBERG:  What they're saying is, I think, for

23   nine months of this case --

24          THE COURT:  Okay.  These are not -- I don't decide

25   where the defendants get housed.  Theoretically, they can be

Motion Hearing - May 3, 2024

1   housed in seven different facilities and not have contact with
2   one another.
3           MR. GLEESON:  They're segregated from each other in
4   the same facility.
5           THE COURT:  But I don't -- I don't make those
6   decisions.  They could be housed in seven different places and
7   not have contact with one another.  So somehow, that decision
8   has been made.
9           Your request is noted.  The marshals can address it.
10          MR. GLEESON:  Thank you.
11          MR. AMBERG:  I would just say -- I know your Honor
12  asked the question, do any of the defendants want to be moved.
13  For Mr. Turner, the answer is yes.  And that would be from
14  Livingston County to Milan.  It's far easier for him to prepare
15  for the trial.  I know Livingston is very difficult to try to
16  look at electronic evidence.  I think there's, like, one
17  computer for, like -- I've got four or five clients that are
18  trying to look at their discovery at the same time.
19          THE COURT:  Okay.  I'll make the request to the
20  marshals to --
21          MR. GLEESON:  Mr. Blake would also like to go to
22  Milan.
23          THE COURT:  All right.  So see if there's any way to
24  move the defendants to Milan, closer here, as we get closer to
25  trial.

Motion Hearing - May 3, 2024

Page 101

1        And that may happen as we get closer to trial.

2   We're not really there yet.

3        MR. GLEESON:  Could I respectfully add Mr. Lewis

4   to that list?  He's in Sanilac.  It's four hours.

5        THE COURT:  Yes, we'll add Mr. Lewis to that as

6   well.

7        All right.  Anything else from the defendants?

8        All right, everybody.  Thank you.  We will see you at

9   the next court hearing.

10        THE CLERK:  All rise.

11        Court is adjourned.

12        (PROCEEDINGS CONCLUDED AT 12:12 p.m.)

13                    * * * * *

14              **C E R T I F I C A T I O N**

15     I certify that the foregoing is a correct transcription

16   of the record of proceedings in the above-entitled matter.

17

18   **s/ April A. Kurtz, CSR-7347, RPR, FCRR**      **06/03/2024**
     April A. Kurtz, CSR-7347, RPR, FCRR          Date
19   Official Court Reporter

20

21

22

23

24

25