1            **UNITED STATES DISTRICT COURT**
          **EASTERN DISTRICT OF MICHIGAN**
2               **SOUTHERN DIVISION**

3  **UNITED STATES OF AMERICA,**

4
                  **HONORABLE LAURIE J. MICHELSON**
5    V.
             **No. 22-20519**
6
  **D1: CORTEZ BLAKE,**
7  **D2: KARAMOH TURNER, and**
  **D7: NASIR LEWIS,**
8
           **Defendant.**
9  _____/

10           **JURY TRIAL, VOLUME 7**
      **CLOSING ARGUMENTS AND JURY INSTRUCTIONS**
11
    **Detroit, Michigan -- Friday, August 9, 2024**
12
           **(Afternoon Session)**
13 **APPEARANCES:**

14

  **David Patrick Cowen, Esq.**      **Jerome Sabbota, Esq.**
15 U.S. Attorney's Office         Ribitwer & Sabbota
  (Detroit)               26862 Woodward Ave., #200
16 211 W. Fort Street # 2001     Royal Oak, MI 48067
  Detroit, MI 48226         Tel: (248) 543-8000
17 Tel: (313) 226-9100        contact@ribitwersabbota.com
  david.cowen@usdoj.gov      *On behalf of Cortez Blake*
18 *On behalf of the Government*

19

  **Jeanine Brunson, Esq.**       **James W. Amberg, Esq.**
20 U.S. Attorney's Office         Amberg and Amberg
  (Detroit)               32121 Woodward Ave. Ste PH
21 211 W. Fort Street, #2001    Suite 305
  Detroit, MI 48226         Royal Oak, MI 48073
22 Tel: (313) 226-9597        Tel: (248) 681-6255
  jeanine.brunson@usdoj.gov    jamberg@amberglaw.net
23 *On behalf of the Government*

24

25

1
                              **TITLE, (Cont.)**
2

3    **APPEARANCES, (Cont.):**

4    **Gerald J. Gleeson, II, Esq.**
     Miller, Canfield, Paddock & Stone, PLC
5    840 W. Long Lake Road, #200
     Troy, Michigan 48098-6358
6    Tel: (248) 267-3296
     gleeson@millercanfield.com
7    *On behalf of Nasir Lewis*

8

9

10

11                              -   -   -

12

13

14

15

16

17

18

19              To Obtain A Certified Transcript, Contact:
        **Christin E. Douglas, Federal Official Court Reporter**
20                   **FCRR, RDR, CRR, CSR-5607**
             **Theodore Levin United States Courthouse**
21                **231 West Lafayette Boulevard**
                     **Detroit, Michigan  48226**
22       **www.transcriptorders.com - christin_douglas@uscourts.gov**

23           Proceedings recorded by mechanical stenography.
            *Transcript produced by computer-aided transcription.*
24

25

```
 1                          I N D E X

 2    Hearing:                                Page    Vol.

 3      Closing Argument by Mr. Cowen           57     7
        Closing Argument by Mr. Sabbota         80     7
 4      Closing Argument by Mr. Amberg         107     7
        Closing Argument by Mr. Gleeson        137     7
 5      Rebuttal by Mr. Cowen                  149     7
        Jury Instructions by The Court         162     7
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18    CERTIFICATE OF REPORTER                         197

19
      Exhibits:
20
       (None.)
21

22

23

24

25
```

```
 1                                          Detroit, Michigan

 2                                          August 9, 2024

 3                                          10:14 a.m.

 4                          -     -     -

 5          THE CLERK:  All rise.  The United States District

 6   Court for the Eastern District of Michigan is now in session.

 7   The Honorable Laurie J. Michelson presiding.

 8          You may be seated.

 9          The Court recalls Case No. 22-20519, the United States

10   of America vs. Cortez Blake, Karamoh Turner, and Nasir Lewis.

11          Counsel, please restate your appearances for the

12   record.

13          MR. COWEN:  Good morning, your Honor.  David Cowen and

14   Jeanine Brunson on behalf of the United States.

15          MR. SABBOTA:  Jerome Sabbota with Mr. Blake, Judge.

16          MR. AMBERG:  Amberg for Turner.

17          MR. GLEESON:  And Gerald Gleeson on behalf of

18   Mr. Lewis, your Honor.

19          THE COURT:  All right.  Thank you, everyone.  You may

20   be seated.

21          Before we bring the jury in, I just wanted to point

22   out, on page 32 of the final jury instructions, which is the

23   defendant's election not to testify, on the very last sentence:

24   "It is not up to the defendant to prove that he or she," I'm

25   going to strike "or she" and just read that "he is innocent."
```

1          Okay.  Then are we ready to bring the jury in?

2          Anything for the Government?

3          **MS. BRUNSON:**  No, your Honor.

4          **THE COURT:**  And anything for the Defense?

5          **MR. AMBERG:**  I'm ready for the jury.

6          **THE COURT:**  All right.  Ms. Parkin will bring them in.

7                    (Brief pause.)

8          **MR. SABBOTA:**  Judge, you don't mind if I slide over a

9  little bit so I can see?

10          **THE COURT:**  No.  That's fine.

11          **MR. SABBOTA:**  Thank you.

12                    (Brief pause.)

13          **THE CLERK:**  All rise for the jury.

14                    (Jury in at 10:20 a.m.)

15          **THE COURT:**  All right.  Thank you, everyone.  You may

16  be seated.

17          Good morning, ladies and gentlemen.  Thank you all for

18  your patience.  We concluded yesterday after the Government

19  rested its case-in-chief.

20          And so now for the Defense.

21          Mr. Sabbota?

22          **MR. SABBOTA:**  Oh, I'm sorry.  At this time, we're

23  satisfied with the evidence.  We would rest, your Honor.

24          **THE COURT:**  All right.  Thank you.

25          Mr. Amberg?

1          **MR. AMBERG:**  Defense rests, your Honor.

2          **THE COURT:**  And Mr. Gleeson?

3          **MR. GLEESON:**  Mr. Lewis rests, your Honor.  Thank you.

4          **THE COURT:**  All right.  Thank you.

5          And does the Government then rest its entire case?

6          **MR. COWEN:**  Yes, your Honor.  Thank you.

7          **THE COURT:**  All right.  So that does conclude the

8  portion of the trial of taking the evidence.  We're now going

9  to hear the closing arguments from the parties.

10         And we'll begin with the Government.

11         Mr. Cowen.

12         **MR. COWEN:**  May it please the Court?

13         **THE COURT:**  Yes.

14                         **Government's Closing**

15         **MR. COWEN:**  Counsel.

16         Ladies and gentlemen of the jury, good morning.

17         **JURORS:**  Good morning.

18         **MR. COWEN:**  Thank you for your attention this week,

19  your service, and your patience.

20         Back on November 14th of 2021, Taliyah Jackson was

21  19 years old.  And she was with the defendant, Cortez Blake.

22  Someone she thought was her friend up until that time period.

23  Even family.

24         What happened to them around 4:45 that day was

25  violent, traumatic, and wrong.  But it was not Taliyah

1    Jackson's fault or her plan.  She was victimized that day

2    for the first time, along with Cortez Blake.

3           They should have sat here today in court together,

4    telling you what happened to them.  But as the defendant told

5    Taliyah Jackson over text message, "this will be handled on the

6    streets."  And so it was.

7           And what happened next is why you are here this

8    past week.  To quote the defendant, Nasir Lewis, "That is

9    kidnapping."  That's what this case is about.  What they did

10   to Taliyah Jackson after the carjacking at Holmur and Puritan.

11          The evidence in this case has conclusively supported

12   that these men, along with their friends, unlawfully took

13   Taliyah, first from the hospital to the vacant lot, from the

14   vacant lot to Cortez Blake's house on Trinity Street, and then

15   from Trinity Street around town until she could identify the

16   home of Amiaya Bryant.  Along the way, she was interrogated,

17   questioned, beaten, and treated like an animal.

18          You heard how Karamoh Turner took her out of the car

19   at the vacant lot at gunpoint, threw her to the ground.  She

20   got muddy.  She became filthy; filthy from the mud, and filthy

21   from her own urine.  She tried to tell them that she had

22   nothing to do with what happened.

23          They had no intention of listening to her.  They went

24   through her phone, and they tried to figure out who was

25   involved.  They couldn't find any evidence because she was

1   not involved.

2        Not satisfied, they put her back into the vehicle

3   against her will and took her to Cortez Blake's house.  She

4   thought she was going home from the hospital, but that was not

5   the plan.  That is indisputable.

6        The men had a plan to figure out what had happened,

7   and they were going to get answers at any cost.  The kidnapping

8   that followed was traumatic and succinct, and the Government

9   has laid out the timeline for you.

10        At 4:51 p.m. on November 14th, Devonte Henry called

11   911.  And just a short time later, at 5:04, Cortez Blake

12   arrived at the hospital, his two armed friends driving him and

13   Ms. Jackson in the black Jeep.

14        Within 19 minutes, the defendant, Karamoh Turner,

15   utilizes a group chat and shares the information they already

16   had.  Jamar Lee Stinson was responsible.

17        Meanwhile, Taliyah's traumatic day being involved in

18   a carjacking, running away, flagging down a good samaritan,

19   finding who she thought was her friend in Mr. Blake, putting

20   him into a car in the back seat bloody, transferring him into

21   the car with the two armed men and taken to the hospital, her

22   day was about to get even worse.

23        When she left the hospital, the defendants placed

24   two friends -- told her she was going to go home.  Now, in

25   hindsight, she should have known better, because she didn't

1    know them, and they did not know where she lived.  But they had

2    different plans for Taliyah.

3            She told her mom she had just been robbed, and she

4    told her mom what she thought at the time was going to happen.

5    "I'm on my way to you.  I'm coming home."

6            Meanwhile, the defendant, Nasir Lewis, responded to

7    Karamoh Turner's group chat:  "15 mins away."  6:02, Nasir

8    Lewis is on his way.

9            This is where Taliyah's fear first became a reality at

10   that vacant lot.  As I said, Karamoh Turner grabbed her out of

11   the car at gunpoint, threw her to the ground into the mud, put

12   a gun to her head.

13           All this was corroborated, first, by Dashania Smith,

14   who told you the first thing she saw when she saw Taliyah was

15   that she was muddy.  She had no idea that she had just been

16   thrown in the mud.  Taliyah also told you that she was thrown

17   in the mud.

18           As I said, Taliyah was filthy from being physically

19   thrown into the ground, and filthy from urinating herself after

20   a gun was pointed to her head.

21           She's placed into the vehicle and taken in a caravan

22   of multiple vehicles, to Cortez Blake's house; again, being

23   held against her will for the second time.

24           We know that Taliyah was at Blake's house no later

25   than 7:38 p.m.  As you see from the top row, her phone had

```
 1    a communication with a nearby cell tower at 7:38 p.m.  So
 2    at minimum, as you heard from Specialist Ganley, that is
 3    consistent with someone being at Cortez Blake's house, and
 4    the evidence supports that.
 5          We know others were there as well, because Taliyah
 6    told you when she arrived, she was ushered in by the armed men
 7    in the two other vehicles, and the doors were opened and more
 8    armed men were waiting for her.
 9          We know that the defendant, Cortez Blake's phone was
10    there as well at 8:10 p.m.  And that is consistent with the
11    evidence, because Cortez Blake was dropped off at the hospital,
12    but he didn't have his phone initially.
13          We know that because his dad came to the residence and
14    got the phone.  So his phone being at the residence, on that
15    top row at 8:10, is consistent with the approximate time that
16    Taliyah also got there, because the men who had his phone also
17    had her and her phone.
18          So he has two communications at 8:10 and 8:23, and
19    then nothing for two hours.  And that is consistent with the
20    evidence, because his dad left the house with his phone, and
21    as we'll talk about shortly, took the phone to Mr. Blake at the
22    hospital.
23          We know Karamoh Turner was there as well, because he
24    was already intimately involved in the kidnapping of Taliyah
25    Jackson.  He had the inside scoop when he started the group
```

1    chat.  Nineteen minutes after Mr. Blake was taken to the
2    hospital, he arrived at the vacant lot.  Taliyah Jackson told
3    you that when she was in the car, thinking initially that she
4    was going home, the armed men were on their phones.  And so
5    it's not happenstance that when they arrived at this abandoned
6    area, two cars show up.

7         The group had already been communicating.  The group
8    had already been discussing in Instagram, as you know, to arm
9    up, gather every gun that they had.  They were ready for a
10   fight, and they were ready to do anything necessary to extract
11   information from Taliyah.

12        Karamoh Turner, his phone was consistent with being at
13   the residence at 7:41, just three minutes after Taliyah's phone
14   had communications at that house, which is precisely consistent
15   with her version that at the vacant lot, they loaded her in the
16   car against her will, and all three vehicles in unison went to
17   Mr. Blake's house.  So this should not surprise us that as
18   Taliyah's phone got there and had a communication 7:38,
19   Karamoh's phone was there within three minutes, which is also
20   consistent with Mr. Blake's phone, with the other men being
21   there at 8:10.

22        Well, for many reasons, as we'll discuss, we know
23   Mr. Lewis was at this house.  But to corroborate the cell phone
24   data and the science, Mr. Nasir Lewis, if you see at the top
25   row, he began receiving communications at 7:47 from Mr. Blake's

 1    residence, six minutes after Taliyah, and about exactly the

 2    same time that Karamoh Turner's phone was communicating at the

 3    house, and within minutes of when Mr. Blake's phone was

 4    communicating at the house.

 5         The coordinated effort to rein in their resources,

 6    circle the wagons, so to speak, had succeeded.  They were all

 7    at the house.

 8         Here is Mr. Lewis, as you've seen, involving himself

 9    in the interrogation and beating of Ms. Jackson, using a

10    firearm as others beat Taliyah senseless.

11         We know the house was full.  There was more than ten

12    men there.  Taliyah told you that.  Dashania told you that.

13    The video of the kidnapping/beating shows you multiple

14    individuals there.  And once again, the cell phone technology

15    tells us that as well.

16         This was a coordinated effort, as I said, where if

17    you watch this time-lapsed video, they all begin to arrive

18    around 7:40.  They come and go a little bit.  Their phones

19    are communicating.  And magically, they are all there until

20    about 11:45, just before midnight, which, as we'll discuss, is

21    precisely consistent with Taliyah's version, with Dashania's

22    version, and with all the text messages and other forms of

23    evidence that we'll highlight shortly.

24         What you're watching in real-time animation, the

25    conspiracy and members of it banding together in defense of

1    Mr. Blake, when there is no lawful defense.

2          Not to be outdone, Cortez Blake needs to join the

3    party.  He's discharged from the hospital at 9:46.  As we had

4    shown earlier after the first two communications with his

5    phone, the device comes back and is there from around 10:45

6    onward.  That's precisely consistent with the evidence.

7          In fact, Mr. Blake had his phone at the hospital.

8    And he posted on Instagram to the minute when he was being

9    discharged.  And he discussed what had just happened to him.

10   And the evidence, of course, that he knew exactly where he was

11   going:  To see where Taliyah was, to ask her what he thought

12   she did to him -- something she had not done to him -- and to

13   join in her pain.

14         Dashania Smith told you that her evening started at

15   a baby shower.  She was there with Maijah Greene, and Maijah

16   Greene's 13-year-old family member.  Except for Ms. Greene

17   received a phone call from the men at the Trinity residence:

18   "Get over here."

19         You heard that Maj had to do a favor for her friend,

20   "Tez," who we know is Mr. Blake.  So Ms. Greene gathered up a

21   13-year-old little girl and Dashania, and on the way, picked up

22   Shatonnia Kimbrough from work at the casino.

23         Taliyah told you that while she was being held against

24   her will at the residence, she heard the phone call to get

25   Ms. Greene over.  And Ms. Greene said, "Don't let her go

1   anywhere," as if the men were going to allow her to go anywhere

2   either way.  Ms. Greene had joined the conspiracy.

3           They went to Mr. Blake's house on Trinity, and

4   Dashania told you, in her words, she had to pee.  So despite

5   her better judgment, she got out of that car on a dark night,

6   walked up the driveway and to the side door -- (knocking) --

7   and they knocked on the door.  An armed man answered the door,

8   and allowed them to use the bathroom, except for it was

9   disgusting.  And so Dashania decided she was good.

10          So instead of just leaving, the armed man escorted her

11  to the back room, along with the 13-year-old little girl.  And

12  inside of that room, she saw Taliyah sitting on the bed, being

13  held against her will, next to an armed man.

14          Now, Maijah Greene and Shatonnia didn't go right to

15  the back room, because they had to get briefed on what was

16  going on, and they had to get caught up to speed.  So you heard

17  that the two women went to a different part of the house to

18  discuss what was going on with the other armed men.

19                  **(Video played for the Jury.)**

20      **MR. COWEN:**  The Government takes no pleasure in

21  showing you this video again, but every time the defendants

22  claim that Taliyah made this all up, it gets played.  Every

23  time they blame Taliyah for not calling 911, it gets played.

24  And every time they laugh, you must be reminded that she cried.

25          Ms. Greene and Ms. Kimbrough walked into that room

 1    upon orders from other armed men, these defendants' friends.
 2    They attacked Taliyah.  They beat her.
 3         As you know from the evidence, that was just one
 4    instance of her being beaten.  This happened over and over and
 5    over again.
 6         Dashania described to you what she witnessed also, how
 7    she felt.  And if you recall this week, Ms. Jackson, on the
 8    stand, had to endure this video one more time.  And all she
 9    could do was look down and cover her ears so that she didn't
10    have to laugh -- listen to them laugh at her all over again.
11         Perhaps most importantly, in real time, Taliyah was
12    able to tell her mom, and now the world, the living hell that
13    she was going through.
14         So after the videos of the beatings that we know were
15    made at 10:17, Taliyah briefly got her phone back.  As you had
16    heard, the men took her phone, went through it, held it, looked
17    for evidence of the carjacking that did not exist, briefly gave
18    it back to her.
19         And, like Mr. Lewis, who described these events as
20    kidnapping, Taliyah also accurately described what was taking
21    place.  At 11:09, she messaged her mom that she was being held
22    hostage; that she thought she was going to die.
23         Mr. Lewis, utilizing the group chat, continued to make
24    his presence felt by letting the group know, updating the
25    members of the conspiracy, that he was waiting for a Lyft to

1   take Mr. Blake to his house.

2        Now, if you recall also, the discussion about

3   Mr. Blake's father coming to get the phone, taking it back

4   to Mr. Blake and how this is circumstantial evidence of what

5   else we know is going on.

6        Because, remember, you heard that when "Pops," as

7   he's known, came inside, he immediately nonchalantly looked at

8   Ms. Jackson.  Didn't try to help.  He says, "Is this the girl?"

9   He knew what was going on.  That's why he was coming to get his

10  son's phone.  That's why he took his son's phone and took it

11  back to the hospital.  And that's why this adult, supposed

12  adult, took Cortez Blake immediately back to the house so

13  that Mr. Blake could join in on the fun.

14       Much has been made about responsibility and calling

15  911 and seeking help.  The defendant's own dad, he didn't take

16  his son to safety.  He didn't drive his son to the police

17  station.  He drove him back to the lion's den so that he could

18  join in the fun.

19       Dashania told you that Cortez Blake arrived in a

20  hospital gown and crutches.  Taliyah told you the same.  And

21  Mr. Blake's hospital records told us that when he was

22  discharged at 9:46 p.m., he was given crutches.  All this

23  information corroborates what Taliyah said happened.

24       So once Mr. Blake arrived, he got right down to

25  business.  He hobbled into the room where Taliyah was being

1  held against her will with armed men, having already been

2  beaten, as you heard, at least once, and he sat on the bed,

3  angry.  He started to go through Taliyah's phone looking for

4  answers that did not exist.

5          He had finally had enough and he ordered another

6  beating.  And the women complied.  But this time, he joined

7  as well.  Using one of his crutches, still sitting on the bed,

8  he whacked Taliyah in her side as she lay down in the fetal

9  position, protecting herself while other people pounded her.

10          A house full of grown men against a 19-year-old girl.

11  A house full of cowards, armed, willing to happily cheer as

12  Taliyah was beaten over and over again, as she continued to

13  deny, deny, deny that she had anything to do with what had

14  happened.

15          She took every punch, every kick, and every stomp.

16  She took a hot sauce bottle to the head.  She took Mr. Blake's

17  crutches.  She took Nasir Lewis's assault with a firearm.  And

18  she had previously taken Mr. Turner's assault with a firearm

19  at the vacant lot.

20          She couldn't leave.  Most of the time she didn't have

21  her phone.  But the defense wants you to hate Taliyah, because

22  when the moment arose, she texted her mother instead of her

23  grandfather.  And you saw how that shame made her feel on the

24  stand.  And once again, all she could do was cry as they

25  laughed.

1    Dashania Smith told you her own traumatic version of

2 simply watching this.  And at one point, she told you that Ms.

3 Greene came back into the room and told Dashania that they were

4 going to kill Taliyah.  So it was only human nature that

5 Dashania felt relieved when she was told to go outside and wait

6 in the car.  She was finally able to leave that hellhole.  But

7 then, much to her surprise, a short while later, out comes Ms.

8 Greene, out comes Ms. Kimbrough, out comes armed men, and there

9 is Taliyah.

10    But as you know, Taliyah's activity wasn't over.  It

11 was simply on the move once again.

12    We've seen Taliyah also message her mom:  "Hurry,

13 hurry, like I'm gonna die."

14    So instead of taking Taliyah home, after being

15 sufficiently kidnapped under the eyes of the law, they

16 continued her captivity at the direction of the armed men.

17    The women put Taliyah in the car, and they drove

18 around looking for Amiaya Bryant's house, the person the group

19 had already known was involved.

20    You saw that, in the group chat, in addition to

21 Karamoh Turner starting things off by sharing Lee Stinson's

22 social media page, they also shared Amiaya Bryant's page, and

23 they said, this is the person Taliyah told us was involved.

24    Taliyah told them what had happened.  And on the one

25 hand, they didn't believe her so they kept beating her, but on

1   the other hand, they wanted the intel.  And so they sent the

2   women to go photograph Ms. Bryant's house so they knew where

3   she lived.

4        You heard that after Taliyah complied and pointed out

5   where Amiaya Bryant lived, the group had enough.  They didn't

6   take her home.  They gave her her phone, thankfully, that they

7   had kept holding, and they released her on the east side of

8   Detroit at 1:10 a.m., still filthy, still covered in her own

9   urine, with one shoe.  The other shoe had been left at the

10  residence that came off during the beating.  They literally

11  beat this woman out of her shoes.

12       She was alone, but she was safe for the first time in

13  over seven hours.  For the first time, Taliyah felt comfortable

14  sharing her location with her mom, so she sent a text message

15  with that location at 1:10 a.m.

16       She told you why she previously didn't tell her mom

17  where it was.  And you can see that in some of the chats.  She

18  didn't want to give her real address so that they knew where

19  she lived.  She didn't want her mom to come find her and be a

20  participant in that hell that Taliyah was going through.  And

21  she certainly didn't want to call 911, because she told you

22  what she thought would happen to her if the men heard sirens.

23  911 is useless if you're dead.

24       Even after her release, three minutes later, the fear,

25  the pain, is still visible.  "Hurry mom.  Before they come

1    back."  That's what's sent at 1:13 a.m. on November 15th, 2021.

2              After Taliyah was dumped on the side of the road on

3    the east side of Detroit, Dashania made her way home.  Dashania

4    told you how horrible she felt for what had happened to

5    Taliyah.  She even tried to seek her out on Instagram to see if

6    she was alive.  She couldn't find her.

7              She told you what she had witnessed and she told you

8    how that made her feel.  She told you how she just wanted that

9    morning hug from her mom.  And even then, she told you why she

10   didn't want to call 911.  She had just witnessed what happens

11   when you wrong these men, what Taliyah had endured.  And she,

12   right or wrong, thought her -- thought about her own child,

13   and said, I don't want that smoke.

14             Meanwhile, other members of the conspiracy were still

15   active in the group chat.  So into November 15th, these men

16   realized a dirty little secret was left behind.  No one,

17   including Taliyah, knew that this 13-year-old little girl had

18   pulled out her cell phone and secretly recorded those two

19   little video clips of Taliyah's kidnapping and beating and

20   attack.

21             So when the rumors were quickly shared in the group

22   chat, as you heard, they watched this video.  The Defendants

23   Blake and Lewis knew that was bad news.  And they let their

24   feelings known.

25             So when the attachment was sent, ladies and gentlemen,

1    and they watched that video that you just watched -- (video

2    playing) -- they described how Nasir Lewis was poking her with

3    his gun.  They laughed again at Taliyah.  And they said, this

4    video must be deleted.

5            And Nasir Lewis correctly narrated this video as

6    kidnapping.  And he said, "Are y'all stupid?"  "Who filmed

7    that?"  And he said:  I'm gonna beat that little girl's ass who

8    recorded it.

9            Taliyah Jackson told you that later after she was

10   released on November 15th, she took some pictures of herself,

11   gathered herself, and took herself to the hospital where,

12   for the first time, anyone -- not any of these defendants, not

13   Mr. Blake's dad, not the women, no one -- but for the first

14   time, law enforcement was told what happened.

15           This is what they did to her.  They ripped her nails.

16   They pulled her hair.  They bruised her.  They battered her.

17   And, of course, you know they laughed at her.  She was injured,

18   but thankfully, she was alive.

19           And as you heard, eventually, as time passed, the

20   defendant, Cortez Blake, finally came around to the truth that

21   Taliyah and the rest of everyone knew:  She was not involved.

22   And so he called Taliyah Jackson, and Cortez Blake apologized.

23   He said, I'm sorry.  Our bad.  Our bad that you were beaten.

24   My bad for hitting you with a crutch.  We good?  We're still

25   family?

1    He even admitted, perhaps most importantly to

2  Taliyah -- she didn't care about the apology -- but he said, I

3  knew you weren't involved.  That's what mattered to her most.

4  Bruises, broken nails, hair, all that can be fixed.  But she

5  just wanted her friend, someone she thought was family, to know

6  that she was not involved.

7    And she told you that's why she reached out to him

8  originally.  She was excited when she found that news article

9  about the carjacking.  She sent it to him even.  Said, look,

10  they are going to get in trouble.  Blake had -- wanted nothing

11  to do with that.  And that's when he said, we're going to

12  handle this on the streets.  And right he was.

13    It took months for this case to be investigated.

14  Quite frankly, it was just good police work and a lot of luck.

15  You heard that in July of 2022, months later, Special Agent

16  Jacobs stumbled across Mr. Lewis' statement of "this was

17  kidnapping."  So he started to look at police reports around

18  the time of that message, and he found Taliyah's police report

19  to Officer Turner outside of the hospital.  And he went to

20  work.

21    He went to work with his fine colleagues at ATF.  They

22  executed search warrants, they got the cell phone tower data.

23  And months later yet, on a cold January morning in 2023, they

24  knocked at the door of that 13-year-old little girl's house,

25  and they found that video of Taliyah being beaten.  That's

1   good police work.

2          So how did these indisputable facts of the defendants'

3   guilt translate into the law that you will be soon instructed

4   on?

5          These three men, all friends, all banded together

6   with their other friends to commit Count 1:  Conspiracy.

7          You're going to be instructed, ladies and gentlemen,

8   in a little bit, and you're going to hear a lot.  And every

9   instruction is equally important.  But I put up here the core

10  elements for you to find them guilty of conspiracy.

11         That's two or more persons conspired or agreed to

12  commit the crime of kidnapping.  We'll talk about that in a

13  minute.

14         That the defendant knowingly and voluntarily joined

15  the conspiracy.

16         And that a member of the conspiracy did one of the

17  overt acts that we'll talk about.

18         You got to see in multiple forms what goes through

19  people's heads.  It's extremely hard to get inside people's

20  minds, but the evidence in this case took you there.  You got

21  to see the Instagram group chat that discussed these men

22  banding together, arming up, coming together.  You got to hear

23  Ms. Jackson tell you that the two people in the Jeep were

24  texting.  And then by happenstance, three cars roll up on them

25  at the vacant lot.

```
 1              This was real-time communication, real-time inferences
 2    that you're allowed to make, that this group was coming
 3    together to not let Taliyah go anywhere.
 4              Taliyah was outnumbered and outgunned, beaten out of
 5    her shoes.
 6              We know Mr. Blake was a member of the conspiracy
 7    because he joined the interrogation.  He beat Taliyah himself.
 8    He ordered others to beat Taliyah.
 9              We know Mr. Turner was a member of the conspiracy
10    because he started the group thread, sharing Mr. Lee Stinson's
11    information 19 minutes after Blake got to the hospital.  He was
12    present during all the Instagram chat conversations, as you
13    know, because after that video was watched, after they talked
14    about -- after Mr. Lewis talked about kidnapping, they said,
15    "Leave this group."  And one by one, everyone left, including
16    Mr. Turner.
17              Mr. Turner was an early member, pulling Taliyah out
18    of the vehicle at gunpoint, physically assaulting her to the
19    ground, emotionally assaulting her to the point where she
20    urinated.  He was involved in putting her back in the Jeep as
21    the three cars whisked her away to the residence.  And we know
22    Mr. Turner arrived at the residence with everyone else, and his
23    phone consistently pinged there throughout the evening.
24              Mr. Lewis was also an early member of the conspiracy.
25    "15 mins away."  I'm on my way.
```

1          He stood guard like a coward with a gun, as Taliyah

2   was being beaten, as other members of the conspiracy were going

3   through her phone.  He, too, assaulted Taliyah.  However you

4   want to describe or minimize the act of taking a rifle and

5   jabbing it into someone's side as she's being beaten by other

6   people.  He was intimately involved, intimately aware, and

7   intimately happy with what was taking place.  They all were.

8          Kidnapping, ladies and gentlemen, again, these are

9   the core elements.  You're going to receive other instructions,

10  definitions, each as equally important.  But you must find the

11  defendant unlawfully seized, confined, inveigled, kidnapped, or

12  abducted Taliyah Jackson.

13         "Seized" has its everyday meaning:  Take hold of

14  suddenly and by force.

15         "Confined" means to restrict someone within certain

16  limits of space or time.

17         "Inveigle" is an important one.  To lead someone

18  astray by a false promise.  "Come on, Taliyah.  Get in the Jeep

19  at the hospital.  We'll take you home."  False promises, false

20  representations.  That's where this kidnapping began.

21         Now, you see there's an "or" there.  Any one of those

22  defined words that you'll get satisfy that element.  You're

23  going to even be told that within each individual word, some of

24  you can think she was confined, some of you can think she was

25  seized, some of you can think she was kidnapped.  What matters,

1     that you all agree unanimously that that element is satisfied.

2     But you can differ on if you think some or all of those terms

3     were met.  There's an instruction about that.

4            That the defendant [sic] Taliyah Jackson was held.

5     Well, this is a loaded one.  She was held against her will in

6     the Jeep.  She was held against her will at the vacant lot.

7     She was held against her will when they put her back into the

8     Jeep and drove her, against her will, to the house.  She was

9     held against her -- against her will when they took her into

10    the house.  And she was held for hours and hours at the house

11    while she was beaten, interrogated, and treated like an animal.

12    And she was held again when they ordered her back into the

13    vehicle to complete the crime by having her show where Amiaya

14    Bryant lived.

15           All three of these men assaulted Taliyah, in some form

16    or fashion, while she was being held against her will.

17           Now, I anticipate defense will stand up and try to

18    isolate the assaults and tell you, yeah, she was assaulted,

19    it's on video -- you kind of have to -- but that's not

20    kidnapping, that's for a case down the street in another

21    courthouse.  They want you to believe that Taliyah was

22    voluntarily there and that she just happened to take a

23    beating.  But there is no evidence to that.

24           All three of these men and others banded together to

25    retaliate, extract information from Taliyah, and in doing so,

1    they assaulted her.

2         That third element, "for ransom, reward, or

3    otherwise," there's no evidence of ransom.  They weren't really

4    seeking a reward, unless you consider getting information they

5    wanted as a reward.  But other -- "or otherwise," you'll see is

6    a pretty broad term.  It's any benefit.  Retaliation,

7    information, that's their benefit.  They wanted to hurt Taliyah

8    for what they thought she did.  They wanted information about

9    who else was involved.  That element will be satisfied.

10        Finally, in furtherance of the commission of

11   the offense, the defendants used a means, facility, or

12   instrumentality of interstate commerce.  You're going to

13   be told that as a matter of law, a cell phone is an

14   instrumentality of commerce, so you don't have to concern

15   yourself with whether that device specifically made calls

16   across state lines or not, even though you heard evidence that

17   some of the calls from these defendants' phones were routed to

18   different cities in different states.

19        But they used the phones very purposefully in this

20   case.  Really, without cell phones, it would have been

21   extremely hard for this crime to have been committed, certainly

22   within the concise time frame and the speed at which it was

23   planned and organized.

24        They were using the phones to text other members of

25   the conspiracy to join, to call other members of the conspiracy

1    to come.  Maijah Greene and Shatonnia Kimbrough could not have

2    beaten Taliyah on that video hadn't one of the men called them

3    over on a phone and said, come over here.

4         The whole entire purpose of holding Taliyah was to

5    look through her phone.  They were using that phone to gather

6    information.  That's what this element means, ladies and

7    gentlemen, and it's been satisfied.

8         Finally, aiding and abetting is attached to

9    kidnapping.  And this tells you that, under the law, it is

10   not necessary for you to find that the defendant personally

11   committed the kidnapping.

12        Even though the evidence supports that it does,

13   you may find these men guilty if you are convinced that he

14   intentionally helped or encouraged someone else to commit a

15   crime.

16        So beyond a reasonable doubt, the crime of kidnapping

17   was committed, in general.  As we just discussed, she was

18   kidnapped.  She was held against her will.  She was moved.

19   The commerce element was satisfied.

20        And they helped encourage -- they helped to commit

21   the crime or encouraged it.  Well, you heard the hooting

22   and hollering in that video.  Standing guard with guns,

23   interrogating.  If not directly convinced that that satisfies

24   an element of kidnapping, you can find that that certainly is

25   encouraging the crime to be committed by others.

1    And then that the defendant intended to help or

2  encourage the crime.  So an example of that will be, I

3  anticipate Mr. Lewis standing up and saying he never had

4  Taliyah's phone; there is no evidence that he called anyone; he

5  was just there with a gun, assaulting Taliyah.  Again, in

6  isolation, an assault.

7    But that doesn't count under the law.  He is standing

8  guard while others are doing that part of the dirty work for

9  him.  He wanted that to happen, he encouraged it to happen, and

10  so, therefore, he is guilty, even if you don't think he had

11  personally committed every single element of the kidnapping

12  statute itself.  And that goes for all of them.

13    Ladies and gentlemen, apply the facts that you've been

14  given this week.  Apply these facts to the law that you will

15  soon be instructed on.  And I'm confident that you will reach

16  guilty verdicts beyond a reasonable doubt.  And because of

17  that, we ask that you find the defendant Cortez Blake, Karamoh

18  Turner, and Nasir Lewis guilty on all counts.

19    Thank you.

20    **THE COURT:**  Thank you, Mr. Cowen.

21    And Mr. Sabbota?

22    **Defendant Blake's Closing**

23    **MR. SABBOTA:**  Thank you.

24    Good morning, ladies and gentlemen.

25    JURORS:  Good morning.

**Defendant Blake's Closing**
**Friday/August 9, 2024**

81

1      **MR. SABBOTA:**  When we started this case, I told you

2  this case is really about assaults, and it's really about

3  gangs.  Remember that?  From the beginning.  And I told you

4  that the Government is not going to be able to prove their

5  case beyond a reasonable doubt.

6          See, the problem with their case is you really have

7  to believe Taliyah Jackson beyond a reasonable doubt.  And I

8  said to you that her actions speak louder than words.  Remember

9  that?

10         And I told you, you're going to not like these people.

11 You're going to like any -- not any of these people.

12         And Taliyah said something very interesting during the

13 trial.  And that's -- what she said was, "I needed to get ahead

14 of the situation."  Remember that, when we asked her -- when I

15 asked her about going to the hospital?  She needed to "get

16 ahead of the situation."

17         And I say that because, if you listen to her

18 testimony, if you look at the objective facts in this case,

19 she was never kidnapped.

20         I mean, she was part and parcel of the 1125 Gang.

21 Now, they bring -- they show you the picture of her like an

22 innocent 19-year-old girl that doesn't get involved in any kind

23 of criminal activity, right?

24         Well, we know that two days before or maybe three days

25 before the, the attempted murder of Mr. Blake, she's at a gang

 1    party, isn't she?  And she's got rifles in her hand.  And she's

 2    dancing to TikTok.  And she's dancing to TikTok with her

 3    friend, Ms. Bryant.

 4          This innocent 19-year-old girl, who doesn't know

 5    anything about the world, who, at the time, was sharing an

 6    apartment -- not an apartment, but was living in the same motel

 7    or hotel in, in, in Warren with Mr. Blake, was over dancing

 8    with the other gang, which the Government already told you

 9    was a rival gang.  That happens a couple days before

10    November the 14th.

11          Because you've got to remember her words.  Her words

12    were, she needed to get ahead of a situation.  And I said to

13    you, let her actions speak louder than what she tells you.

14          They rent a car.  Remember that?  And the Government

15    didn't talk about the car rental.  We put in the exhibit for

16    you, which I think is 67 of the car rental.  You read it.

17    Read it well.  Because the car rental is an agreement which

18    authorized only one person to drive the car:  Amiaya Bryant.

19    It didn't authorize Taliyah to have the car.  It didn't

20    authorize Mr. Blake to have the car.

21          They needed a car.  So what happens?  Taliyah Jackson

22    gets Ms. Bryant to go to Enterprise.  I think it's in Oak Park

23    or Southfield.  Bryant represents to Enterprise that she's

24    going to be the driver of the car.  She's going to have the

25    car.  She's not going to give the car to anybody else, but she

1    gives it to Ms. Jackson.  And Ms. Jackson is part and parcel of

2    that.  And that's for their business.  And when I asked what

3    her business was, do you remember what she said?  She's a

4    marketer and she takes investments.  That was her business.

5           Now, that's a 19-year-old that stays in a hotel,

6    I guess with Mr. Blake or one has one room and the other has

7    another room, and she is an investment banker, I guess, or a

8    marketer that does investments.

9           But then when you look at the scenario that occurs on

10   November the 14th, and you follow it all the way through,

11   here's where the actions again speak louder than words.

12          She's driving a car November the 14th.  It's cold.

13   It's a Sunday.  About 5:00 she pulls up at a stop sign, right?

14   She sits there for five to seven minutes.

15          If I stood here from 5 to 7 minutes and just stood

16   here, didn't say nothing -- I mean, the Judge would get mad at

17   me, I'll tell you that right now -- but that would be a long

18   time, wouldn't it?

19          When you go into that jury room, don't say anything to

20   each other for five minutes.  Somebody take your phone out --

21   not your phone -- or your watch and just sit there for five

22   minutes.  Or maybe go to 7 minutes.

23          What do you think she's waiting for?  You know what

24   she's waiting for, is Bryant.  It's clear.  Because how does

25   Bryant know where Mr. Blake is, and how does Bryant know where

1   she is?  I know there was a location monitor.  They shared it.

2   But she waits for her.

3        And then what are the actions when the car pulls up?

4   She pulls up in front of the car, Ms. Bryant.  She's got the

5   Malibu.  The Kia that they've rented can't back up.  And who is

6   the one that's the authorized user of the car?  It's Bryant.

7   Do you think Bryant is there to carjack her own car?  That

8   don't make sense, does it?  She's got the lease on the car.

9   She's got the rental on the car.  Ms. Jackson doesn't back up.

10  She waits.

11       And then there becomes a little dispute as to what

12  happens.  And why I say that, is there's a guy by the name of

13  Mr. Henry.  And Mr. Henry wants to be a policeman.  Remember

14  him?  He wants to be the policeman.  He doesn't have any bias.

15  He doesn't have any prejudice.  He's not looking to get out of

16  a situation.  He's not looking to explain himself, is he?

17       And he comes, and he says, I watched this thing go

18  down.  And what did I see?  I saw Ms. Jackson being kind of --

19  or the driver being kind of -- his words were -- I think it was

20  "sketchy."  Sketchy, right?  Because the somebody gets out,

21  which is the girl, and talking to the other girl.  And Ms.

22  Jackson says she gets out and she starts to run away.

23       That's not what Mr. Henry says.  And there is four

24  guys that he can see particularly good.  What can he see?  They

25  get out of the car, four guys with masks.  Isn't that what he

1    said?  He can't identify them, because they got masks on.

2            And those are the guys that get out of the passenger

3    side of the car, the back seat of the car.  And they don't go

4    to grab the Kia, do they?  Because you know that Mr. Blake gets

5    out of the car, and he is running.  And he is running so fast,

6    that I suggest, and you can infer those two shoes that were

7    left out there are his shoes.  And it's cold out.  And then

8    four guys, in unison, together shoot at least 40 times.

9    They've got the Kia.  They shoot 40 times, with rifles, with

10   guns.

11           And the agent was clear.  Mr. Blake was a lucky guy.

12   Mr. Blake was lucky he wasn't killed.

13           It's a far different story than Ms. Jackson tells,

14   isn't it?  A far different story.

15           And here is, again, where her actions speak louder

16   than their words.  And that's when they go to the hospital.

17           Because this is really interesting.  When you go into

18   the jury room, you do not lose your experience with people.

19   All right?  In other words, you can take common sense and

20   experience that everybody has.

21           She takes somebody to the hospital that can't walk;

22   am I right?  He's got to get put in a wheelchair.  This is an

23   individual that's been shot.  This is an individual that -- you

24   know when you go to the hospital, from your own experience, if

25   you go there with a serious injury, if you're shot, who are

**Defendant Blake's Closing**
**Friday/August 9, 2024**

86

```
 1   they going to call?  They are going to call the police, aren't
 2   they?  They are going to notify the police that there has been
 3   a shooting, in a hospital.
 4          And what does Ms. Jackson tell you?  Innocent
 5   Ms. Jackson?  She says, "The hospital said I couldn't stay."
 6   Isn't that what she said?  "I can't stay.  I gotta leave."
 7          Do you believe that's truthful?  Do you believe for a
 8   minute somebody in the hospital told her, you can't stay with a
 9   person that's been brought in that's been shot?
10          And so when you think about how she's got to get ahead
11   of the situation, think about that.  See, maybe she didn't know
12   it was going to be a shooting, but don't tell me she wasn't
13   involved in what happened.  There is no way they could have
14   found Mr. Blake in the car.
15          And don't tell me it's a carjacking because they
16   wanted the Kia back that she wanted that was rented, because
17   that didn't happen.  I mean, they could have taken that car.
18   There was absolutely no need for the people in that car -- who
19   were her friends, right?  Her friends that she partied with a
20   couple days before, where she's got a rifle and she's dancing,
21   okay, and she is on TikTok.  This is not an innocent little
22   girl that doesn't know what's going on.  She got out of that
23   hospital because she didn't want to be questioned.
24          And at no time during this case, at no time did the
25   Government ask her, or anybody ask her, did you ever tell
```

1    anybody you wanted to go home and you didn't want to stay

2    there?  She never answered that question, did she?

3            She got in the car, she tells us now, she thought she

4    was going home.  Well, I suggest to you she wanted to go back

5    to be with the 1125 group, because she had to.  Because at that

6    point, she is with them.

7            You know, she is in the car with Blake.  She's got a

8    problem now, because she's friends with Bryant.  This was --

9    you know, the Government says, well, that's a carjacking.

10   Yeah, you're carjacking a car.  I mean, think about it.  Think

11   how this makes sense.  You're carjacking a car that you have a

12   right to, right?

13           So when you get to the point that you're going to

14   carjack the car, and one person runs to the right, and one

15   person leaves and goes to the left, right?  You got the car,

16   don't you?  What's the reason that four guys get out with

17   masks and shoot 40 times?  Why are they doing that?

18           They are doing that because they want to kill

19   somebody.  There is no other reason.  Because they are not

20   shooting at her.  They are not chasing her.  They are not going

21   after her.  They are chasing him.  And he's running so fast

22   that the shoes come off.

23           Remember I asked -- I can't remember, I think it was

24   the lady -- one of the officers that was at the scene.  I asked

25   about the shoes.

1    Remember I asked about also the door handle?  Because

2  there was a door handle that was pulled off, right?  You know,

3  she unlocks the door so they can get to them inside the car.

4  And she knows she's got to explain that.  She has to.

5    And that's why she -- and she doesn't want to get

6  questioned by the police.  That's why she goes with them.  She

7  didn't -- at that point she has no car.  Don't know how much

8  money she's got.  We know she doesn't have a credit card.  So

9  she gets in the car.

10    And being part of the 1125 group -- which don't tell

11  me she's not.  You know, everybody wants to gloss -- gloss over

12  the fact that this is not gang activity.  I was honest at the

13  beginning.  I said to you, this is gang activity, right?

14    But they are not charged with gang activity.  Didn't

15  I tell you that?  They are not charged with felonious assault,

16  which means you hit somebody with an object.  They are not

17  charged with fighting.  They are charged with conspiracy to

18  commit kidnapping.

19    She got in that car voluntarily.  She got in that car

20  voluntarily because she wanted to get out of there and she

21  didn't want to talk to the police.  That's why she got in that

22  car voluntarily.

23    You can infer things, right?  Because if she stays

24  there, what's going to happen?  The police are going to show

25  up, they are going to question you, they are going to want

1    to know what happened, and they are going to want to know who

2    did what.

3          And they got to -- and she's got to explain it as a

4    carjacking.  She can't say, I was part of an assault with an

5    intent to murder, can she?  No way.

6          And then they take her to what they say is a vacant

7    lot.  All right?  Now, when she says she goes to the vacant

8    lot, and she says she gets out.  I mean, she's the only one

9    that really says that.  There is nothing else that supports

10   that.  And then she goes back to the house.

11         Now, remember, at the time she leaves the hospital,

12   he is not there.  And do you know what he doesn't have?  He

13   doesn't have a phone.  So he can't communicate with anybody.

14         And another thing that's really interesting, I think

15   it was -- I can't remember which officer it was.  I think it

16   was the officer that became the detective or the officer before

17   him, the one that was from Meridian Township.  He -- him or the

18   woman officer, they found two cell phones, didn't they?  There

19   were two cell phones that were left at the scene.  Do you know

20   whose cell phones those are?  Two cell phones.

21         Now, Mr. Blake doesn't have a phone, so he doesn't

22   know what goes on in the car.  He can't.

23         He doesn't know what goes on in a vacant park or if

24   they ever went there.  He can't.  He doesn't have a phone.

25         He doesn't know what goes on in the house.  He doesn't

1   have a phone, does he?

2           You know who's got a phone?  Taliyah.  You know, she

3   says, "Well, I texted my mother," which she was able to do.

4   "I'm telling her how bad things are," which I'm able to do.

5   But I don't want anybody to come because I don't want the

6   police to show up.  That doesn't make sense, does it?

7           "I don't want to dial 911," which she had the ability

8   to do.  That's where your actions speak louder than words.  She

9   could have called 911.  She could have texted her mother and

10  said, "This is where I'm at."  She could have left her location

11  finder.

12          She's worried about Ms. Bryant finding her.  Think

13  about -- think about the existence of the facts as you heard.

14  She's in a car now with plenty of guys with guns, right?  Am I

15  right?  She goes back to the house now, right?  There's guys

16  with guns there.  And she's worried about Amiaya Bryant finding

17  her?

18          Do you think if Ms. Bryant came to that house where

19  the guys are with guns, they are going to let her take

20  Ms. Jackson?  Do you think that's going to happen?

21          She has to get ahead of this.  I mean, that's

22  literally what she told you, because I asked her.

23          If you remember, there is an exhibit, which is

24  Number 50.  All right?  And you can ask to see all the

25  exhibits.  I want you to ask to see 67, which is the rental

1    agreement.  Ask to see Exhibit Number 50.

2          They have a crime thing in Detroit that goes on

3    Facebook.  So if you piece it back as to the story that they

4    are telling you, there is a carjacking, which is a possible

5    carjacking and a shooting.  That information comes from 911.

6    All right?

7          So it happens that when Mr. Henry calls 911, and we

8    have the lady here from the 911 operator, there is a tape.  All

9    911 calls are taped.  It's like body cameras now, they are all

10   taped.  But they don't have it, because it happened so long,

11   and so you have the lady testify.  But that 911 information

12   goes on "Crime in Detroit."

13         So what does it say?  You look at that.  It's Exhibit

14   Number 50.  You look at that exhibit really good.  Because what

15   it says is, "Crime in the D.  Possible carjacking and shooting.

16   Individual conveyed by private transportation to the hospital."

17         And she told you that she knew the police were going

18   to be looking for her.

19         So now she's got to get ahead of it.  She's got to be

20   able to explain her behavior, and she's got to be able to walk

21   away free.

22         No different than when the Government is paying her to

23   be a witness, she comes in here and takes the Fifth.

24         So you have to believe Jackson, that's the key to this

25   whole case.  They want to take your focus off Jackson.  You

```
 1   have to believe her beyond a reasonable doubt that she,

 2   herself, was held against her wishes.

 3         And so when I said to you the actions have to speak

 4   louder than words, look at her actions.  Her motivation is to

 5   get herself out of the situation.  She's got a phone.  She can

 6   leave a location finder in the phone.  She can dial 911.  She

 7   can do all of those things.  She never does it.

 8         Now, a lot of the activity takes place before

 9   Mr. Blake comes home to the house.  But during the part of

10   it -- and you're going to hear an instruction, what they call

11   prior inconsistent statements.  And I'll tell you what it

12   means.  It means if -- there's a judge by the name of

13   Judge Morrow in Wayne Circuit that explained it better than

14   anybody I've ever seen.  He says, if I say to you something

15   happened today which is different than something happened

16   tomorrow -- in other words, two different statements -- if I

17   say the sky is green today, and I say the same sky is blue

18   tomorrow, you can think of two things, right?  Either I'm

19   mistaken -- am I right? -- one day, or I'm a liar.  That's what

20   that says.

21         So you have to listen -- look at those statements,

22   because you're going to see that she testified that Mr. Blake's

23   father came one time when she was sitting in the living room.

24         She testified here that everybody had their guns out.

25   Do you remember that?
```

1      She testified before the grand jury before the trial.

2   It's a different jury where she comes in and talks.  And what

3   did she say?  When the father came in, they put the guns away.

4   Isn't that what she said?  If you remember, we went through

5   the impeachment as she sat on the stand here.

6      So in other words, before she came into this

7   courtroom, she said they had put their guns away.  When she

8   testified before you, she said they had the guns out.  She

9   admitted to both of those statements.  They both can't be

10  true, can they?

11      But she's got to keep herself in the situation,

12  because when she was with them in the house, she's held --

13  she's in safety.  She doesn't have to worry about the other

14  gang.  The other gang knows who she is.  Ms. Bryant knows who

15  she is.  Ms. Bryant got the car for her.  Ms. Bryant confronted

16  her when she was over there on Pembroke and -- sorry -- Puritan

17  and Holmur, in Detroit.  She was there.  And that's why she was

18  acting kind of sketchy.

19      So when Mr. Blake's father comes in, and if she's

20  being held against her will and he's an adult, that's the first

21  time.  She says absolutely nothing.  That's her saving grace.

22  That's an independent individual coming in, and she admits he

23  was there for one purpose:  To get Blake's phone.

24      So Blake, he doesn't know anything that's going on in

25  that house.  He can't.  He's got no communication.  That's why

1   he sent his father.

2          His father, you can infer, probably was at the

3   hospital because somebody had to stay with him.  She was -- she

4   left.  Her -- her friend, his friend, that they are so tight

5   together, that she would -- she would never set up, her friend,

6   left him at the hospital because they threw her out.  Do you

7   believe that?  Do you believe that beyond a reasonable doubt?

8          You know, when they talk beyond a reasonable doubt,

9   and you're going to get the instruction from the Judge what it

10  means, it will tell you that if it can cause you to hesitate

11  if you make an important decision in your life.  The Government

12  has to prove guilt beyond a reasonable doubt, not by a

13  reasonable doubt.  You know, "by" is "by."  Beyond is way down

14  the road.

15         It's like when we talked about presumption of

16  innocence, remember that?  And we talked about the word

17  "until."  It's not "until."  It's "unless."

18         So ask yourself, if I'm being held kidnapped, and I'm

19  worried about getting killed, and I don't want to be here, and

20  the adult comes in, and his only reason to come in was to get a

21  phone, why didn't you say something to him?  What are the other

22  guys or the girls or the group going to do to his father?  She

23  never said a word.

24         And she said she only remembers him being there.  You

25  know, this was a witness, Ms. Jackson, that used the word, "I

1    don't remember" more than my grandson does when he gets caught

2    doing something.

3          I mean, it was like, "I don't remember.  I don't

4    remember.  I don't remember.  I don't remember."  Any time you

5    asked a question that she didn't like:  "I don't remember.

6    I don't remember."

7          She doesn't remember whether or not Mr. Blake's father

8    came there on two occasions.  You know he did, because that's

9    how Blake got back from the hospital.  She didn't remember.

10         Now, I'm not minimizing the fights that happened in

11   the room.  In fact, during my cross-examination, I asked her

12   specifically:  "And you got into a fight with two other girls

13   in the room?"  And her response was, "yes."

14         She didn't describe it as a beating.  She described it

15   as a fight.  That's how she described it.  And that was before

16   Blake got there.  That's how she described it.

17         Now, when Mr. Blake comes home, you know, you know,

18   that he's probably in pain because he's just been shot.  You

19   know he can't walk so he can't -- you know, he's not ambulatory

20   unless he has crutches.  She claims that he hit her with

21   crutches.  And, you know, Dashania Smith says the same thing.

22         But when Ms. Jackson goes to the hospital and her

23   medical records -- look at this, because I admitted her

24   medical records.  Remember that?  Her medical records on page

25   64 -- Exhibit 64, on page 22, she is asked what happened.  You

1    know, when you go into the hospital, what do they do?  They sit

2    down and say, why are you here?  What happened to you to get

3    you here?  Am I right?

4         And you know that most people, when they really want

5    to be treated at the hospital, they want to tell the truth

6    about what happened, don't they?  Because you are going to the

7    doctor.  You want the doctor to help you.  You're not going to

8    lie to the doctor.  You're not going to hold anything back.

9         Do you know what her words were?  "I was assaulted by

10   multiple men and women and hit with fists."  She never mentions

11   the word "crutches."  Never.

12        So I want you to pull that medical record and I want

13   you to read it, because those are her words.  They are not my

14   words.  And that's Exhibit Number 64.

15        And the Judge will tell you, you are entitled to all

16   of these records.

17        So why does she want to get ahead of this?  She wants

18   to get ahead of this because, number one, they were trying to

19   kill Mr. Blake.

20        Number two, the linkage to kill Mr. Blake was her and

21   her friend Ms. Bryant, who at the time were friends.  She

22   takes -- she takes Mr. Blake to the hospital.  She knows --

23   because it's now been on the "Crime in the D," based on what

24   Mr. Henry did, she wants to make certain that she's protected.

25             You know, and this is an individual that, you know,

1    she's, for lack of a better word, this is a street person.  She

2    knows how to protect herself.

3           You know, she gets into the Government's program and

4    she is protected.  The Government told you they were looking

5    for this group.  They wanted to get the 1125 group.  They were

6    looking for something.

7           You know, when she goes and she initially talks to the

8    police, you know, her story gets a little different than when

9    she talks to the ATF.  And so what they want to do is they want

10   to say to you, well, look at all these things that corroborate

11   what she says.  The phone calls.

12          Nobody denies that Mr. Blake was there.  I didn't deny

13   Mr. Blake was there.  But the key to this case is whether she

14   was held against her will.  The key to this case is whether

15   Mr. Blake held her against her will or whether -- the key to

16   this case is whether he conspired.  Did he agree to commit the

17   offense of kidnapping by holding her against her will.

18          She never said no.  She never said "take me home."

19   She is saying that now, because when she went to the police,

20   she's got to tell them something.  She can't say, I was part

21   and parcel of it.

22          They have an attempt murder on Mr. Blake, don't they,

23   at a minimum?  And guess who knows who those individuals are?

24   According to Ms. Jackson, she's identified them.  Two of them

25   didn't have masks.

1          Now, that's -- the two of the shooters from the car

2     didn't have masks, which clearly contradicts what Mr. Henry

3     said.  But you're going to have to resolve that.

4          And when you talk about Ms. Smith, Ms. Smith really

5     doesn't corroborate what she says, Dashania Smith.  How does

6     Dashania Smith get to this room?

7          Police show up at her door, right?  She doesn't come

8     to them and say, hey, look.  He leaves a card for her to

9     contact ATF.

10         Now, she's in the room.  So she's got a problem,

11    doesn't she?  And she -- she's going to talk to ATF.  And she

12    doesn't want to be caught up in a bad situation, does she?

13         So think about what she says.  She goes into the

14    house.  Why?  The only reason she's going into that house is

15    to take a pee.  Those are her words, yes?  I got to go to the

16    bathroom.

17         She's in there a while.  She goes in the bathroom.

18    The bathroom is disgusting.  She's not going to urinate here.

19    She doesn't want to sit down.

20         Now, she's got to go to the bathroom, right?  So she

21    goes into the room.  And then she watches what occurs inside

22    the room.  That's what she is telling us.

23         You know, I suggest to you, she went in there not

24    because she wanted to pee.  She just went in there because

25    she's part and parcel of the same group.

1          And then when you listen to what she said in relation

2    to what Ms. Jackson said, she tells you that they took her in

3    the car, they drove around, they were trying to find the house,

4    that they were dropped off someplace around the block where her

5    daddy was.  Remember that?  Doesn't talk about way on the east

6    side like Ms. Jackson says.

7          But she says something that's really, really

8    important.  She said that when they gave her back her phone,

9    her phone was dead.  Remember that?  They didn't charge her

10   phone.  She didn't have a phone.  That's what she said.

11         So when she's saying that, she's saying they dropped

12   Ms. Jackson off and Ms. Jackson had nowhere to go anywhere,

13   because she didn't have a phone in the middle of the night on

14   the 14th or early morning hours of the 15th.  Doesn't she say

15   that?

16         I asked her if she had -- her phone was dead.  What

17   does Ms. Jackson tell you?  Ms. Jackson tells you, when she got

18   out of the car, she used a phone, didn't she?  When she was

19   looking for where Bryant was, she used the phone, didn't she?

20   Those are two big conflicts, two big inconsistencies.

21         See, we're talking beyond a reasonable doubt.  You

22   know, you have to believe Ms. Jackson beyond a reasonable

23   doubt.

24         You know, when Mr. Blake gets to the house, he's

25   angry.  You'd probably be angry, too.  When he says, "Take

1    her," according to Ms. Jackson, Ms. Jackson says -- doesn't

2    say, "I don't want to go."  Ms. Jackson doesn't say, "I want to

3    go home."  Ms. Jackson makes no objection.

4        And then when you go through his -- her phone, when

5    you talk about the ability, when you talk about actions speak

6    louder than words, talk about the hospital.  That's the first

7    thing you should really think about.

8        They are good friends.  She takes her friend to the

9    hospital that's been shot, and she leaves him there.  And the

10   inference is she don't want to talk to the police.  That's what

11   the real inference is.

12       I've been to hospitals.  You've all been to hospitals,

13   too.  They've never thrown anybody out that brings somebody in

14   unless the person is, you know, unruly.  Doesn't sound like she

15   was unruly.  It sounded like she wanted to get out of there as

16   soon as she could get out of there.  We all know that.

17       She was on the phone, texting her brother, texting her

18   mother.  There are items that were deleted from the phone.  She

19   was -- and this is all at the house.  She's checking her

20   reservations over at the hotel or the motel.  She's listening

21   to music.  This sounds like a person that's really, really

22   kidnapped.

23       I mean, I'm not saying they didn't fight her in the

24   house, just like she said, but that's not what they are charged

25   with.  Mr. Blake is charged very, very specifically:

**Defendant Blake's Closing**
**Friday/August 9, 2024**

1    Conspiracy to commit kidnapping.

2           Well, you know, she left the hospital of her own

3    volition, didn't she?  According to her.  Because they tossed

4    her.  She got in her car.  He's in the hospital.  He's not

5    talking to nobody.  He don't have a phone.

6           Which raises another interesting thing, too.  How do

7    we know he even had a phone at the time of the shooting?  Do

8    you remember the officer said he picked up two phones?

9           There were two phones that the woman officer picked

10   up.  She's the officer, when I questioned her, she has the

11   same last name as a male officer at the same precinct.  Do you

12   remember the one I'm talking about?  Remember her?  And she

13   said she had two phones.  She found two phones down that path

14   where all those -- where all the shell casings were.  Do you

15   remember that?

16          And what did she tell us?  She's got to turn those

17   phones in.  She doesn't keep them.  Do you remember that?  Now,

18   we didn't see those two phones here.  So how do you know it

19   wasn't Ms. Jackson who called the troops?

20          Because do you think that Mr. Blake would give up his

21   phone when he went in the hospital?  He didn't have a phone.

22   Maybe it was her that called those troops.  I mean, that's an

23   inference.

24          Because we know that Mr. Jackson's father had to bring

25   him the phone.  So if Mr. Jackson's father had to bring him

1    the phone, that means, by inference, he didn't have a phone,

2    doesn't it?

3         Now, when you go in the hospital, you don't give your

4    phone up.  Nobody ever gives their phone up today.  Everybody

5    carries their phone around like they are wearing their

6    underwear, don't they?  Nobody gives the phone up.

7         So maybe the inference is because Mr. Blake lost a

8    phone when he was running away, it was Ms. Jackson that called

9    in the troops.  Because she needed those troops just as much as

10   protection for herself as they needed them for Mr. Blake.

11        And so when you talk about whether she was kidnapped,

12   you have to believe her beyond a reasonable doubt that she was

13   really kidnapped and held against her will.

14        So when you say "kidnap," it means you're being held

15   and you don't want to be -- you're being held against your

16   will.  You can't leave.

17        There is no evidence that Mr. Blake ever conspired to

18   kidnap her.  There is no evidence that he threw her out of the

19   hospital.  She did that voluntarily.  She was already at the

20   house.

21        When he said, "Take her," according to her, if you

22   believe that, then you got to ask yourself the question, why

23   didn't she say, "I don't want to go"?  She never does.  She

24   never tells anybody she doesn't want to go.  She never tells

25   anybody she wants to go home.  She wasn't living at home with

1  mommy.  She was living in Warren, with him, in separate rooms,

2  but together.

3          There is no evidence of kidnapping, not on behalf of

4  Mr. Blake, nor conspiracy to commit kidnapping.

5          And when you think about inferences, and I like to

6  tell jurors this story, because it really equates to what an

7  inference really means.

8          You know, the Judge will instruct you, and the Judge

9  is going to say to you that if I walked in today and I've got

10  an umbrella -- remember we talked about this -- you can infer

11  that it's raining; am I right?  And I said, well, if it's 32

12  degrees out and it's snowing, you don't really know the

13  difference.

14          But the best circumstantial evidence case is from the

15  Bible.  It really is.  It's called Joseph's coat of many

16  colors.  Anybody know that story?  Joseph was Jacob's son.

17          Now, Jacob had two wives.  The first wife, he was

18  forced to marry.  He has 11 children with her.  That's how you

19  get the 12 tribes.  And the second wife, who he supposedly

20  loved the most, was barren.  So she has a son by the name of

21  Joseph.  The other brothers hated Joseph because that was his

22  favorite son.  So she goes out -- Jacob goes out and buys

23  Joseph a coat of many colors, a beautiful coat, to make him

24  extremely different than his brothers.

25          So his brothers get together one day and they decide,

1    we're going to kill him.  And they are all talking, and they

2    say, you know, we really can't kill our brother.  So what do

3    they do?  They kill an animal -- because the Bible loves

4    killing animals -- and they put blood, the animal's blood on

5    the coat.  And they take the coat, and they take it to their

6    father, Jacob.  And they say, you know, Joseph is dead.  Here

7    is the blood which supports it on his coat of many colors.

8         And you know, the truth eventually finds out, in the

9    Bible that Joseph was never killed.  He was sent to Egypt and

10   he saves the tribes because of the famine that occurs.

11        So the evidence of the blood on the coat that they

12   gave to the father -- which is circumstantial, yes?  -- to

13   support the death was wrong.  It wasn't correct.  Just like

14   the evidence here is not correct.

15        If you go through and you think about the motivation

16   of people and why they do what they do, you have to ask

17   yourself the question:  Do their actions really speak louder

18   than words?  I mean, she's telling you one thing but her

19   activity is a lot different.

20        Does she have motivation to protect herself?  Sure,

21   she does.  She told you that.  Once that came out, which is

22   posted in everybody's Facebook and they get to see it, it's

23   Exhibit Number 50, talking about possible carjacking -- that's

24   where you get the carjacking, possible carjacking and shooting,

25   victim taken to the hospital, conveyed privately -- she's got

1   to get herself away from that.  If not, she's just

2   as responsible as the people that they say did a carjacking or

3   did the attempted murder.

4           I thank you for your time.  I mean, the other lawyers

5   are going to give you arguments.  They are basically probably

6   going to -- you know, the law is the same for all of us.  But

7   the key to this case is going to be whether you really believe

8   Ms. Jackson's actions and whether you really believe her,

9   because they don't make sense.

10          All you have to do is start with the standing --

11  sitting in the car for 5 to 7 minutes waiting for something

12  to happen.

13          I mean, nobody sits at a stop sign on a busy street

14  for 5 to 7 minutes.  They just don't do that.  That's not

15  common sense.

16          And common sense tells you, when you go to the

17  hospital and bring somebody in with a gunshot wound, they don't

18  tell you to leave.  The first thing they do is report it to

19  the police and some cop wants to talk to you.

20          But what does she do?  When she sees that, and she

21  knows that, and she knows the police are going to be looking,

22  she flags down the police and she tells her story.

23          The Government brings her in.  Now they can get the

24  group that they want to get.  They bring her in.  They begin

25  their investigation.  It dovetails.  They pay her $40,000.  She

**Defendant Blake's Closing**
**Friday/August 9, 2024**

1    becomes a Government witness.  And then she takes the Fifth.

2            Thank you.

3            **THE COURT:**  Thank you, Mr. Sabbota.

4            Do any of our jurors need a break?

5            Okay.  So we'll take a short break.

6            I'll just remind the ladies and gentlemen of the jury,

7    please do not discuss the case during the break.  And we'll

8    reconvene in 15 minutes.

9            All rise for the jury.

10                   (Jury out at 11:54 a.m.)

11           **MR. SABBOTA:**  Fifteen?

12           **THE COURT:**  We'll be in recess until the men come

13   back.  So 15 minutes.

14           **MR. SABBOTA:**  Thank you.

15      (A break was taken from 11:55 a.m. to 12:09 p.m.)

16           **THE CLERK:**  All rise.  The United States District

17   Court for the Eastern District of Michigan is now back in

18   session.  The Honorable Laurie J. Michelson presiding.

19           The Court recalls Case No. 22-20519, United States vs.

20   Cortez Blake, Karamoh Turner, Nasir Lewis.

21           Will counsel please restate your appearances for the

22   record.

23           **MR. COWEN:**  Good afternoon, your Honor.  David Cowen

24   and Jeanine Brunson on behalf of the United States.

25           **MR. SABBOTA:**  Judge, Jerome Sabbota with Mr. Blake.

1    Good afternoon.

2              **MR. AMBERG:**  Good afternoon, your Honor.  Amberg for

3    Turner.

4              **MR. GLEESON:**  And Gerald Gleeson on behalf of

5    Mr. Lewis, your Honor.

6              **THE COURT:**  All right.  Thank you.  Good afternoon.

7    We're going to bring the jury back in.

8                             (Brief pause.)

9              **THE CLERK:**  All rise for the jury.

10                          (Jury in at 12:10 p.m.)

11             **THE COURT:**  All right.  You may all be seated.

12             And we are ready to continue.

13             And Mr. Amberg.

14                     **Defendant Turner's Closing**

15             **MR. AMBERG:**  Ready, your Honor.

16             Good afternoon, everybody.

17             As the DPD officers looked out on the scene of carnage

18   on that cold November night, that cloudy night, that rainy

19   night, those kind of nights that make the cold go right to your

20   bones, these men and women, these officers looked out and they

21   saw this carnage.  They saw what only can be concluded as some

22   type of extreme violence of a group of, what we find out to be

23   men, armed with all sorts of assault rifles, pistols, and

24   everything in between.  And these guys unloaded on Cortez

25   Blake.

```
 1              This right here, folks, is why we're here.  This
 2    picture right here.  This is why we're here.  What caused
 3    this is what ultimately causes the next 24 hours of all the
 4    lives of all the people that you've heard about in this case.
 5              The root cause of what happens here is dreamt up
 6    between two people:  Amiaya Bryant, and her friend, Taliyah
 7    Jackson.
 8              Now, you heard me in my opening statement say this:
 9              That Ms. Jackson, after she had got involved in this,
10    did everything she could to get ahead of the situation.  And
11    that's exactly what I'm saying now.
12              Now, it's unclear exactly how much Ms. Jackson knew,
13    because I put this to you:  Everything she said to you was
14    a lie.  Every time I asked her any kind of question, as
15    Mr. Sabbota said:  "I don't know.  I don't know.  I don't
16    know."  We'll get more into it.  But she wasn't saying, "I
17    don't know."  She was saying, "I'm lying to you, Jury.  I'm
18    lying to you, Jury.  I'm lying to you.  I'm lying to you."
19              Because she knew.  She always knew what happened.
20    Why?  Well, let's see.
21              Let's go to the attempted murder.  It starts off on
22    November 13th, the day before this murder.  There is a video
23    that's made.  We don't get to see it.  But it is literally made
24    with Ms. Jackson and "Mar" where they both point guns at a
25    camera and post that on TikTok.  Think about that.
```

1      Do you do that with somebody that you don't know?

2  Because remember how she came in here, Ms. Jackson, and

3  pretended like she didn't even know this guy?  And about how

4  every time she talked to the cops, it was like she barely knew

5  this person.  But she's doing that.

6      A few days before that, she's making videos with guys

7  playing the AR air guitar.  And as I pressed her and pressed

8  her, and the I-don't-knows, and the I-don't-knows, "I don't

9  know, I don't know, I don't remember, I don't remember," it

10  turns out that she could have hung out with those guys a whole

11  lot more.

12      But she wanted to lie to you for a reason.  In the

13  early morning hours before this happens, think about what goes

14  on, on her phone.

15      And I will submit this to you, folks:  You can hear

16  the Government's arguments about Ms. Jackson and believing her

17  and how terrible this was.  That's not what this case is about.

18  It's about hard facts.

19      I got that phone out and I called her out for a

20  reason, because that is hard truth.  You can't say, "I don't

21  know."  A phone doesn't know how to say, "I don't remember."

22      At 2:48 in the morning, Mar calls.

23      Now, you heard one of the more unbelievable things, I

24  think, at this trial, was Ms. Jackson goes, "oh, I don't

25  remember."  And then she goes, "I know a lot of Mars."

```
 1              What?  Do you really believe that?

 2              Okay.  Let's give her the benefit of the doubt for a

 3    second.  Okay.  Some other Mar was calling that she doesn't

 4    really know or remember or anything like that.  But guess what?

 5    Look who is calling six minutes later?  Do you think this is a

 6    coincidence, folks?  Do you think she was being honest to you

 7    then?  She was not.

 8              You fast-forward, just a few hours from then.  Okay?

 9    Look where we're at.  We're on Holmur and Puritan.  And I want

10    to tell you what's leading up to this moment.

11              Ms. Jackson is on FaceTime with Ms. Bryant.  They

12    share locations.  They know where each other are.

13              Now there's a key fact.  It kind of came out and it

14    came out, like many facts do in trials, but it was a key fact.

15    And it was this:  It wasn't just Cortez and Ms. Jackson in the

16    car.  It also had Ms. Jackson's little cousin.  And think about

17    what she said.  She drops the little cousin off, and just a few

18    minutes later, she is at this stop sign.

19              Now, I want to take a step back and I want to set the

20    stage here.  Because Ms. Bryant knows that Cortez has thousands

21    of dollars on him.  Okay?  She knows that, right?

22              And I would put this to you folks, too, because let's

23    be real here about what's really going on, because that was

24    just lie after lie after lie, because she didn't tell you what

25    was really going on.  So I will.  This is what's really
```

**Defendant Turner's Closing**
**Friday/August 9, 2024**

1    happening.  Her and Amiaya Bryant have conspired together to

2    rob Cortez Blake.  How do you know that?  As Mr. Sabbota said,

3    you don't sit there for seven minutes at a stop sign, waiting

4    around.  You're not looking at the birds.  You're not counting

5    the cars that go by.

6         What you are is counting the seconds for this plan

7    of coordination, just like I told you about in my opening

8    statement, comes to terms.  And that's exactly what happens

9    here.

10         Now, here is the thing, too.  Those guys that she,

11    Ms. Jackson, makes all these TikTok videos with, they got a

12    beef with Cortez Blake.  To them, it's not about the money.

13    Cortez is a member of a rival group, and they want him dead.

14         As Mr. Sabbota so eloquently pointed out, if it's just

15    a robbery, why did they get in the cars, like cowboys getting

16    on a horse, and chasing the guy down and shooting and shooting

17    and shooting, 46 times.  It is just chaos there.

18         Now we come to the next lie of Ms. Jackson, though.

19    And it's the lie of the good samaritan.  Keep in mind, a lot

20    of what Ms. Jackson says and what the Government says happens,

21    it's only from Ms. Jackson, because there's really no

22    investigation about whether she's actually telling the truth

23    about these things.

24         Where is this good samaritan?  Because Mr. Henry does

25    not tell that story.  And Mr. Henry is just a regular guy who

1    is watching the carnage unfold.

2          What does he see?  He sees four guys in ski masks come

3    out, and there are the four guys and Ms. Bryant standing there

4    for, like, three minutes.

5          And then Ms. Jackson gets out of the car, and

6    Mr. Blake is taken out of the car, and he runs like hell for

7    his life while Ms. Jackson just stands there acting sketchy.

8    Acting sketchy is a very specific kind of acting.  That's not

9    acting scared, because that would be acting scared.  Mr. Henry

10   would have said "she looked like she was scared out of her

11   mind," as you all would be in that situation.

12         The only reason why you are not scared out of your

13   mind when you see the brigade come up there with the ARs is

14   because you know those guys.  And the fact that all four of

15   them have masks on, don't believe Ms. Jackson, she lied to you.

16   Two guys didn't happen to have their masks off.  How does that

17   make sense?

18         When you're about to go commit a murder, "Hey, guys,

19   I'm going to wear the mask.  You don't want to wear the mask?

20   Fine.  No problem."  That's a big lie, giant, giant lie, for

21   you.  That was to deceive you, you, you, you, you, you, you,

22   you, you, you, you, you.  Are you deceived yet?  Did you buy

23   her bologna she was selling to you?  Because she lied to you

24   straight to your face.

25         The reason why she knows who those people are is not

1    because two of them didn't have masks on.  It's because she

2    knows these guys.  She probably could tell by looking at the

3    guns, "Hey, I think I appeared in a video with that AR-15

4    assault rifle."  "Whoa, hey, maybe that was the pistol I

5    was twirling around as we were having so much fun, as I

6    was dancing and I was showing you how I hold a gun."

7            And here is why the good samaritan never really

8    happens.  The good samaritan thing only comes out from

9    Ms. Jackson because she's got to say something.  Because what

10   is she going to tell Mr. Blake and everybody else when they

11   realize what she's done?  That she has been complicit in a

12   gangland attempted murder.  What is she going to say?

13           Oh, I just stood there until they all left and I kind

14   of walked over and saw you.  No, no, no.  She's got to make up

15   some sort of thing.  I ran away.  I got into this car where

16   this magical lady let me in, and then she drove me down to find

17   you.

18           That's all lies.  Look at this.  I'll show you why.

19   There is where the shooting and everything happens, right

20   there.  Here is the Marathon gas station.  Does that look

21   like it's that far?  No.  That's right down the street.

22           She watches Cortez run for his life, bleeding and

23   barely walking.  She watches.  Then she watches all of her

24   friends drive away.  And then she just walks on over there.

25   That's what really happened.

**Defendant Turner's Closing**
**Friday/August 9, 2024**

114

 1          She's not going to tell you that.  She never will.

 2     Because the second she starts telling the truth, we are no

 3     longer here.  We're done.  Because if she tells the truth,

 4     she was never kidnapped.

 5          Take what happens next.  This is -- this -- just think

 6     about what happens after the shooting.  Right?  And I put two

 7     control dates on here.  At 4:45-ish, that's the shooting, and

 8     then you have the text to mom:  "Mama!!!"  At 5:59 p.m.  That's

 9     a considerable period of time.

10          So let's talk about what she does.  She makes

11     17 outgoing phone calls.  To who?  "I don't remember."  Why

12     would you be calling people 17 different times in this hour or

13     so time period before you decided to text your mom?  "I don't

14     remember."

15          What?  What?  Do you think I'm stupid?  Do you think

16     I haven't had somebody try to run one on me before?  I'm not.

17     I don't believe you.  I'm sorry.  You're lying right to me, and

18     you're lying to these people, too.  Straight up.

19          She goes on Instagram 35 separate times, right?  This

20     isn't, like, 911 Instagram.  This is just like Instagram.  And

21     here is the excuse that Agent Jacobs gives us:  Well, you know,

22     she's a 19-year-old girl.  Blah, blah, blah.  What?  What?

23     What?  Did you guys believe that?  No, you did not.

24          This is what she's doing on Instagram.  She's looking,

25     because she knows what she did.  She's looking to see if people

1   are talking.  What are they saying?

2          She's worried.  She's got to make sure she gets ahead

3   of it.  What other explanation is there?  There is none.  There

4   is none.  "Oh, I just wanted to check the weather on

5   Instagram."  "Oh, I just wanted to see what my friends in, you

6   know, Arizona are doing on Instagram."  No, no, no, no, no.

7   "Oh, you know, I wanted to see what Taylor Swift was up to,

8   what she had for breakfast three days ago."  Do you think

9   that's what's going on?  No.

10          This is the craziest part about this, though, too.

11  And this is why I love when I have an actual, real piece of

12  evidence, when I got that phone and I could just show it to

13  her, to call her out on her lies.  Because let me tell you

14  something:  When you see a chaotic event, you're probably going

15  to remember the first person you texted, right?  And here is

16  her text:  "Brooo." I mean, this is literally minutes after,

17  right?  "Brooo."  "Brooo where you at?"

18          How do you not remember who that was?  How?  You tell

19  me, folks.  Do you believe her now?  Do you still believe her

20  now?

21          Because let me tell you something.  She knew exactly

22  who that was and she just didn't want to tell you.

23          And the agents were so convinced that she was so

24  innocent, babe in the woods, naive, that they didn't even

25  bother to really dig down deep and go through her phone and ask

 1   her these questions.

 2          Instead, they just thought maybe these guys won't get

 3   a lawyer up there that knows more than anybody else does about

 4   going through a cell phone.  Guess what?  I do know how to do

 5   that.  And guess what?  You can't give me any explanation for

 6   that, Ms. Jackson.

 7          Now, one thing we know she doesn't do is she doesn't

 8   call 911.  That would have been really easy to do.  You got a

 9   phone, it's three numbers.  DPD.  She could have said something

10   at the hospital, she doesn't.

11          The vacant lot?  Does it even exist?  Did it really

12   even happen?  Like, if you're going to come in here and say

13   this happened, where is the investigation?  Tell me.  Tell me

14   where she was at.  I would like to know.

15          Is there video?  Green Light videos of the vacant lot?

16   Anything?  Does the agents -- do they do anything to figure

17   that out?  No.  They got her phone.  You're telling me you

18   can't do location tracking on the phone, as they tried and

19   failed to do here for my client at this house later on?  They

20   don't do anything.  You'd have to believe Jackson.  Okay?

21          And I would submit this to you:  This is in evidence.

22   The Government put this in here.  There are two Turners in

23   this case.  Here's my Turner, Karamoh; he's my client.  But

24   there's also another Turner, Ramone.

25          And I want you to think about what the vacant lot

**Defendant Turner's Closing**
**Friday/August 9, 2024**

```
 1   story is.  Okay?  I want you to put yourself in there, right?
 2          Like I said, it's dark, it's raining, it's cloudy.
 3   It's cold, and it is chaotic.  It is chaotic.  According to Ms.
 4   Jackson, you have multiple cars and people, all kinds of people
 5   all over the place, all kinds of men, as the Government keeps
 6   telling, all these men everywhere, all that stuff.  It's very
 7   chaotic.  Right?
 8          So in the dark, in the chaos, are you telling me that
 9   it couldn't have been Ramone Turner?  They have the same nose.
10   They have the same ears.  They have the same mouth.  They have
11   the same neck tattoos.  I mean, these guys look just like each
12   other.  Maybe they are related.
13          The way that Ms. Jackson describes what happens to
14   her there is very important, too.  It's not like, like an
15   identification in the sense that, you know, the officer's got
16   a panel of different pictures and she got to pick one out.
17          She just shows up and says, oh, it's this guy.  And,
18   like, nobody questions her about it.  Like, nobody says, you
19   know, maybe we ought to look into this, just to make sure we
20   don't have the wrong Turner.  Like, nobody does that.
21          Nobody asks her, like, hey, how did you actually --
22   besides just saying you went on Instagram, like, did you talk
23   to people about what happened?  Did you, like, look around?
24   Like, what did you do?  Maybe we should show you some other
25   pictures, just to see if it's the same guy.
```

1    But none of that ever happens.  Instead, what happens

2  is they just believe her; a fatal mistake for any agent.

3    Now, one thing we know about Ramone Turner is he is

4  literally at this house.  You heard evidence about it.  Okay?

5  Think about that.  Because I can tell you who wasn't there.

6  Karamoh.  He wasn't there.

7    I just had to hear an hour of the Government saying

8  how he was there and laughing and all that.  I was like, did

9  I miss that witness?  Because he was never there.  He never

10  was.  She never identified him as being there.  Ms. Smith never

11  identified him as being there.

12    The closest that anybody gets to even him being within

13  miles of the place is this tower records thing, which, as you

14  heard, it was all incoming calls to a phone that he may not

15  even have been touching at the time somewhere, potentially,

16  miles away from that home.

17    And nobody tells you where Karamoh lives.  These guys

18  were, like, you know, it's a gang thing.  Do they all live in

19  the same neighborhood?  Hmm.  You know, wonder about that.  But

20  you know, that's a bad fact.  So why would we go and

21  investigate that if we're, you know, the agents?

22    All right.  What is kidnapping?

23    Karamoh unlawfully seizes, confines, inveigles, all

24  that stuff.  That does not happen here.  All right?

25    The second element, though, is this.  And you folks

```
 1    will get this back here, but this is very important.  You think
 2    about this.  The holding of Taliyah Jackson, right?  And this
 3    goes for all the guys, too.  Holding, it's -- it's more than
 4    just some sort of, like, like, mere thing.  You have to, like,
 5    literally hold somebody for an appreciable period of time.
 6    That holding was for some purpose.
 7             And that the instrumentality of interstate commerce
 8    was used or facilitated.  I would argue in this case, it has
 9    not been, at least for Mr. Turner, because whatever role he
10    had in this, if you even believe Ms. Jackson, even if you
11    believe everything she says about the vacant lot, it's brief
12    and, poof, he's gone.  He's gone.  He's gone long before the,
13    the, the home, the Trinity house.
14             And I just want you folks to go back there and look at
15    these instructions.  I mean, make your own decisions, but I'm
16    telling you, she was not held by Karamoh Turner.
17             Oh, one last thing here, too.  How she feels is not
18    an element.  Okay?  I heard a lot about that during the
19    Government's closing.  She felt like this.  She felt like that.
20    She felt like this.  She felt like that.  That's not an
21    element.  Okay?
22             As Mr. Sabbota said, actions speak louder than words.
23    Right?  She can come here now and say whatever she wants.  But
24    the actions that she took are not there at all.  And I'm going
25    to get into that right now.
```

 1          Let's talk about what happens at Trinity.  Okay?  This

 2   is the most important slide in my whole entire presentation, so

 3   please pay close attention to it.

 4          This is just a microcosm of her phone.  Okay?  You

 5   heard me cross-examine Ms. Jackson about her phone, and you

 6   heard "I don't know" about a million times, right?  Oh,

 7   "I don't know."  "I don't know."  "Hey, were you, like, on

 8   TikTok?"  "I don't know."  "No, I didn't have a phone at all."

 9   All that stuff, right?

10          This is how this goes down, and you compare it to the

11   text messages that her brother and her mom are sending her at

12   the time, right?

13          About 7:10 p.m., somebody on that phone is on

14   Instagram.  Okay?  Because the agents don't bother to go

15   and actually get her Instagram, which would have literally

16   exonerated everybody in this case -- you know, we're sort of

17   stuck with the I-don't-knowing of her.  All right?  I wish I

18   could do that, frankly, I wish.  I don't -- I don't have the

19   badge.  I can't do that.

20          Her brother calls her just a little after that.

21          Somebody on that phone goes on Tapcart.  Do you think

22   this is like a mid-kidnapping, like the kidnapper is going to

23   go, "Okay, I'm going on Tapcart real quick, and, like, check,

24   like, check out what I'm purchasing"?  What?  Like, that makes

25   no sense.  It makes no sense.

```
 1              Then, somebody listens to a voicemail on her phone.
 2    That also makes no sense.
 3              Her mom tries to call her.  "Are you okay?"
 4              While that's happening, she gets off of Instagram.
 5              "Shaking my MF head," is what her mom texts her.
 6              TikTok comes on right after that.
 7              Then, Instant Messenger, where messages are being
 8    sent.
 9              Then Tapcart again.
10              Brother:  "Really need a text back.  I don't know what
11    you were doing or where you are.  I just want you to be safe.
12    Just give me an addy and I'll pick you up no questions asked.
13    Please, Taliyah.  Please."
14              Oh, hold on.  Hold up.  I'm on iTunes.  Let me fire
15    up my bluetooth really quick on my I -- on my Airpods.
16              Do you think like, like, like, she's being held
17    against her will and, like, the kidnapper guys are going to
18    put the Airpods in and listen to a jam on her phone?
19              How does that make sense in any facet of any world?
20    Okay?
21              This is but a microcosm of the whole phone.  That's --
22    her whole phone was like that.  Okay?  That's her whole phone.
23              Oh, and then she makes an outgoing call.  I forgot
24    about that.  She makes an outgoing phone call, too.
25              I mean, that's like 20 minutes.  How many times does
```

1   she go on Instagram during this or- -- you know, supposed

2   ordeal?  Hundreds, hundreds, hundreds, and hundreds of times.

3   But nobody bothered to see what she was doing.

4          You can DM people on Instagram.  That means you can

5   send them messages.  We don't know what she was sending.

6          We know that -- as we're going to find out here -- you

7   know, she was deleting stuff.  But this is the most key fact

8   on the phone.  Hard evidence is hard evidence.

9          At 9:14 p.m., she checks -- or somebody does, look, it

10  could be anybody -- somebody 16 times checks the Tru Hilton

11  Hotel in Sterling Heights.  All right?

12         Let's talk about how, if Ms. Jackson doesn't have her

13  phone, okay, if Ms. Jackson doesn't have a her phone, okay,

14  that would mean that somebody that was holding her against

15  her will decided to go on her phone to check a hotel in

16  Sterling Heights that she happens to be staying at.  What?

17         Does that make any sense to you?  It doesn't, because

18  it doesn't make any sense.  Okay?

19         What makes a lot of sense is she's got her phone

20  and she is doing stuff like listening to music, and going on

21  TikTok, and playing on Instagram, and doing all this stuff.

22  Because there's a big gap.  You know, when she gets to that

23  house, before anything happens with the, the video and stuff

24  like that, there's, like, hours that go by.

25         She's not being held against her will.  That's the

1    key to this case, especially for Karamoh.  She's not kidnapped.

2    She's not kidnapped.  Okay?  She's not.

3         Because if the only person that would have knowledge

4    of that is her.  And if you're going to go check your -- your

5    hotel, all right, your hotel reservation, why would you do

6    that if you're kidnapped?  You would only do that if you think

7    you're going to be going to that hotel later, right?  Doesn't

8    that make sense?

9         Late night at Trinity.  This is interesting, too.

10   Okay?  You heard me call out the, the phone expert for the ATF.

11   Jackson's phone had far more events than what was presented to

12   you.  All right?  Think about that.

13        I mean, she had -- just from the stuff I described

14   right there, there was more than what's in total on here.  She

15   made outgoing calls.  Miya called her at 8:54 p.m.  Remember

16   that?  Miya literally called her and they talked -- or somebody

17   talked with her for 40 seconds.  Hmm.  Weird.

18        Text messages, just between her and her mom and her

19   brother, there was somewhere in the neighborhood of, like,

20   70 text messages.

21        And you've got endless data, Instagram and TikTok,

22   endless with the shopping apps, and all this other stuff.  But

23   yet, this is all that registers on the tower.

24        That means a couple of things.  Okay?  It's either

25   that phone was somewhere else, or maybe somebody gave her the

**Defendant Turner's Closing**
**Friday/August 9, 2024**

1    Wi-Fi password to that house.  So if you're being kidnapped,

2    do you, like, get the Wi-Fi password to the house?  Really?

3    Because that's the only explanation I can come up with.  You

4    come up with a better one than me, let me know.

5         The assault happens later in time.  And as Mr. Sabbota

6    said, that, that was something that we all acknowledge that

7    that happened.  And it's an assault.  It's not a kidnapping.

8    It's an assault.

9         I would say this.  Karamoh was not there.  Ms. Jackson

10   did not testify that he was in the house.  Okay?  The thing

11   about his phone, that -- the way that the Government made it

12   seem like he was there, that's not true at all.  And you all

13   know that, because you all heard me cross-examine that lady.

14        That just means that phone was within miles of a

15   vicinity of that sort of arc of 90 degrees, or whatever it was,

16   or 120 degrees.  And that does not tell you where the phone is.

17        And you're dealing, like I said, with a gang case.

18   And guess what?  Gang guys all live in the same neighborhood

19   together.  Or the phone could just be sitting there somewhere.

20   And it doesn't even look like anybody was answering the phone.

21   Right?

22        And why would you not -- like, if you're going to

23   investigate this case and say all this stuff, why would you

24   not, like, go, get the phone, see who people talk to, like,

25   do all that stuff?  None of that is presented for you.

1      One thing we don't know [sic] is that she does not

2   call 911 after she gets jumped, right?  And we heard the

3   excuse that -- and look, I don't want to downplay what

4   happened, right?  She got -- she was beat up by those, those

5   young ladies.  Okay?  That was terrible.

6      And look, I'm a human being.  I see it.  It is

7   terrible.  But my client wasn't there.  So darn right, I'm

8   going to get up here and say he's not guilty of that, because

9   he wasn't even there.  They never showed any evidence that he

10  even had any knowledge of that.  Nothing.  Nothing.  He was

11  never in the house.  He's never even around.

12      When you look at that Instagram, you know, thing

13  where the kidnapping thing happens at the end, the Instagram

14  attributed to Karamoh only goes off far earlier in the evening,

15  and it's about trying to figure out what happened and maybe

16  get back to the guys that tried to kill his buddy.  He's not

17  talking about kidnapping anybody.

18      No DPD.  No nothing.

19      And here is the lack of evidence.  And I kind of

20  jumped the gun here.  But the cell phone evidence is

21  nonexistent in this case against Karamoh.  There is no text

22  messages.  Nothing ever happens.  Why not investigate that?

23      If you want to say that my client committed kidnapping

24  and conspired -- because conspiracies involve people, like, you

25  know, conspiring with each other.  But they didn't show you any

1   evidence of that, at least with Karamoh.

2          Nobody sees him.  And like I said, the Instagram does

3   not reflect what the Government has claimed.

4          All right.  Let's go to the lies.

5          First of all, this is a crazy fact:  Ms. Jackson says

6   that she always shares her location, not just with Ms. Bryant

7   but with her mother.  All right?  She shares her location with

8   her mother.  And that leading up to this, you know, if her mom

9   wanted to see where she's at, it would be shared.  But she

10  turns that off.

11         Why would you turn off the location tracking thing

12  with your mom?  That's what she testified to.  She literally

13  turned it off.  And the excuse was crazy.  It's like, well,

14  I didn't want to, you know, have these people come over and

15  stuff.

16         What are you talking about?  You turned off the

17  location tracking thing with your mom.  Like, you're up here

18  trying to claim that you were held against your will, but you

19  turned off this thing where literally you wouldn't even have to

20  send a text message.  She could just look you up.

21         You could have said something like:  Hey, mom, my

22  location data is off.

23         Nothing.  She doesn't do anything like that.  Why?

24  Because it's all a lie.  It's all a lie.  This is all a lie to

25  you.

1          I put this garbage can up here because I'm going to

2    tell you why she's lying, and I know the way I can prove it to

3    you.  Okay?

4          You heard evidence when I confronted first her,

5    Ms. Jackson, with how she deleted files on her phone.  Right?

6    And these were not files that existed for some time before this

7    happens, right?  These are things -- these are text messages

8    that are being sent from her phone that have attachments to

9    other people during this event.  I mean, all sorts of -- I

10   can't remember if it was, like, 20 files or something like

11   that.  And she denies, of course.  She gets the I-don't-know

12   syndrome.  That's, like, what I like to call selective amnesia.

13         But when Agent Jacobs gets up there, he admits that

14   Cellebrite tells you when somebody deletes a phone -- or

15   deletes a file.  And that's what she did.  She deleted all

16   kinds of files.

17         So why would you do that, right?  Like, like, if you

18   know that this phone is going to be given -- because it wasn't

19   like they take her phone out of nowhere.  It's like, she goes

20   down and gives it to the cops a few days later.  So she's got

21   the phone for a few days.  Why would you delete attachments,

22   photos, God only knows what else?  Why would you do that?

23   Right?  If -- especially since, you know, like, for example,

24   less than an hour before the shooting starts, she had sent

25   something out with an attachment.  Probably the plans for the

1    caper she was about to commit and -- but it's all deleted.

2    Right?

3            The only reason why you do that is you don't want

4    these cops to see it.  Okay?

5            And she is not a police officer.  She doesn't know

6    that, like, these guys can take your phone and look and they

7    can tell that you deleted something.  She doesn't know that.

8    So she is already doing things, sneaky things, sketchy things

9    to hide what she did.

10           Are you going to believe somebody beyond a reasonable

11   doubt that literally deleted files that clearly had something

12   to do with this before she gave the phone to the officers and

13   then pretended like she didn't know what she did?  Because

14   that's what the Government is asking you to do.

15           This is crazy, too.  Right?  This video thing?  You

16   have literally been in this incident where these guys tried to

17   kill Cortez.  And now you are -- here you are with Detective

18   Fox and the other officer, I think Officer Wilson, down at DPD,

19   and you're doing this interview, and you don't tell them:  Hey,

20   by the way, like, I might have, like, made a couple of crazy

21   videos on TikTok where I literally was on there with these guys

22   that had, like, machine guns, and I'm pointing guns at the

23   camera, and my best friend over there is pointing guns at the

24   camera.  And oh, yeah, the night before this literally

25   happened, I was with the guy who did this, and, yeah, we kind

1   of made these videos together.

2           She never says that at all.  Why?  Do you think she

3   forgot?

4           There was an interesting exhibit that was put into

5   evidence that nobody really looked at.  Okay?  But when I

6   saw it, I looked at it, and I said wait a second.  Hold on.

7   Hold up.

8           This is the bottom snippet of a text message string

9   between Bryant and Jackson.  And this is the last text.  It's

10  from Bryant.  And she -- this is what she tells -- like a day

11  or two later, whatever it is, this is what she tells Jackson:

12  "You got somebody posting me saying I set you up?"

13          What?  What do you think Ms. Bryant was thinking

14  when she sent that?  Sure sounds to me like she was saying,

15  you're -- you're over there making it seem like you had nothing

16  to do with what happened here?  Give me a break.

17          Look at her actions after the fact.  She signs this

18  agreement with the ATF, right?  And look down here:  "I will

19  not post on any electronic or social media regarding my

20  location or disclose any information regarding the case."

21  Right?  And then she agrees that she could lose her money

22  and all this other stuff.

23          But what does she do?  You know, she's relocated

24  because she's so scared and all this other stuff.  She

25  literally -- and she admits to this -- on TikTok, puts her

1    plane ticket on it.  Like, literally, the plane ticket.  Like,

2    the actual plane ticket.  Like, here's my -- if you guys go, go

3    fly to the Bahamas for Thanksgiving or something, you put your

4    plane ticket on there and, like, you show the whole world,

5    like, where you're flying out of and where you're going?  What?

6          And then when I call her out on it, because, you know,

7    obviously I had gone on her TikTok and showed it to her.  And,

8    I mean, just the little things that I could show her, she's

9    over there literally writing the name of the other place that

10   she was at, that she had, you know, left and, and was relocated

11   to somewhere else?

12       (Disruption outside the courtroom.)

13       **MR. AMBERG:**  I apologize for that.  Well, court

14   is never dull, I can say that.

15          Now, on top of that, you know, the location itself,

16   this is a violation of this agreement.  Like, look at this.

17   She is telling, you know, the world where she's at.  She's not

18   scared.  She doesn't care about this agreement.  She lied to

19   these agents about that.

20          And then the final lie is this.  Okay?  She is telling

21   these guys, the agents, that she has no money.  That she's

22   broke.  That she's destitute.  That she needs money for a car.

23   And what do these agents do?  Oh, here's thousands of dollars.

24   Here.  Here.  Here is all the government money.  Be okay out

25   there in the world.

```
 1          What does she do?  She is literally on TikTok this
 2   entire time, posting pictures of her with thousands of dollars.
 3   She admitted it.  Expensive liquor, all kinds of stuff.
 4   Flaunting it.  Flaunting it.
 5          A conspiracy?  Now, I want you folks to read the
 6   conspiracy instructions, because it says a lot of stuff in
 7   there.  I don't want to bore you with the details of it.
 8          But you've got to have an agreement and then you have
 9   to knowingly join.  Karamoh does neither in this case.  There
10   was never a conspiracy at all anyways.  But as far as Karamoh
11   goes, his, his, like, chapter in this story is about one page
12   long.  He's in it and he's gone, even if you believe it was
13   really him.
14          People can meet together.  They can talk about common
15   interests.  They can do things together.  That's not enough for
16   a conspiracy.  Okay?  You folks get this instruction.  I put it
17   on there.  I don't want to read it to you.  But you can read it
18   when you're in there.
19          Now, no text messages.  There is no evidence at all
20   that he was texting about a conspiracy or anything like that.
21   He's never seen at Trinity.  There is no evidence of him ever
22   being at the house ever.  Ever, ever, ever.  Contrary to what
23   the Government claims.  That's not real.  You heard the
24   evidence.  That, the reality of that situation is, he's never
25   there.
```

1      There is no agreement that Karamoh makes with anybody

2  to hold anybody.  He never joins any conspiracy.

3      Reasonable doubts.  And Mr. Sabbota touched on this,

4  but I'm going to touch on it, too.  Proof beyond a reasonable

5  doubt means proof which is so convincing that you would not

6  hesitate to rely and act on it in making the most important

7  decisions in your own lives.  All right?

8      Think about it.  Will you marry me?  Should I buy this

9  house so I can send my kids to this school?  I mean, these are

10 things that are the most important decisions in your life.  And

11 that's exactly what you're doing here today.  You're going to

12 be making one of the most important decisions of your lives.

13 That's what this is.  At least that's what it is to Karamoh.

14 It truly is.

15     I ask you to take that very seriously.  I know you --

16 folks, I know you will.  So I have confidence in that.

17     Reasonable doubts.  Ms. Jackson's video.  That's a

18 reasonable doubt.  The fact that she made these videos and

19 didn't tell anybody, that's a reasonable doubt.  The fact

20 that what she's doing in those videos is so insane, that's a

21 reasonable doubt.

22     Ms. Jackson on her phone, the entire time, going on

23 Instagram, going on TikTok, going on iTunes, going on whatever

24 Tapcart is, doing all this stuff where she's supposedly

25 kidnapped?  That's reasonable doubt.

1          Clearly this was a setup.  She lied to you repeatedly

2   throughout this whole ordeal, and she got all these guys from

3   the Government's side to believe her.  It was a setup, clearly.

4          Never calls 911.  We all know that.  Why would you

5   not call 911?  Why would you not call 911 in the beginning?

6          Forgets texts and calls.  How do you forget?

7   Seriously, how do you forget?  That's a reasonable doubt.

8   How do you not remember the first person you texted?

9          Why did you not text your granddaddy?  You saw that

10  emotion that she had when I asked.  I didn't want to do that,

11  and I don't like doing that, but I have to, to show you folks

12  one thing.  There are issues with her mom and her.  She --

13  whatever is going on, her mom is not her person.  That's not

14  the person that she calls when she's really in trouble.  That's

15  her granddaddy.  Why not call him?  Why call your mom, who you

16  don't really get along with?

17         She knows Mar.  What a lie she told you folks.

18  Because clearly she did.  I mean, she was making videos with

19  the guy.

20         Lying to agents repeatedly through the process from

21  the videos to, you know, I only met him weeks ago to, oh, I

22  guess it was last night.  All that stuff.  They are all lies.

23         Karamoh was never at Trinity.  That's beyond a

24  reasonable doubt.  Not guilty just on that.

25         Lies about ski masks.  I mean, the little things, the

1   little lies, all of this.  It's all reasonable doubts.

2          Social media.  The fact that she does this, she

3   flaunts it to the Government, she posts all kinds of things,

4   that's reasonable doubt.

5          Constantly on Instagram throughout this whole ordeal

6   and nobody bothers to go get the Instagram?  That's a

7   reasonable doubt.

8          How much do you folks wish you could read what she was

9   writing on Instagram?  Well, we find out that you can't delete

10  that from the server.  Like, once you -- once you pop in there

11  on Facebook something, Mark Zuckerberg has got it forever.

12  Okay?  She may not know that.  But the Government does know

13  that.

14         But here is the problem.  And this is why, my theory

15  is, anyways, why they don't.  Because these people are, are

16  smart.  And if you go that extra distance and get her Instagram

17  after you have looked at that phone, you've got to think, what

18  could be on there?  It's going to sink the case.  It will

19  literally sink this case.  It will.  And that's why you don't

20  have it.  So that's a reasonable doubt, too.

21         Phone evidence.  Wi-Fi.  Come on.  You know she was

22  on that Wi-Fi at that house.  You're not a kidnappee if you're

23  using the Wi-Fi.

24         Hey, kidnapper, can I grab that Wi-Fi password?  Give

25  me a break.

**Defendant Turner's Closing**
**Friday/August 9, 2024**

```
 1              She deletes all of the important phone info.  I mean,
 2    come on.  Would you trust anybody that did that?  No.
 3              Acting sketchy, that wasn't my words.  That was the
 4    words of the eyewitness who literally saw this, Ms. Jackson,
 5    acting sketchy.
 6              I don't know?  Come on.  She knew.  She just wanted
 7    to lie to you.
 8              Getting ahead of it.  And getting ahead of it is what
 9    leads me back to the beginning.  That's what she was doing.
10    She was always doing that.
11              Now, what happened to her while she was at Trinity
12    was terrible.  Nobody, nobody, even if you're sketchy, even if
13    you've done -- you know, you set somebody up and, and what you
14    thought was a robbery turned into a murder, potentially, or an
15    attempted murder, you still don't deserve for that to happen.
16    But that's not a kidnapping.  It's an assault.  It's an
17    assault.  That's what that is.
18              These other theories of liability, I would say this:
19    Mr. Turner, there is no proof that he knew of any kidnapping.
20    There is no proof at all.  None.  Zero.
21              The idea that a conspiracy could exist, that he could
22    be a part of and not know that a kidnapping was happening,
23    because that's, like, how you reach these conclusions with
24    these other things here, it just doesn't make any sense.
25              These two alternative theories, I would say look at
```

 1   those, set those aside, and just ask yourselves, was there

 2   really a kidnapping conspiracy here?  Did Mr. Turner actually

 3   know anything about it beyond a reasonable doubt?  The answer

 4   is simply, no.  No knowledge, and he's not involved.

 5         Defendant's duties.  He's got no duty to present

 6   evidence.  I was very happy I was able to in this case for you,

 7   folks.  I was able to go through that phone and show the lies

 8   of Ms. Jackson.

 9         No duty to give a theory.  Well, I did that, too, in

10   this case.  So I actually went beyond what we were -- what we

11   can do, which is nothing, and I gave you the actual theory,

12   because that's what really happened.

13         Karamoh has every right not to testify.  Okay?  You

14   folks all understand that.  I know we talked about that a

15   little bit in the beginning of this case.  But that's --

16   you know, that's his right.  You can't even consider it when

17   you're talking about it back in the deliberations.

18         The Government has not met their burden, plain and

19   simple.  Okay?

20         You folks go back there.  You talk about it.  You

21   look at all the stuff.

22         It's not about these guys are bad guys, so we're going

23   to -- you know, maybe they didn't really kidnap this person,

24   but they're bad guys, so we're going to do this.  That's not

25   why we're here.  That defeats the whole purpose of why we're

1    here.  Okay?

2           If the Government wants to charge Karamoh with an

3    assault in a vacant lot, go ahead.  Go ahead.  They want

4    to charge Cortez Blake for supposedly hitting, you know,

5    Ms. Jackson with a crutch, go ahead.  But that's not

6    kidnapping.  None of this is kidnapping.

7           Go back there, folks.  Do your duty as jurors, and

8    find him not guilty.

9           Thank you very much, your Honor.

10          **THE COURT:**  Thank you, Mr. Amberg.

11          And, Mr. Gleeson.

12          **MR. GLEESON:**  May I have a moment to allow Mr. Amberg

13   to...

14          **THE COURT:**  Sure.

15                    (Brief pause.)

16                **Defendant Lewis' Closing**

17          **MR. GLEESON:**  Good morning, ladies and gentlemen.

18          Nasir Lewis was not at that intersection where Cortez

19   Blake had four people shooting at him trying to kill him.

20   And Nasir Lewis wasn't at the hospital where Ms. Jackson was

21   allegedly told to leave.  He wasn't in any car or any Jeep

22   that was driving around wherever.  And he was not in any car

23   with Ms. Greene or with Ms. Smith.

24          There are other places where Mr. Lewis also isn't at.

25   He isn't anywhere in Ms. Jackson's interview with the Detroit

1    Police Department, or the ATF, or the grand jury.

2          When Ms. Jackson talked to the Detroit Police, she

3    went through her phone, found Cortez Blake's Instagram, and

4    said these are the people who were there.  These are the people

5    who were involved.

6          Did she say Nasir Lewis?  No.  Did she say "Nas"?  No.

7    Did she pull up Naserati's Instagram page?  No.

8          Did she pick out the photos that have been introduced

9    by the Government of the group and say, that guy, Mr. Lewis?

10   No, she didn't.

11         When they gave her a lineup, a photo lineup with

12   Mr. Lewis's face right there, did she pick him out?  Well,

13   thanks to Agent Jacobs, we know she didn't.  She came and

14   testified that she did.  Agent Jacobs was here to tell you

15   the truth.

16         Did Ms. Jackson mention Mr. Lewis to the grand jury?

17   No.

18         Did she point to him and identify him in any way,

19   shape, or form in this courtroom for you?  No.

20         And the same is said for Ms. Smith.  Did she go

21   through her Instagrams and pull up Naserati?  No.

22         Did she point to Mr. Lewis at any point in time when

23   she was here and say he was involved?  No.

24         So not in anyone's testimony, anybody's interview,

25   anyone who was there, says anything about Mr. Lewis.  He wasn't

1    at the shooting, the hospital, in any car.  He's at a house in

2    a video for a few seconds.  I didn't run away from that in my

3    opening statement, and I'm not running away from it now.

4         But with all due respect to Mr. Cowen, in that video,

5    Mr. Lewis doesn't hoot.  He doesn't holler.  He doesn't

6    interrogate.  He doesn't encourage.  And he doesn't snatch her

7    phone.  For all intent and purposes, he's just standing there

8    in his winter coat with his hat on.

9         And we can quibble whether he poked her, whether they

10   made contact or not.  Can't really tell.  The bed is there.

11   Bodies are there.  But he's just standing there for all intent

12   and purposes.  Not yelling at her.  Not threatening her.  Not

13   seeking information.  None of that.

14        He's also there on his phone.  We know that from

15   Ms. Ganley and the tower dump.  But my take away from

16   Ms. Ganley's testimony, the most important thing is not what

17   she said but what she didn't say; what you weren't given.  The

18   call detail records for his phone, where he was before, during,

19   or after.  The call detail records for anyone.  Any of these

20   1125 "gentlemen."  You didn't see any of those.  Easily

21   acquired with a search warrant and a subpoena.  It would have

22   told you where they were, who they called, who they texted

23   throughout, before, during, and after.

24        The burden of proof is at that table.  And they want

25   to prove this is a conspiracy, they get the call detail records

1    and tell you who was talking to who for how long and when.

2    They didn't do that, and Ms. Ganley admitted that.

3            She also didn't have any Cellebrite GPS data, the most

4    accurate locational data available.  It can put you within a

5    foot of where the phone is.  Did they give Ms. Ganley any of

6    that information that would tell you who is standing next to

7    who?  For how long?  Where?  No.

8            Again, they want to say this is a conspiracy, that

9    they are all out to do this together, they should give you the

10   Cellebrite GPS data and tell you who was where and when.

11           They also don't tell you who Mr. Lewis called, because

12   we've got the numbers.  Did they go out and tell you who, who

13   those numbers were, whether his mom, his girlfriend?  Remember,

14   I don't have to prove anything.

15           There is only one of those phone numbers that's

16   involved in this group.  One.  And that guy calls Mr. Lewis.

17   Mr. Lewis isn't calling anybody.  And I said -- and I hope

18   you'll remember this -- Ms. Ganley, you don't usually call

19   somebody when you're standing right in front of them.  She

20   wanted to disagree.

21           Now, I'll concede there have been times in my house

22   when my wife is upstairs, and I am in the doghouse, and I will

23   text her to test the temperature of the room upstairs, I've

24   done that.  But when she and I are in the living room watching

25   television or reading books, I do not pick up my cell phone to

1    call her and talk to her.

2            And so what that call tells you is that those two

3    individuals are not in the same place.  And what the, the

4    Google information, which presumably they could have gotten

5    for everybody with a Google ID, like Mr. Lewis, and Naserati

6    and all of that, is that people were outside, not inside.

7    People were outside where, in November, you'd wear a coat and

8    wear a hat.  Coincidentally, what Mr. Lewis was wearing in

9    those few seconds that he is on a video in that room.

10           Likewise, the Instagram chat on November 14th and

11   15th, and I'm going to divide that up.  You'll have that

12   exhibit.  You'll see it.  There is nothing about kidnapping in

13   those chat messages.  There is nothing about:  We've got her,

14   we got the information from her, forced it out of her.  Nothing

15   like that.  Probably because it didn't happen, but certainly,

16   it's not in the chat.

17           What do we have from Mr. Lewis?  I'm 15 minutes away,

18   on the front end.  And on the back end, I'm taking Cortez to

19   my house.  Doesn't seem like criminal activity to me.

20           Now, I want to pause and read, because Mr. Amberg

21   talked about it a minute, but Judge Michelson is going to give

22   you your instructions in a minute.  It's a pack.  And you're

23   going to have those instructions in the jury room.  But I want

24   to read a couple excerpts for you, so you get a preview,

25   because it's important.

1           Proof that a defendant simply knew about a conspiracy

2   or was present at times or associated with members of the group

3   is not enough.  Even if the defendant approved of what was

4   happening, or did not object to it, similarly, just because a

5   defendant may have done something that happened to help a

6   conspiracy does not make him a conspirator.  Without more

7   evidence, that's not enough.

8           Proof that a defendant may have known about the crime,

9   even if he was there when it was committed, is not enough for

10  you to find him guilty.

11          That's an instruction that Judge Michelson is going to

12  give you, and you'll get a whole lot more.  But that's one that

13  I feel is fairly important in your assessment here.

14          Now, Mr. Cowen led off with a quote from Mr. Lewis,

15  "That was kidnapping," with a "D."  If you look at that chat,

16  he spells it "kipnapping," with a "P."  Mr. Lewis can't even

17  spell the word right.

18          And so they put that up there.  But what don't they

19  give you?  Because that doesn't happen in the moment.  It

20  happens the next afternoon.  What don't they tell you?  What

21  don't they show you?

22          Well, first of all, the call details.  Right?  Who

23  is talking to who in that morning?  Who is making accusations?

24  Who is making allegations?  Who is having that good old game

25  of telephone?

```
 1              And who don't they call as a witness?  Ms. Jackson's
 2    mother.  What is she saying about this that morning?  Because
 3    let's remember, with all due respect to Mr. Blake, he and
 4    Ms. Jackson are cousins.  Not the genetic kind, but the close
 5    kind.  This is family.  And what's going on that morning?  We
 6    don't know.  Because the Government didn't tell you.  And,
 7    quite frankly, it's not my burden.  I don't have to.  Mr. Lewis
 8    doesn't have to.
 9              So he says it, misspells it, but not in the moment.
10    And not with any context supplied to you by the Government.
11              Likewise, they show you Exhibit 127.  Do you remember
12    that one?  A picture of Mr. Lewis with the gun with the big
13    puff of marijuana smoke there?
14              Was he kidnapping anybody in that photograph?  No.
15    Was that on the day in question?  No.  Why did they do that?
16    Because they want to dirty Mr. Lewis up.  Okay?  It's because
17    they want you going back in that jury room thinking Mr. Lewis
18    is a bad guy.
19              Well, maybe, maybe you might have some questions, but
20    he's a bad guy.  And, and I, I respect the Judge's ruling,
21    the bar of relevance is fairly low.  But what does that, what
22    does that photograph tell you as jurors about kidnapping or
23    conspiracy to kidnap?  Absolutely nothing.  It's just somebody
24    putting a finger on the scale in hopes that you'll look in a
25    different direction.
```

1          It's important to remember that the "boys" aren't on

2    trial here.  1125 isn't on trial here.  Mr. Lewis is.  And I

3    speak for Mr. Lewis.

4          And the Judge is going to instruct you that you judge

5    Mr. Lewis individually.  And that's an important concept.

6          Mr. Cowen and Mr. Amberg talk about the elements of

7    crime, conspiracy; there must be an agreement, an overt act,

8    and, and the defendant must join in the kidnapping, the seizing

9    and taking away of a person.  And they -- Mr. Amberg touched on

10   the ways you can prove kidnapping.  Somebody actually does it.

11   I don't think Mr. Lewis is accused of that.  That he aided and

12   abetted it or he Pinkerton-liabilitied it.

13         Let me just tell you what Pinkerton is, because you're

14   wondering, because it hasn't been explained to you yet.  But

15   Pinkerton says if you are a conspirator, if you find beyond

16   a reasonable doubt that a defendant is a conspirator and it's

17   reasonably foreseeable a crime will occur, then regardless of

18   whether the defendant commits it or not, he's guilty.

19         For instance, you go to a bank robbery, is it

20   reasonably foreseeable the guard might be shot?  If it happens,

21   all the conspirators can be held Pinkerton liability.

22         But I haven't seen any evidence in this case that

23   shows Mr. Lewis is a conspirator; that he agreed on that chat

24   or at any point in time to kidnap anyone.  And so don't worry

25   about Pinkerton when it comes to Mr. Lewis, or at least I hope

1    you don't.

2          Mr. Cowen, who is a genuinely nice guy, used the

3    words, standing guard.  And that's how he's getting to this

4    aiding and abetting idea, that Mr. Lewis somehow aided or

5    encouraged or abetted by standing there; that he was standing

6    guard.  But has that been proven to you, that he was standing

7    guard, that that was his purpose there with that thing in his

8    other hand that looked like rolling papers or a bag of Doritos?

9          I think what Mr. Cowen, as nice as he is, is trying

10   to have you do is fill in the blanks for him.  Standing guard

11   sounds good.  Hmm, sounds good, he was there.  But that's not

12   enough.  The instructions I read to you tell you that's not

13   enough.

14         And sometimes, even, I've seen where jurors like to

15   help nice prosecutors out.  Well, you know, let's help him

16   fill in the blanks.  But the oath you took prevents you from

17   doing that.  The oath you took says look at the evidence and

18   determine whether it proves beyond a reasonable doubt that

19   Mr. Lewis committed either one of those crimes.

20         And I want to revisit the concept of beyond a

21   reasonable doubt.  And you saw it briefly with Mr. Amberg.

22   It's proof so convincing, so convincing that you would not

23   hesitate to rely and act on it in the most important decisions

24   in your life.  Decisions related to your family, your children,

25   your parents.  The most important decisions.

```
 1            Now, I remember when we selected this jury, we had a

 2     talk about race car driving, I think.  Okay?  Race car driving

 3     and things of that nature, professions, require sometimes

 4     educated guesses, decisions based on experience, expertise.

 5            That's, that's not beyond a reasonable doubt.  Beyond

 6     a reasonable doubt is when you're in your everyday life, and

 7     you're thinking this is a life-moment decision.  And can I

 8     trust and make the decision with what's been put in front

 9     of me.

10            Many things have been said about Ms. Jackson by

11     Mr. Amberg and Mr. Sabbota.  And I will agree that I got a

12     lot of "I don't knows" and "I don't remembers" too.  But the

13     two things that struck me most about Ms. Jackson is when she

14     said, "they asked me to leave the hospital."

15            Now, she's just dropped off Mr. Blake with a gunshot

16     wound.  Cops are going to be there in a little bit.

17            Now, I've been to the hospital because I've got an

18     86-year-old father and, unfortunately, I've been to the

19     emergency room a few times lately.  And I have seen Royal Oak

20     Beaumont, and sat there and watched people come and people go.

21     And the hospital doesn't tell you to leave the emergency room.

22     They might tell you to sit somewhere else, stay out of the way.

23     They don't tell you to leave.  And I submit to you, Ms. Jackson

24     wasn't being truthful.

25            And if Ms. Jackson isn't being truthful, she's
```

1    thinking about her lies, because that wasn't made up on the

2    spot.  She came in with that one ready to go.  And if she

3    can come into a United States District Court, a federal

4    courthouse, in front of a federal judge, prepared to lie, it's

5    easy breezy to do it for the DPD or the ATF.

6           Likewise, another moment in Ms. Jackson's history

7    struck me.  When I asked Agent Jacobs, I said, hey, Agent

8    Jacobs, did Ms. Jackson tell you she was leaving Florida while

9    she was under your protection, receiving your money?  Nope.

10   Why not?  I think it's pretty clear why not.  She wanted to

11   get out of town.

12          And that's the kind of person Ms. Jackson is, in a

13   microcosm.  And I think, quite candidly, if there was a

14   credible point in her testimony, one credible point, it's when

15   her lawyer, Mr. Weiss, stood up and took the Fifth Amendment

16   on her behalf.  So that's the Ms. Jackson that we're talking

17   about.

18          This job isn't easy.  To meet people seven days ago,

19   ask a few questions, and keep your fingers crossed that you'll

20   listen at the end of the case.  It's not easy.

21          What I put is my faith in your oath.  You may not like

22   me.  Criminal defense attorneys aren't always the most popular

23   people in town.  But I put my faith in your oath to hold

24   them to the burden of proof, the burden of proof beyond a

25   reasonable doubt, to follow the law the judge tells you is

1   the law of the United States.

2          You are what separates our country from Russia.  Just

3   last week we had people return in a prisoner swap.  Do you

4   think any of them got a fair trial?  No.  That's why this

5   country is what it is.  It's because people like you come

6   together to make decisions, to follow the law, and hold the

7   Government to its proofs and say, look, the law says mere

8   presence does not make a man guilty.

9          I told you at the beginning, you wouldn't like that

10  video.  We saw it.  I didn't like it.  I didn't like that Mr.

11  Lewis was there.  I didn't like that Mr. Lewis had a rifle.

12  But that's not kidnapping and that's not conspiracy.  And

13  nothing in the chats creates a conspiracy at all.

14         If the Government wanted to prove that Mr. Lewis

15  conspired or kidnapped someone, they should have done it with

16  the evidence that was available to them with a simple subpoena

17  or search warrant, and they didn't do that.  There is nothing

18  here that shows that he conspired.  There is nothing that shows

19  that he kidnapped.

20         And if you want to play the Monday-morning quarterback

21  and say the next day, in the afternoon, that convicts him, I

22  guess you can, but I hope you won't do that in the absence of

23  the context that's missing and what the Government didn't show

24  you.  Because the judge will tell you that reasonable doubts

25  can be raised by the evidence or the lack of evidence.

1          Ladies and gentlemen, I very much appreciate your

2    time.  I appreciate the sacrifice that you all made to come

3    in here and sit in judgment.  And I'll respect whatever verdict

4    you come back with.  I simply ask that you follow the law and

5    hold the Government to its burden.

6          Thank you very much.

7          **THE COURT:**  Thank you, Mr. Gleeson.

8          Mr. Cowen, are you more than ten minutes?

9          **MR. COWEN:**  I'm going to be brief, your Honor.

10         **THE COURT:**  Okay.  All right.  Mr. Cowen.

11                        **Government's Rebuttal**

12         **MR. COWEN:**  I say that as, the only thing they don't

13    teach you in law school is how to tell time.  And so I

14    apologize if I'm slightly over ten minutes, but I'm going to be

15    quick.

16         And I'm going to go in reverse starting with some of

17    the events Mr. Gleeson made, beginning with Monday-morning

18    quarterbacking and no context, which is a little rich, because

19    his client just watched a video of the crime he had committed

20    and wants you to believe that a spelling error is the confusion

21    between what had taken place.

22         He literally just watched a video that was part of the

23    thread with his friends that started off talking about getting

24    together, arming up, all these things, I'm 15 minutes away, and

25    he wants you to believe that's out of context, that quote is

1    out of context.

2          He literally just watched himself in that video with

3    the knowledge of what everyone else is doing that night a few

4    hours later.  And it being described as a kidnapping is out of

5    context?  That doesn't make any sense.

6          Defense wanted to claim that we were just dirtying up

7    Mr. Lewis with the photograph, 127, of him in the hallway with

8    Mr. Turner.  That wasn't gratuitous.  That was the two of them

9    standing with rifles similar to which was used during the

10   kidnapping, just like Taliyah said Mr. Turner used at the

11   vacant lot, just like the one you saw Mr. Lewis on video with

12   a couple days before the crime.  That's not gratuitous.  That's

13   evidence.

14         Speaking of gratuitous, defense counsel had just

15   mentioned that the only truthful thing Ms. Jackson did was

16   invoke -- invoke her own rights under the Constitution.

17         Now, there's a specific instruction in there that you

18   should not consider the fact that a witness takes the Fifth

19   Amendment.  Exact opposite of what Mr. Gleeson just asked you

20   to do, completely to disregard that, along with some of other

21   rights that you're going to be instructed on.  That's just --

22   that's not fair play.

23         And speaking of dirtying people up, this entire

24   defense, for the last two hours, was dragging Taliyah through

25   the mud.  Figuratively, of course, not literally, like

 1   Mr. Karamoh Turner had done, while armed with a rifle at the

 2   vacant lot.

 3          This entire defense is asking you to consider elements

 4   of a carjacking that no one is charged with.  There is not a

 5   single mention in 56 pages that you're about to be read, about

 6   a carjacking.

 7          So let's live in a world, for one moment, where you

 8   think Taliyah was involved in the carjacking.  You think some

 9   points were made about the deleted messages or sketchiness here

10   and there.  That doesn't matter.  That's the simplicity of the

11   differences between the two arguments.

12          Even if you think Taliyah was involved, she was still

13   kidnapped.  You don't get to retaliate within the walls of

14   society like that.  Street justice, maybe a little differently.

15   But she was still a victim.  And that's why we're here for.

16          There's another instruction that tells you about, do

17   not consider guilt of other crimes or other people.  That's to

18   narrow the focus and not go down these bridges to nowhere, so

19   to speak, that Defense wants to take you and then you look

20   around, and you're like, where are we?  Oh.

21          This case is about kidnapping.

22          The Defense wants you to believe, one, she was

23   involved.  And as I just said, whether you think she wasn't,

24   as the Government submits, or if you think she was, like the

25   Defense submits, doesn't really matter.  She can still be then

1    kidnapped.

2          But to take the next big faith -- leap of faith,

3    Defense want you to think she concocted this mastermind plan

4    to elude and convince federal agents, law enforcement, everyone

5    in the world, this 19-year-old, in real-time, could predict the

6    future.  She was going to predict, they are going to look at

7    my phone messages, so I'm going to text my mom, "Help, I'm

8    being held hostage."  Yeah, that will be a good one.

9          She's going to predict that these men and their

10   friends are talking on Instagram about this conspiracy.  And

11   I disagree.  They are formulating this plan.  "15 minutes

12   away."

13         Mr. Lewis said there's no information about the

14   kidnapping in the group chat.  Of course, there is.  They

15   specifically said, this is the girl that, Taliyah, set it up.

16   And then they posted a picture of Amiaya Bryant.  Taliyah told

17   you she kept telling them the truth.  It was Amiaya Bryant.

18   They are sharing these messages, these conversations.

19         For Taliyah to continue to concoct this master plan,

20   she had to have known about the video that no one knew about.

21         She had to know of all this separate corroborating

22   information, so that would circle around and then, under the

23   defense theory, that she was worried about being in trouble, so

24   to get out of trouble, she concocted this plan to claim she was

25   kidnapped.  That didn't happen.  The evidence does not support

1    any of this.

2           Now, you might not like that she was irresponsibly on

3    a video with a firearm.  That -- that was very dangerous.  No

4    one should be doing that.  But again, they are trying to dirty

5    her up for playfully being in a video with music, when the real

6    video that's for what you're going to discuss this case about

7    the actual facts, is violent.

8           And you saw the screaming.  Those two videos are polar

9    opposites.  Dancing around in an unsafe manner, sure, we don't

10   condone that.  But the crime is the video at issue here, where

11   Mr. Lewis and others are all around her, being beaten.  I

12   absolutely think he's standing guard.  Actually, guards don't

13   do anything but stand there.  Mr. Lewis was engaging.  So maybe

14   I'm wrong.

15          He also wasn't helping her.  That's an important part.

16   They keep blaming Taliyah for not calling 911, not doing all

17   these things.  None of these guys did anything to stop the

18   beatings, stop the interrogation, stop the questioning.  It's

19   because they are fully involved and invested.

20          The conspiracy was formed over phone calls, over

21   social media, which is another thing.  Mr. Amberg wanted to

22   drag Taliyah through the mud for being on social media during

23   this crime.  That wasn't her.  They were going through her

24   phone.

25          All the other evidence is that Instagram, TikTok, half

154

1   their evidence that they want you to hate her for, being on

2   TikTok and being on Instagram, is the same locations that these

3   men are in her phone looking to see what she was doing.

4          She wasn't sitting there scrolling about her next

5   vacation plans.  They were going through her phone, her

6   messages, looking for things with Amiaya Bryant and everything

7   else.

8          And as I said, it doesn't matter, actually, whether

9   they actually found evidence of Taliyah being involved or

10  sketchy things.  You may think, it's a little weird that she

11  was sitting there for five minutes.  It doesn't matter.

12         If someone shoots up a house and a family member is

13  tragically killed, and then the family of that individual hurt

14  goes and retaliates and shoots up and hurts people, that might

15  be revenge, and it might help you sleep well at night, but

16  those people are guilty of retaliation as well.

17         You don't get to weigh this, well, it's less of a

18  crime because they hurt you.  This isn't a self-defense case

19  where someone pulled out a gun while they were being harmed,

20  these things you are not being instructed on, you don't need to

21  worry about.  This was just street vengeance, street vengeance

22  gone way too far, and street vengeance taken out on a

23  19-year-old girl by a bunch of men.

24         Mr. Sabbota had talked about how in the heck could

25  Cortez Blake get information when he was at the hospital.  It's

1    because his dad was going back and forth, bringing him his

2    phone, keeping him apprised.  That's how the dad knew that,

3    "is this the girl?"  It's not very far-fetched for Mr. Blake to

4    be informed that way.

5          Mr. Sabbota also questioned how in the heck could

6    Mr. Blake even have his phone.  Well, Devonte Henry, who they

7    want you not to believe under certain times and believe under

8    other times, Devonte Henry said Mr. Blake was on his phone.

9    And we know that's true because he was calling the two men to

10   come pick him up.

11         And we know from Ms. Allen that Taliyah did run away

12   and flag someone down because she described the original

13   real-time report on how Mr. Blake and Taliyah were in the

14   Chevy Cruze, and then she read her notes to you where she said,

15   "getting out of the Chevy Cruze and being placed into the

16   Jeep."  That's real-time reliability information, written down,

17   not subject to the passions of time or where our memory fades.

18   Memory is not a videotape, whether you're Taliyah, whether

19   you're a witness, anyone.

20         There's a lot of other straw arguments being submitted

21   to try to shift the focus away from the actual evidence.

22   There's theories, and then there's evidence.

23         For instance, Ms. Ganley made a lot of subtle points

24   that are just being totally ignored.  Mr. Amberg talks about

25   there's no evidence of these text messages.  Well, Ms. Ganley

1   broke down the differences between iMessages and text messages

2   and how some carriers don't give you anything more than

3   incoming/outgoing calls.  And so it's not -- it's not a

4   conflict if that carrier, if you only see incoming/outgoing

5   calls.

6          And Mr. Sabbota said, let me get this right, everyone

7   keeps their phone on them like underwear.  No one gives up

8   their phone.

9          And then Mr. Amberg said, well, Mr. Turner's phone was

10  there, but the Government can't prove he was with his phone.

11  Maybe he left it there, maybe he didn't.

12         I submit to you the only time you give up your phone

13  is when your kidnappers take it from you, just like they did to

14  Taliyah.

15         There is no evidence, as Mr. Amberg was trying to put

16  in your mind, about Wi-Fi at the house, and how she could have

17  only logged in.  That's another straw argument.  Stick to --

18  stick to the facts, stick to the evidence, ladies and

19  gentlemen.

20         Importantly, Ms. Ganley, again, talked to you about

21  the differences between the type of device matters.  The reason

22  we don't have a lot of the geofence more accurate data is

23  because they all had iPhones.  So unless they were running an

24  Android program like Google Maps at a house where they all knew

25  to go to, so they didn't really need Maps to get there, it's

1    not a surprise that we don't have that data.

2         We do have the broader cell phone data.  That isn't

3    being offered for anything more than it stands to tell you,

4    which is, if you are receiving a call, whether you answer it

5    or not, it doesn't matter.  Your device is there.

6         And, sure, you could be down the corner, but the

7    evidence as a whole doesn't support that Mr. Turner, Mr. Lewis,

8    or Mr. Blake were two blocks over at someone else's house.

9         In isolation, yes, they could be down the street,

10   because that's how towers work.  But when you have

11   conversations, when you have Mr. Blake living at his house,

12   when you have a video being filmed at the house, when you have

13   Ms. Jackson being beaten at the house, that's where that

14   technology becomes even more accurate.  That's the accuracy.

15        As I said, Taliyah's credibility was just being

16   attacked left and right.  And then when it conveniences the

17   defense, Mr. Gleeson wanted to say, she couldn't identify the

18   guy; therefore, you've got to believe her.

19        She just said she didn't recognize anyone.  She was

20   being on the ground in the fetal position being beaten for

21   hours, men all over the place.  Does it really surprise us

22   that she didn't identify Mr. Lewis?

23        I mean, that's to her credit.  If her plan is -- their

24   theory is, again, was to get as many people as possible, the

25   more the good, to shy away from this charge, she would have

 1   gone up there and identified every single person she could and

 2   been, like, he was there, he was there, he was there, he was

 3   there.  She didn't.  She told the police when she recognized

 4   someone and she didn't.

 5          Unfortunately for Mr. Lewis, and unfortunately for

 6   this group, there is a video, there's a group chat, there's

 7   tower data, there's all this other evidence, which puts these

 8   three here before you, along with their companions, who were

 9   part of the conspiracy.

10          Ladies and gentlemen, I agree with defense on this:

11   Stay focused.  Take the evidence that you actually have, not

12   speculation, not theories.  Evidence.

13          When you look at that evidence, you're going to reach

14   a verdict that is just and proper, and the Government submits

15   that that guilty is guilty -- that verdict is guilty beyond a

16   reasonable doubt.

17          Thank you for your time this week.

18          **THE COURT:**  Thank you, Mr. Cowen.  And thank you to

19   all of the counsel.

20          We're going to take a lunch break before I give the

21   jury the jury instructions.  And because I have not yet

22   instructed the jury, I will ask again that you please not

23   discuss the case during the lunch break.

24          And we'll reconvene about 2:30.

25          **THE CLERK:**  All rise.

```
 1                    (Jury out at 1:32 p.m.)
 2         THE COURT:  All right.  I'd like to try to start back
 3   by 2:15, so if everybody could start to regather, but I
 4   recognize that it may be closer to 2:30.  But we'll be in
 5   recess for the lunch break.
 6         MR. SABBOTA:  Thank you.
 7         MR. AMBERG:  Can we leave our stuff here?
 8         THE COURT:  Yes.
 9      (A break was taken from 1:32 p.m. to 2:25 p.m.)
10         THE CLERK:  All rise.  The United States District
11   Court for the Eastern District of Michigan is now in session.
12   The Honorable Laurie J. Michelson presiding.
13         You may be seated.
14         The Court calls Case No. 22-20519, the United States
15   of America vs. Cortez Blake, Karamoh Turner, and Nasir Lewis.
16         Counsel, please restate your appearances for the
17   record.
18         MR. COWEN:  David Cowen and Jeanine Brunson on behalf
19   of the United States.
20         MR. SABBOTA:  Good afternoon.  Jerome Sabbota with
21   Mr. Blake.
22         MR. AMBERG:  Good afternoon, your Honor.  Amberg for
23   Turner.
24         MR. GLEESON:  Gerald Gleeson on behalf of Mr. Lewis
25   here.
```

1          **THE COURT:**  All right.  Thank you.  You all may be

2    seated.

3          I had just one question before we bring the jury back

4    in.  And I, I did see this initially in the instructions, and

5    you all mentioned it in the closings.

6          So is your preference to have the jury ask to see

7    specific exhibits as opposed to just giving them to them?

8          **MR. SABBOTA:**  My preference would be just to give

9    it to them.

10          **MR. AMBERG:**  It makes it easier.

11          **THE COURT:**  In terms of responding to questions, it

12    can.

13          **MR. GLEESON:**  I'll defer to the majority, your Honor.

14          **MR. COWEN:**  Judge, I don't care.  I guess they -- the

15    only way it would be tricky is if it's electronic, we'd have to

16    probably -- are you going to give them a computer just to --

17          **THE CLERK:**  They have one back there already.

18          **THE COURT:**  Yeah.  All it does is show video.  It

19    doesn't do anything else.  It doesn't have any other

20    capabilities.

21          **MR. SABBOTA:**  Well, I think it would be easier, rather

22    than bouncing in and out of the courtroom, don't you?

23          **THE COURT:**  Yes.  So that was instruction -- oh,

24    here it is on page 44.  So on page 44 -- well, Nina, you can

25    probably delete that paragraph on your computer.  I can just

 1   cross it off.

 2           **MS. MOZEIHEM:**  Page 44?

 3           **THE COURT:**  Page 44, the second-to-last paragraph.

 4   If you want to see any of the exhibits that were admitted in

 5   evidence, you may send me a message and those exhibits will

 6   be provided to you, if we just delete that and send them the

 7   exhibits.  Okay.  I'll delete that paragraph.

 8           And do you want me to read the verdict form?  Which is

 9   how we currently have it.

10           **MR. GLEESON:**  I think the Court should just instruct

11   how to fill it out.

12           **THE COURT:**  So on page 52, we just delete -- and maybe

13   it's not even on the version we're going to show -- where it

14   says that I'll read the verdict form.

15           Page 52.  So can you delete what's in the brackets

16   there?  Yeah.

17           Okay.  That was all I had.

18           Are we ready to bring the jury back in?  Anything for

19   the Government?

20           **MR. COWEN:**  No.  Thank you, your Honor.

21           **THE COURT:**  And for the Defense?

22           **MR. SABBOTA:**  No, your Honor.

23           **THE COURT:**  Okay.  Ms. Parkin, if you would bring the

24   jury back in, please.

25                           (Brief pause.)

| | |
|---|---|
| 1 | **THE CLERK:**  All rise for the jury. |
| 2 | (Jury in at 2:31 p.m.) |
| 3 | **THE COURT:**  All right.  You all may be seated. |
| 4 | Members of the jury, I am going to put the |
| 5 | instructions on the screen, if you wish to follow along while I |
| 6 | read them. |
| 7 | You've seen throughout the trial, we do have an |
| 8 | occasional gremlin that sneaks into the system.  So if the |
| 9 | screens go out while I'm reading, I will continue reading.  So |
| 10 | just continue to pay attention, and we'll do our best to get |
| 11 | them back on the screen for you. |
| 12 | All right.  Members of the jury, now it is time for me |
| 13 | to instruct you on the law you must follow in deciding this |
| 14 | case. |
| 15 | I will start by explaining your duties and the general |
| 16 | rules that apply in every criminal case.  Then I will explain |
| 17 | the elements or parts of the crimes that the defendants, Cortez |
| 18 | Blake, Karamoh Turner, and Nasir Lewis, are accused of |
| 19 | committing. |
| 20 | Then I will explain some rules that you must use in |
| 21 | evaluating particular testimony and evidence. |
| 22 | And last, I will explain the rules that you must |
| 23 | follow during your deliberations in the jury room and the |
| 24 | possible verdicts that you may return. |
| 25 | Please listen very carefully to everything I say. |

1        You have two main duties as jurors.

2        The first one is to decide what the facts are from the

3    evidence you saw and heard here in court.  Deciding what the

4    facts are is your job, not mine.  And nothing that I have said

5    or done during this trial was meant to influence your decision

6    about the facts in any way.

7        Your second duty is to take the law that I give you,

8    apply it to the facts, and decide if the Government has proved

9    the defendant guilty beyond a reasonable doubt.

10       It is my job to instruct you on the law, and you are

11   bound by the oath that you took at the beginning of the trial

12   to follow the instructions I give you, even if you personally

13   disagree with them.  This includes the instructions I gave you

14   before and during the trial, and these instructions.  All of

15   these instructions are important and you should consider them

16   together as a whole.

17       The lawyers have talked about the law during their

18   arguments.  But if what they said is different from what I say,

19   you must follow what I say.  What I say about the law controls.

20       Perform these duties fairly.  Do not let any bias,

21   sympathy, or prejudice that you may feel toward one side or

22   the other influence your decision in any way.

23       As you know, the defendants have pled not guilty to

24   the crimes charged in the indictment.

25       The indictment is not evidence at all of guilt.  It is

1  just the formal way that the Government tells the defendant

2  what crimes he is accused of committing.  It does not even

3  raise a suspicion of guilt.

4        Instead, the defendant starts the trial with a clean

5  slate, with no evidence at all against them, and the law

6  presumes that they are innocent.

7        This presumption of innocence stays with them unless

8  the Government presents evidence here in court that overcomes

9  the presumption and convinces you beyond a reasonable doubt

10  that they are guilty.

11        This means that the defendant has no obligation to

12  present any evidence at all or to prove to you in any way that

13  they are innocent.  It is up to the Government to prove that

14  they are guilty, and this burden stays on the Government from

15  start to finish.  You must find the defendant not guilty unless

16  the Government convinces you beyond a reasonable doubt that he

17  is guilty.

18        The Government must prove every element of the crimes

19  charged beyond a reasonable doubt.  Proof beyond a reasonable

20  doubt does not mean proof beyond all possible doubt.  Possible

21  doubts or doubts based purely on speculation are not reasonable

22  doubts.  A reasonable doubt is a doubt based on reason and

23  common sense.  It may arise from the evidence, the lack of

24  evidence, or the nature of evidence.

25        Proof beyond a reasonable doubt means proof that is

1  so convincing you would not hesitate to rely and act on it in

2  making the most important decisions in your own lives.  If you

3  are convinced that the Government has proved the defendant

4  guilty beyond a reasonable doubt, say so by returning a guilty

5  verdict.  If you are not convinced, say so by returning a

6  verdict of not guilty.

7       You must make your decision based only on the evidence

8  that you saw and heard here in court.  Do not let rumors,

9  suspicions, or anything else that you may have seen or heard

10  outside of court influence your decision in any way.

11       The evidence in this case includes only what the

12  witnesses said while they were testifying under oath; the

13  exhibits that I allowed into evidence; the stipulations that

14  the lawyers agreed to; and the facts that I have judicially

15  noticed.

16       Nothing else is evidence.  The lawyers' statements and

17  arguments are not evidence.  Their questions and objections are

18  not evidence.  My legal rulings are not evidence.  And my

19  comments and questions are not evidence.

20       During the trial, I did not let you hear the answers

21  to some of the questions that the lawyers asked.  I also ruled

22  that you could not see some of the exhibits that the lawyers

23  wanted you to see.  And sometimes, I ordered you to disregard

24  things that you saw or heard or I struck things from the

25  record.

1       You must completely ignore all of these things.  Do

2   not even think about them.  Do not speculate about what a

3   witness might have said or what an exhibit might have shown.

4   These things are not evidence, and you are bound by your oath

5   not to let them influence your decision in any way.  Make your

6   decision based only on the evidence as I have defined it here

7   and nothing else.

8       You are to consider only the evidence in the case.

9   You should use your common sense in weighing the evidence.

10  Consider the evidence in light of your everyday experience with

11  people and events, and give it whatever weight you believe it

12  deserves.  If your experience tells you that certain evidence

13  reasonably leads to a conclusion, you are free to reach that

14  conclusion.

15      In our lives, we often look at one fact and conclude

16  from it that another fact exists.  In law, we call this an

17  inference.  A jury is allowed to make reasonable inferences,

18  unless otherwise instructed.  Any inferences you make must

19  be reasonable and must be based on the evidence in the case.

20      The existence of an inference does not change or shift

21  the burden of proof from the Government to the defendant.

22      Now, some of you may have heard the terms direct

23  evidence and circumstantial evidence.

24      Direct evidence is evidence like the testimony of an

25  eyewitness that, if you believe it, directly proves a fact.

1   If a witness testifies that he saw it raining outside and you

2   believe him, that would be direct evidence that it is raining.

3        Circumstantial evidence is a chain of circumstances

4   that indirectly proves a fact.  If someone walks into the

5   courtroom wearing a raincoat covered with drops of water and

6   carrying a wet umbrella, that would be circumstantial evidence

7   from which you could conclude that it was raining.

8        It is your job to decide how much weight to give

9   the direct and circumstantial evidence.  The law makes no

10  distinction between the weight you should give to either one;

11  the law does not say that one is any better evidence than the

12  other.  You should consider all the evidence, both direct and

13  circumstantial, and give it whatever weight you believe it

14  deserves.

15       Another part of your job as jurors is to decide how

16  credible or believable each witness was.  This is your job, not

17  mine.  It is up to you to decide if a witness's testimony was

18  believable and how much weight you think it deserves.  You are

19  free to believe everything that a witness said, or part of it,

20  or none of it at all.  But you should act reasonably and

21  carefully in making these decisions.

22       Let me suggest some things for you to consider in

23  evaluating each witness's testimony.

24       Ask yourself if the witness was able to clearly see or

25  hear the events.  Sometimes even an honest witness may not have

1  been able to see or hear what was happening and may make a

2  mistake.

3        Ask yourself how good the witness's memory seemed to

4  be.  Did the witness seem able to accurately remember what

5  happened?

6        Ask yourself if there was anything else that may have

7  interfered with the witness's ability to perceive or remember

8  the events.

9        Ask yourself how the witness acted while testifying.

10 Did the witness appear honest?  Or did the witness appear to be

11 lying?

12       Ask yourself if the witness had any relationship to

13 the Government or the defendant, or had anything to gain or

14 lose from the case that might influence the witness's

15 testimony.

16       Ask yourself if the witness had any bias, prejudice,

17 or reason for testifying that might cause the witness to lie

18 or slant the testimony in favor of one side or the other.

19       Ask yourself if the witness testified inconsistently

20 while on the witness stand, if the witness said or did

21 something or failed to say or do something at any other time

22 that is inconsistent with what the witness said while

23 testifying.

24       If you believe that the witness was inconsistent, ask

25 yourself if this makes the witness's testimony less believable.

1    Sometimes it may; other times, it may not.  Consider whether

2    the inconsistency was about something important or about some

3    unimportant detail.  Ask yourself if it seemed like an innocent

4    mistake or if it seemed deliberate.

5         And ask yourself how believable the witness's

6    testimony was in light of all the other evidence.  Was the

7    witness's testimony supported or contradicted by other evidence

8    that you found believable?

9         If you believe that a witness's testimony was

10   contradicted by other evidence, remember that people sometimes

11   forget things; and that even two honest people who witness the

12   same event may not describe it in exactly the same way.

13        These are only some of the things that you may

14   consider in deciding how believable each witness was.  You may

15   also consider other things that you think shed some light on

16   the witness's believability.  Use your common sense and your

17   everyday experience in dealing with other people.  And then

18   decide what testimony you believe and how much weight you think

19   it deserves.

20        One more point about the witnesses.  Sometimes jurors

21   wonder if the number of witnesses who testify makes any

22   difference.  Do not make any decisions based only on the number

23   of witnesses who testified.  What is more important is how

24   believable the witnesses were and how much weight you think

25   their testimony deserves.  Concentrate on that, not the

1    numbers.

2            There is one more general subject that I want to talk

3    to you about before I begin explaining the elements of the

4    crimes.

5            The lawyers for both sides objected to some of the

6    things that were said or done during the trial.  Do not hold

7    that against either side.  The lawyers have a duty to object

8    whenever they think that something is not permitted by the

9    Rules of Evidence.  Those rules are designed to make sure

10   that both sides receive a fair trial.

11           Do not interpret my rulings on their objections as

12   any indication of how I think the case should be decided.  My

13   rulings were based on the Rules of Evidence, not on how I feel

14   about the case.  Also, you are free to disregard any questions

15   that I asked or comments that I made.  Remember that your

16   decision must be based only on the evidence that you saw and

17   heard here in court.

18           That concludes the part of my instructions that

19   explains your duties and the general rules that apply in every

20   criminal case.  In a moment, I will explain the elements of

21   the crimes that the defendants are accused of committing.

22           But before I do that, I want to emphasize that the

23   defendants are only on trial for the particular crimes charged

24   in the indictment.  Your job is limited to deciding whether the

25   Government has proved the crimes charged.

1      Also keep in mind that whether anyone else should be

2   prosecuted and convicted for these crimes is not a proper

3   matter for you to consider.  The possible guilt of others is

4   no defense to a criminal charge.  Your job is to decide if the

5   Government has proved the defendants guilty.  Do not let the

6   possible guilt of others influence your decision in any way.

7      The defendants have all been charged with several

8   crimes.  The number of charges is no evidence of guilt, and

9   this should not influence your decision in any way.

10      And in our system of justice, guilt or innocence

11   is personal and individual.  It is your duty to separately

12   consider the evidence against each defendant on each charge and

13   to return a separate verdict for each one of them.  For each

14   one, you must decide whether the Government has presented proof

15   beyond a reasonable doubt that a particular defendant is guilty

16   of a particular charge.

17      Your decision on any one defendant or charge, whether

18   it is guilty or not guilty, should not influence your decision

19   on any of the other defendants or charges.

20      Next, I want to say a word about the dates mentioned

21   in the indictment.  The indictment charges that the crimes

22   happened on or about certain dates.  The Government does not

23   have to prove that the crimes happened on those exact dates.

24   But the Government must prove that the crimes happened

25   reasonably close to those dates.

1       Next I want to explain something about proving a

2   defendant's state of mind.

3       Ordinarily, there is no way that a defendant's state

4   of mind can be proved directly because no one can read another

5   person's mind and tell what that person is thinking.  But a

6   defendant's state of mind can be proved indirectly from the

7   surrounding circumstances.  This includes things like what

8   the defendant said, what the defendant did, how the defendant

9   acted, and any other facts or circumstances in evidence that

10  show what was in the defendant's mind.

11      You may also consider the natural and probable results

12  of any acts that the defendant knowingly did or did not do,

13  and whether it is reasonable to conclude that the defendant

14  intended those results.  This, of course, is all for you to

15  decide.

16      Although the indictment charges that the statute was

17  violated by acts that are connected by the word "and" it is

18  sufficient if the evidence establishes a violation of the

19  statute by any one of the acts charged.  Of course, this must

20  be proved beyond a reasonable doubt.

21      Count 1 of the indictment accuses the defendants of a

22  conspiracy to commit the crime of kidnapping, which is defined

23  below, in violation of federal law.  It is a crime for two or

24  more persons to conspire or agree to commit a criminal act,

25  even if they never actually achieve their goal.

1        A conspiracy is a kind of criminal partnership.  For

2    you to find any one of the defendants guilty of a conspiracy

3    charge, the Government must prove each and every one of the

4    following elements beyond a reasonable doubt:

5        That two or more persons conspired or agreed to commit

6    the crime of kidnapping;

7        That the defendant knowingly and voluntarily joined

8    the conspiracy;

9        And that a member of the conspiracy did one of the

10   overt acts described in the indictment for the purpose of

11   advancing or helping the conspiracy.

12       You must be convinced that the Government has proved

13   all of these elements beyond a reasonable doubt in order to

14   find any one of these defendants guilty of the conspiracy

15   charge.

16       With regard to the first element, a criminal

17   agreement, the Government must prove that two or more persons

18   conspired or agreed to cooperate with each other to commit the

19   crime of kidnapping.

20       This does not require proof of any formal agreement,

21   written or spoken.  Nor does this require proof that everyone

22   involved agreed on all the details.  But proof that people

23   simply met together from time to time and talked about common

24   interests or engaged in similar conduct is not enough to

25   establish a criminal agreement.  These are things that you may

1    consider in deciding whether the Government has proved an

2    agreement, but without more, they are not enough.

3         What the Government must prove is that there was a

4    mutual understanding, either spoken or unspoken, between two or

5    more people to cooperate with each other to commit the crime of

6    kidnapping.  This is essential.

7         An agreement can be proved indirectly by facts and

8    circumstances which lead to a conclusion that an agreement

9    existed, but it is up to the Government to convince you that

10   such facts and circumstances existed in this particular case.

11        If you are convinced that there was a criminal

12   agreement, then you must decide whether the Government has

13   proved that the defendants knowingly and voluntarily joined

14   that agreement.

15        You must consider each defendant separately in this

16   regard.  To convict any defendant, the Government must prove

17   that he knew the conspiracy's main purpose, and that he

18   voluntarily joined it, intending to help advance or achieve

19   its goals.

20        This does not require proof that a defendant knew

21   everything about the conspiracy, or everyone else involved, or

22   that he was a member of it from the very beginning.  Nor does

23   it require proof that a defendant played a major role in the

24   conspiracy, or that his connection to it was substantial.  A

25   slight role or connection may be enough.

1    But proof that a defendant simply knew about a

2  conspiracy or was present at times or associated with members

3  of the group is not enough, even if he approved of what was

4  happening or did not object to it.  Similarly, just because

5  a defendant may have done something that happened to help a

6  conspiracy does not necessarily make him a conspirator.  These

7  are all things that you may consider in deciding whether the

8  Government has proved that a defendant joined a conspiracy, but

9  without more, they are not enough.

10    A defendant's knowledge can be proved indirectly by

11  facts and circumstances which lead to a conclusion that he knew

12  the conspiracy's main purpose.  But it is up to the Government

13  to convince you that such facts and circumstances existed in

14  this particular case.

15    The third element that the Government must prove is

16  that a member of the conspiracy did one of the overt acts

17  described in the indictment for the purpose of advancing or

18  helping the conspiracy.

19    The indictment lists overt acts.  The Government does

20  not have to prove that all these acts were committed, or that

21  any of these acts were themselves illegal.  But the Government

22  must prove that at least one of these acts was committed by a

23  member of the conspiracy, and that it was committed for the

24  purpose of advancing or helping the conspiracy.  This is

25  essential.

1    Now, some of the people who may have been involved in

2    these events are not on trial.  This does not matter.  There is

3    no requirement that all members of a conspiracy be charged and

4    prosecuted or tried together in one proceeding.

5    Nor is there any requirement that the names of the

6    other conspirators be known.  An indictment can charge a

7    defendant with a conspiracy involving people whose names

8    are not known, as long as the Government can prove that the

9    defendant conspired with one or more of them.  Whether they are

10   named or not does not matter.

11   Count 1 of the indictment accuses the defendants of

12   committing the crime of kidnapping conspiracy.

13   There are two ways that the Government can prove the

14   defendants guilty of this crime.  The first is by convincing

15   you that they personally committed or participated in this

16   crime.  The second is based on the legal rule that all members

17   of a conspiracy are responsible for acts committed by the other

18   members, as long as those acts are committed to help advance

19   the conspiracy and are within the reasonably foreseeable scope

20   of the agreement.

21   In other words, under certain circumstances, the act

22   of one conspirator may be treated as the act of all.  This

23   means that all the conspirators may be convicted of a crime

24   committed by only one of them, even though they did not all

25   personally participate in that crime themselves.  But for

1    you to find any one of the defendants guilty of kidnapping

2    conspiracy based on this legal rule, you must be convinced that

3    the Government has proved each and every one of the following

4    elements beyond a reasonable doubt:

5            One, the defendant was a member of the conspiracy

6    charged in Count 1 of the indictment.

7            Second, that after he joined the conspiracy, and while

8    he was still a member of it, one or more of the other members

9    committed the crime of kidnapping.

10           Third, that this crime was committed to help advance

11   the conspiracy.

12           And four, that this crime was within the reasonably

13   foreseeable scope of the unlawful project.  The crime must have

14   been one that the defendant could have reasonably anticipated

15   as a necessary or natural consequence of the agreement.

16           This does not require proof that each defendant

17   specifically agreed or knew about -- or knew that the crime

18   would be committed.  But the Government must prove that the

19   crime was within the reasonable contemplation of the persons

20   who participated in the conspiracy.  No defendant is

21   responsible for the acts of others that go beyond the fair

22   scope of the agreement as the defendant understood it.

23           If you are convinced that the Government has proved

24   all these elements, say so by returning a guilty verdict on

25   this charge.  If you have a reasonable doubt about any one of

1    them, then the legal rule that the act of one conspirator is

2    the act of all would not apply.

3            Count 2 of the indictment charges the defendants,

4    Cortez Blake, Karamoh Turner, and Nasir Lewis, as individuals,

5    with kidnapping, aiding and abetting.  For you to find the

6    defendant guilty of this offense, you must find that the

7    Government has proved each and every one of the following

8    elements beyond a reasonable doubt:

9            First, the defendant that you are considering

10   unlawfully seized, confined, inveigled, kidnapped, or abducted

11   Taliyah Jackson, the individual identified in the indictment.

12           Second, the defendant held Taliyah Jackson.

13           Third, the holding was for ransom, reward, or

14   otherwise.

15           And fourth, in furtherance of the commission of the

16   offense, the defendant used a means, facility, or

17   instrumentality of interstate commerce.

18           Now I will give you more detailed instructions on some

19   of these terms.

20           With respect to the first element, "seize" means to

21   take hold of suddenly and forcibly.

22           With respect to the first element, "confine" means to

23   keep or restrict someone within certain limits of space, scope,

24   quantity, or time.

25           With respect to the first element, "inveigle" means

1   to lure or entice or to lead a person astray by false

2   representations or promises, or other deceitful means.

3          With respect to the first element, to "kidnap" a

4   person means to forcibly and unlawfully hold, keep, detain, and

5   confine that person against the person's will.  Involuntariness

6   or coercion related to taking and keeping the person is an

7   essential part of the crime.

8          With respect to the first element, to "abduct" means

9   to carry or lead a person away by threat or use of force or by

10  fraud.

11         With respect to the second and third elements, "held"

12  and "holding" requires an unlawful physical or mental restraint

13  for an appreciable period against the person's will and with a

14  willful intent to confine the person.

15         Willfully means that Defendant acted purposefully and

16  voluntarily with the intent to violate the law.

17         With respect to the third element, "or otherwise"

18  refers to any objective of a kidnapping which the defendant

19  may find of sufficient benefit to induce him to commit the

20  kidnapping.  In other words, it means for some purpose of his

21  own.

22         With respect to the fourth element, a means, facility,

23  or instrumentality of interstate commerce includes a cellular

24  telephone.

25         For you to find the defendants guilty of kidnapping,

1    it is not necessary for you to find that he personally

2    committed the crime.  You may also find him guilty if he

3    intentionally helped or encouraged someone else to commit the

4    crime.  A person who does this is called an aider and abettor.

5           But for you to find the defendant guilty of kidnapping

6    as an aider and abettor, you must be convinced that the

7    Government has proved each and every one of the following

8    elements beyond a reasonable doubt:

9           One, that the crime of kidnapping was committed.

10          Two, that the defendant helped to commit the crime

11   or encouraged someone else to commit the crime.

12          And three, that the defendant intended to help commit

13   or encourage the crime.

14          Proof that the defendant may have known about the

15   crime, even if he was there when it was committed, is not

16   enough for you to find him guilty.  You can consider this in

17   deciding whether the Government has proved that he was an

18   aider and abettor, but without more it is not enough.

19          What the Government must prove is that the defendant

20   did something to help or encourage the crime with the intent

21   that the crime be committed.

22          If you are convinced that the Government has proved

23   all of these elements, say so by returning a guilty verdict on

24   this charge.  If you have a reasonable doubt about any one of

25   these elements, then you cannot find the defendant guilty of

1    kidnapping as an aider and abettor.

2         That concludes the part of my instructions explaining

3    the elements of the crime.  Next, I will explain some rules

4    that you must use in considering the testimony and evidence.

5         A defendant has an absolute right not to testify or

6    present evidence.  The fact that the defendant did not testify

7    or present any evidence cannot be considered by you in any way.

8    Do not even discuss it in your deliberations.

9         Remember that it is up to the Government to prove a

10   defendant guilty beyond a reasonable doubt.  It is not up to

11   the defendant to prove that he is innocent.

12        In considering the testimony of a witness who is a

13   law enforcement official or agent and/or employee of the

14   government, you may not give more weight to the testimony of

15   law enforcement officials or to agents or employees of the

16   government for the mere reason that the witness is a police

17   officer or an agent of the government.

18        You have heard Taliyah Jackson exercise her right

19   under the Fifth Amendment to the United States Constitution to

20   refuse to answer questions because the testimony might tend to

21   incriminate her.

22        You must not infer anything at all, for or against

23   either the Government or the defendant, because the witness did

24   not answer.

25        You have heard the testimony of Jillian Ganley and

1    Michael Jacobs, who testified to both facts and opinions.  Each
2    of these types of testimony should be given the proper weight.
3          As to the testimony on facts, consider the factors
4    discussed earlier in these instructions for weighing the
5    credibility of witnesses.
6          As to the testimony on opinions, you do not have to
7    accept Jillian Ganley's or Michael Jacobs's opinion.  In
8    deciding how much weight to give it, you should consider the
9    witness's qualifications, and how he or she reached his or her
10   conclusions, along with the other factors discussed in these
11   instructions for weighing the credibility of witnesses.
12         Remember that you alone decide how much of a witness's
13   testimony to believe and how much weight it deserves.
14         You have heard the testimony of Taliyah Jackson and
15   Devonte Henry.  You have also heard that before this trial he
16   or she made a statement that may be different from his or her
17   testimony here in court.
18         This earlier statement was brought to your attention
19   only to help you decide how believable his or her testimony
20   was.  You cannot use it as proof of anything else.  You can
21   only use it as one way of evaluating his or her testimony here
22   in court.
23         You have heard the testimony of Taliyah Jackson and
24   Dashania Smith, who have identified certain defendants as the
25   persons who were involved in the kidnapping of Taliyah Jackson.

1    You should carefully consider whether this identification was

2    accurate and reliable.

3              In deciding this, you should especially consider if

4    the witness had a good opportunity to see the person at that

5    time.  For example, consider the visibility, the distance,

6    whether the witness had known or seen the person before, and

7    how long the witness had to see the person.

8              You should also consider the circumstances of the

9    earlier identification that occurred outside of court.

10             For example, consider how that earlier identification

11   was conducted, and how much time passed after the alleged crime

12   before the identification was made.

13             You may take into account any occasion in which the

14   witness failed to make an identification of defendant or

15   made an identification that was inconsistent with his

16   identification -- his or her identification at trial.

17             Consider all these things carefully in determining

18   whether the identification was accurate and reliable.

19             Remember that the Government has the burden of proving

20   beyond a reasonable doubt that the defendant was the person who

21   committed the crime charged.

22             During the trial, you have seen counsel use summaries,

23   charts, drawings, calculations, or similar material which were

24   offered to assist in the presentation and understanding of the

25   evidence.  This material is not itself evidence and must not be

1   considered as proof of any facts.  However, Jillian Ganley's

2   testimony about the material is evidence.

3        You have heard testimony that after the crime was

4   supposed to have been committed, the defendants wanted to

5   delete a video of the crime.

6        If you believe that the defendants wanted to delete a

7   video of the crime, then you may consider this conduct, along

8   with all the other evidence in deciding whether the Government

9   has proved beyond a reasonable doubt that he committed the

10  crime charged.  This conduct may indicate that he thought he

11  was guilty and was trying to avoid punishment.  On the other

12  hand, sometimes an innocent person may want to delete a video

13  for some other reason.  The defendant has no obligation to

14  prove that he had an innocent reason for his conduct.

15       You have heard testimony from Taliyah Jackson that

16  Cortez Blake apologized to her.  You can only consider this

17  testimony against Cortez Blake in deciding whether the

18  Government has proved him guilty.  You cannot consider it

19  in any way against any of the other defendants.

20       You have heard evidence that the defendants made a

21  statement in which the Government claims he admitted certain

22  facts.  It is for you to decide whether the defendant made a

23  particular statement, and if so, how much weight it deserves.

24       In making these decisions you should consider all of

25  the evidence about a particular statement, including the

1    circumstances under which the defendant allegedly made it.

2        You may not convict the defendant solely upon his own

3    uncorroborated statement or admission.

4        You have heard that the lawyers in this matter talked

5    to various witnesses.  There is nothing wrong with this.  A

6    lawyer may talk to a witness to find out what the witness knows

7    about the case and what the witness's testimony will be.  It is

8    proper for an attorney to interview any witness in preparation

9    for trial.

10        That concludes the part of my instructions explaining

11    the rules for considering some of the testimony and evidence.

12    Now let me finish up by explaining some things about your

13    deliberations in the jury room and your possible verdicts.

14        The first thing that you should do in the jury room is

15    choose someone to be your foreperson.  This person will help to

16    guide your discussions and will speak for you here in court.

17        Once you start deliberating, do not talk to the jury

18    officer, or to me, or to anyone else except each other about

19    the case.

20        If you have any questions or messages, you must write

21    them down on a piece of paper, sign them, and then give them to

22    the jury officer.  The officer will give them to me, and I will

23    respond as soon as I can.  I may have to talk to the lawyers

24    about what you have asked, so it may take me some time to get

25    back to you.

1        Any questions or messages normally should be sent to

2    me through your foreperson.

3        One more thing about messages.  Do not ever write down

4    or tell anyone, including me, how you stand on your votes.  For

5    example, do not write down or tell anyone that you are split

6    6 to 6 or 8 to 4 or whatever your vote happens to be.  That

7    should stay secret until you are finished.

8        Remember that you must make your decision based only

9    on the evidence that you saw and heard here in court.  During

10   your deliberations, you must not communicate with or provide

11   any information to anyone by any means about this case.

12       You may not use any electronic device or media or

13   application, such as a telephone, cell phone, smart phone,

14   iPhone, Blackberry, or computer, the Internet, any Internet

15   service, or text or instant messaging service, any Internet

16   chat room, blog, or website such as Facebook, Myspace,

17   LinkedIn, YouTube, Twitter, Instagram, WhatsApp, Snapchat, or

18   other similar electronic service to communicate to anyone any

19   information about this case or to conduct any research about

20   this case until I accept your verdict.

21       In other words, you cannot talk to anyone on the

22   phone, correspond with anyone, or electronically communicate

23   with anyone about this case.  You can only discuss the case in

24   the jury room with your fellow jurors during deliberations.

25   I expect you will inform me as soon as you become aware of

1    another juror's violation of these instructions.

2         You may not use these electronic means to investigate

3    or communicate about the case, because it is important that you

4    decide this case based solely on the evidence presented in this

5    courtroom.

6         Information on the Internet or available through

7    social media might be wrong, incomplete, or inaccurate.  Even

8    using your smart phones, tablets and computers, and the news

9    and social media apps on those devices may inadvertently expose

10   you to certain notices, such as pop-ups or advertisements, that

11   could influence your consideration of the matters you've heard

12   about in this courtroom.

13        You are only permitted to discuss the case with your

14   fellow jurors during deliberations, because they have seen and

15   heard the same evidence you have.

16        In our judicial system, it is important that you are

17   not influenced by anything or anyone outside of this courtroom.

18   Otherwise, your decision may be based on information known only

19   by you and not your fellow jurors or the parties in this case.

20   This would unfairly and adversely impact the judicial process.

21        A juror who violates these restrictions jeopardizes

22   the fairness of these proceedings, and a mistrial could result,

23   which would require the entire trial process to start over.

24        Your verdict, whether it is guilty or not guilty, must

25   be unanimous.

1    To find a defendant guilty of a particular count,

2  every one of you must agree that the Government has overcome

3  the presumption of innocence with evidence that proves his

4  guilt beyond a reasonable doubt.

5    To find a defendant not guilty of a particular count,

6  every one of you must agree that the Government has failed to

7  convince you beyond a reasonable doubt.  Either way, guilty or

8  not guilty, your verdict must be unanimous as to each count.

9    One more point about the requirement that your verdict

10  must be unanimous.  Count 2 of the indictment accuses the

11  defendants of committing the crime of kidnapping in more than

12  one possible way as to the first and second element; that is,

13  the defendant seized, confined, inveigled, kidnapped, or

14  abducted Taliyah Jackson.

15    The Government does not have to prove all of these for

16  you to return a guilty verdict on this charge.  Proof beyond a

17  reasonable doubt of any one of these ways is enough.

18    In order to return a guilty verdict, all 12 of you

19  must agree that at least one of these has been proved; however,

20  all of you need not agree that the same one has been proved.

21    Now that all the evidence is in and the arguments are

22  completed, you are free to talk about the case in the jury

23  room.  In fact, it is your duty to talk with each other about

24  the evidence and to make every reasonable effort you can to

25  reach unanimous agreement.

1    Talk with each other, listen carefully and

2    respectfully to each other's views, and keep an open mind as

3    you listen to what your fellow jurors have to say.  Try your

4    best to work out your differences.  Do not hesitate to change

5    your mind if you are convinced that other jurors are right and

6    that your original position was wrong.

7    But do not ever change your mind just because other

8    jurors see things differently, or just to get the case over

9    with.  In the end, your vote must be exactly that, your own

10   vote.

11   It is important for you to reach unanimous agreement,

12   but only if you can do so honestly and in good conscience.

13   No one will be allowed to hear your discussions in the

14   jury room, and no record will be made of what you say.  So you

15   should all feel free to speak your minds.

16   Listen carefully to what the other jurors have to say,

17   and then decide for yourself if the Government has proved the

18   defendants guilty beyond a reasonable doubt.

19   If you decide that the Government has proved the

20   defendant guilty, then it will be my job to decide what the

21   appropriate punishment should be.

22   Deciding what the punishment should be is my job, not

23   yours.  It would violate your oaths as jurors to even consider

24   the possible punishment in deciding your verdict.

25   Your job is to look at the evidence and decide if the

1  Government has proved a defendant guilty beyond a reasonable

2  doubt.

3        I have prepared a verdict form that you should use to

4  record your verdict.  You will take the verdict form to the

5  jury room, and when you have reached unanimous agreement as

6  to your verdict, you will have your foreperson fill in each

7  answer, sign his or her name, and date the form.

8        Each of you will then sign the verdict form.  Please

9  complete these documents in ink.  Unless all of you agree,

10 you may not return an answer to any question.

11       If you decide that the Government has proved the

12 charges against the defendants beyond a reasonable doubt, say

13 so by having your foreperson mark the appropriate place on the

14 forms.  If you decide that the Government has not proved the

15 charges against him beyond a reasonable doubt, say so by having

16 your foreperson mark the appropriate place on the forms.

17       Each of you should then sign the forms, put the date

18 on it, and return it to me.

19       After you have all signed the appropriate documents,

20 ring the jury buzzer, and you will be returned to the courtroom

21 as soon as we have gathered all of the parties and their

22 counsel.

23       Remember that the defendants are only on trial for

24 the particular crimes charged in the indictment.  Your job is

25 limited to deciding whether the Government has proved the

1    crimes charged.

2          Also, remember that whether anyone else should be

3    prosecuted and convicted for this crime is not a proper matter

4    for you to consider.  The possible guilt of others is no

5    defense to a criminal charge.  Your job is to decide if the

6    Government has proved the defendants guilty.  Do not let the

7    possible guilt of others influence your decision in any way.

8          You will have a copy of these instructions with you in

9    the jury room for your assistance during your deliberations.

10   These instructions should answer any question that you have

11   about your role as a juror.

12          However, if, during your deliberations, you should

13   desire to communicate with the Court, please reduce your

14   message or question to writing, signed by the foreperson, and

15   pass the note to the courtroom deputy, who will bring it to my

16   attention.

17          I will then respond as promptly as possible, either in

18   writing or by having my courtroom deputy bring you back to the

19   courtroom so that I can address you orally.

20          Remember at all times, you are not partisans.  You are

21   judges of the facts.  Your sole interest is to seek the truth

22   from the evidence in the case.

23          Let me finish up by repeating something that I said to

24   you earlier:  Nothing that I have said or done during this

25   trial was meant to influence your decision in any way.  You

1    decide for yourselves if the Government has proved the

2    defendant guilty beyond a reasonable doubt.

3         Remember that if you elected to take notes during the

4    trial, your notes should be used only as memory aids.  You

5    should not give your notes greater weight than your independent

6    recollection of the evidence.  You should rely upon your own

7    independent recollection of the evidence or lack of evidence,

8    and you should not be unduly influenced by the notes of other

9    jurors.  Notes are not entitled to any more weight than the

10   memory or impression of each juror.

11        Whether you took notes or not, each of you must form

12   and express your own opinion as to the facts of the case.

13        And that concludes the jury instructions.

14        If I could see counsel at side bar for a moment,

15   please.

16              **(Bench conference held at 3:23 p.m.)**

17                   —       —        —

18        **THE COURT:**  Other than what has already been

19   previously stated, any objections to the instruction as read,

20   from the Government?

21        **MR. COWEN:**  No, your Honor.

22        **THE COURT:**  From the Defense?

23        **MR. SABBOTA:**  None.

24        **MR. GLEESON:**  None, your Honor.

25        **MR. AMBERG:**  None.

 1          **THE COURT:**  And I think we all were in agreement

 2   that the way in which we selected the jury, that Jurors 13

 3   and 14 would be the alternates.  Juror 13 would be the first

 4   alternate.  Juror 14 would be the second alternate.

 5          We had to replace one juror.  So at this time, I'm

 6   going to excuse Juror 14.  I'm not going to discharge him.

 7   I'll excuse him.  I'll let him go home, but tell him not to

 8   speak with anybody.  Okay?

 9          **MR. SABBOTA:**  Thank you.

10          **(Side Bar Conference concluded at 3:24 p.m.)**

11                  —      —      —

12          **THE COURT:**  All right, ladies and gentlemen, I did

13   indicate in my opening instructions to you that this case would

14   be decided by 12 of you, and that we did have some alternates.

15          So at this time, the Court is going to thank and

16   excuse the juror in Seat Number 14.

17          And Mr. Olmstead, I'm going to excuse you.  I'm not

18   going to discharge you, which means if there is a reason that

19   we need to excuse another juror, we will call you back and

20   replace you.

21          So I will ask -- I will let you go home, but I will

22   ask that you please not discuss the case with anyone until

23   you hear from the Court, and we will advise you.

24          All right.  Thank you very much.

25          And at this time, I will excuse the rest of the jurors

1  to please return to the jury room to begin your deliberations.

2  **THE CLERK:**  All rise.  And bring your notes with you.

3  (Jury out at 3:25 p.m.)

4  **THE COURT:**  All right.  You all may be seated.

5  When Ms. Parkin comes back, I am going to swear her

6  in and Nina Mozeihem in as the bailiffs, the juror clerks.

7  I don't have a jury buzzer, so we advise the jury -- Nina will

8  stay down here -- if they have any questions, to put a sticky

9  tab outside the door to the jury room, and we check every few

10  minutes.  And I also give them -- I have forms that they can

11  use if they do have a question, that they'll submit to us.

12  I'd like you all to just stay in the courtroom or

13  courthouse for today, since we'll probably only go another

14  hour or so.

15  And if you could give Nina -- if everybody could give

16  her your cell phones, your cell phone numbers, in case she

17  needs to get in touch with you.

18  This would be more for Monday, if we're still going

19  on Monday.

20  And then does the Government have a set of the

21  exhibits ready to go?

22  **MR. COWEN:**  I had previously given them to Ms. Parkin,

23  along with defense counsel's exhibits.  We put them all into

24  one binder.

25  **THE COURT:**  Okay.  She has those.  All right.  So

1    then, here, you'll print out a clean set of jury instructions.

2                        (Brief pause.)

3            **THE COURT:**  Okay.  Erica, I'm going to swear you and

4    Nina in.  So if you would both raise your right hands for me,

5    please.

6            Do you solemnly swear or affirm that you will keep all

7    members sworn upon this panel in some private and convenient

8    place, and that you will permit no one to communicate with

9    them, nor communicate with them yourself, except to inquire if

10   they have agreed upon a verdict until discharged by this Court?

11   If so, say "I do."

12           **MS. PARKIN:**  I do.

13           **MS. MOZEIHEM:**  I do.

14           **THE COURT:**  Okay.  Thank you.

15           Counsel, anything further, then, we need to address

16   before we recess during the deliberations?

17           Well, let me ask, if the juror does have a -- if the

18   jury has a question, do you want the defendants brought up?

19           **MR. AMBERG:**  I think it just depends on the question,

20   right?

21           **MR. SABBOTA:**  Yeah.  Depending on what the question

22   is.

23           **THE COURT:**  Okay.  All right.  Then anything further

24   you all want to address before we go into recess?

25           Anything for the Government?

1          **MR. COWEN:**  No.  Thank you, your Honor.

2          **MR. SABBOTA:**  Nothing on behalf of Mr. Blake, your

3     Honor.

4          **MR. AMBERG:**  Or Mr. Turner.

5          **MR. GLEESON:**  Or Mr. Lewis, your Honor.

6          **THE COURT:**  Okay.  Thank you, all.

7          I said the other day, this is a difficult case.

8     There's a lot of emotion involved.  But I want to commend all

9     of you for the able manner in which you all tried this, the

10    professional manner in which you all tried this.

11         The obvious professionalism that the two sides have

12    between one another, the way that you cooperated with one

13    another, it made a big difference in the way in which the

14    case was tried.  And I appreciate it.  I'm sure the jurors did

15    as well.  So you're all to be commended.

16         Thank you.

17         All right.  We'll be in recess.

18         **THE CLERK:**  Before you leave, Counsel, if you would

19    come and write your contact information down.

20      **(Volume 7, Afternoon Session, Part B, concluded at 3:30 p.m.)**

21

22

23                         -     -     -

24

25

```
 1

 2                    CERTIFICATE OF REPORTER

 3

 4          As a Federal Official Court Reporter for the United

 5  States District Court, appointed pursuant to provisions

 6  of Title 28, United States Code, Section 753, I do hereby

 7  certify that the foregoing is a correct transcript of

 8  the proceedings in the above-entitled cause on the date

 9  hereinbefore set forth.

10

11

12                          Dated this 9th day of August, 2024.

13

14                          __s/ Christin E. Douglas_____
                            Christin E. Douglas
15                          RDR, CRR, FCRR, CSR
                            Federal Official Court Reporter.
16

17

18

19

20

21

22

23

24

25
```